1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN EYE MEDIA USA, INC., a California corporation,<br><br>            Plaintiff,<br><br>v.<br><br>TROLLEY BAGS UK LTD, a corporation of the United Kingdom; and BERGHOFF INTERNATIONAL, INC., a Florida corporation,<br><br>            Defendant.<br><br>TROLLEY BAGS UK LTD, a corporation of the United Kingdom; and BERGHOFF INTERNATIONAL, INC., a Florida corporation,<br><br>            Counterclaimants,<br><br>v.<br><br>GOLDEN EYE MEDIA USA, INC., a California corporation; FARZAN DEHMOUBED, an individual; and JENNIFER DUVALL, an individual,<br><br>            Counterdefendants. | Case No.:  3:18-cv-02109-BEN-LL<br><br>**ORDER:**<br><br>**(1)  GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(2)  GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 80, 83, 86, 89, 90, 93, 97]** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

Plaintiff/Counterdefendant GOLDEN EYE MEDIA USA, INC., a California corporation ("Plaintiff") brings this action for a declaratory judgment of non-infringement against Defendants/Counterclaimants TROLLEY BAGS UK LTD, a corporation of the United Kingdom ("Trolley Bags"); and BERGHOFF INTERNATIONAL, INC., a Florida corporation ("Berghoff") (collectively, "Defendants").  Complaint, ECF No. 1 ("Compl.").

Before the Court are (1) Plaintiff's Motion for Summary Judgment, ECF No. 83, and (2) Defendants' Motion for Summary Judgment, ECF No. 80.

The Motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure.  ECF Nos. 94, 114.  After considering the papers submitted, supporting documentation, and applicable law, the Court (1) **GRANTS** Plaintiff's Motion for Summary Judgment, ECF No. 83, and (2) **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment, ECF No. 80.

## II.   BACKGROUND

This matter arises out of a dispute over whether Plaintiff is infringing on the claim of U.S. Design Patent No. D779,828 (the "828 Patent") as well as the trademark held by Trolley Bags.  Compl. at 2:7-9; *see also* Answer, ECF No. 14 ("Ans.") at 9:24-27.

### A.   Statement of Facts

Plaintiff owns and operates Lotus Sustainables, a family-run company located in Carlsbad, California, which aims to eliminate plastic bags.  Plaintiff's Motion for Summary Judgment, ECF No. 83-1 ("Pltff. Mot.") at 10:2-4.[1]  As part of its business, it sells eco-friendly items, including but not limited to reusable shopping bags. *Id.* at 10:4-5.

Defendant Trolley Bags also sells reusable shopping bags that are used with ordinary shopping carts, also known as trolleys.  Compl. at 3:15-18; *see also* Ans. at 9:21-23.  In March 2015, Defendants began promoting and selling Trolley Bags' reusable bags in the

---

[1]   Unless otherwise indicated, all page number references are to the ECF generated page number contained in the header of each ECF-filed document.

United States and "gained a significant foothold" there, with their bags being sold in hundreds of Bed Bath & Beyond Stores. Ans. at 10:4-8. "Defendant Berghoff purports to be the exclusive distributor of Trolley Bags' products in the United States." Compl. at 19-20; *see also* Ans. at 9:27-28. Defendants market and sell Trolley Bags' reusable bags throughout the United States under the mark TROLLEY BAGS™. Ans. at 10:1-4. However, on March 14, 2016, the United States Patent and Trademark Office ("USPTO") rejected Trolley Bags' application for U.S. Trademark Reg. No. 5,126,274. Compl. at 4, ¶20:20-22; Defendants and Counterclaimants' First Amended Answer, Affirmative Defenses, and Counterclaims, ECF No. 32 ("First Amend. Ans.") at 3, ¶¶ 20-22.

Sometime in 2016, Plaintiff created its Lotus Bags "as Plaintiff sought to design a solution to plastic bags when the city of San Diego approved a ban on plastic shopping bags around the same timeframe." Plaintiff's Opposition to Defendants' Motion for Summary Judgment, ECF No. 90 ("Pltff. Oppo.") at 8:9-11. That same year, around April 2016, Trolley Bags also started using its claimed trademark of "Trolley Bags." *See* Plaintiff's Reply Brief in Support of Plaintiff's Motion for Summary Judgment, ECF No. 95 ("Pltff. Reply"), at 10:17; First Amend. Ans. at 10, ¶ 13:1-4.

On February 28, 2017, the USPTO approved Trolley Bags' 828 Patent as a design patent titled, "Foldable Bag," which included one claim for "the ornamental design for a foldable bag." Pltff. Mot. at 12:3-7; First Amend. Ans. at 12, ¶ 26:20-21. Meanwhile, sometime between late 2016 and May 2017, Plaintiff began marketing and selling reusable bags in the United States under the mark LOTUS TROLLEY BAG™. First Amend. Ans. at 11, ¶ 16:12-16; Pltff. Oppo. at 8:9-11; Pltff. Reply at 10:8-9.

On July 13, 2017, Defendant Berghoff served a cease and desist letter on Plaintiff, asserting that Plaintiff's sale of trolley bags infringed on Trolley Bags 828 Patent. Compl. at 3:21-28; *see also* Ans. at 20-23; Pltff. Mot. at 6-8; Defendants' Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 89 ("Defs. Oppo.") at 29:9-11. Defendants allege that (1) Plaintiff's reusable bags are substantially the same as Trolley Bags' reusable bags and infringe on Trolley Bags' 828 Patent under the "ordinary observer" test and (2)

the LOTUS TROLLEY BAG$^{TM}$ mark is likely to, and has caused, confusion among customers with respect to Defendants' TROLLEY BAGS$^{TM}$ mark.  Ans. at 10:14-20.

On October 24, 2017, the USPTO "rejected Trolley Bags' trademark application [No. 87531929] under Section 2(e)(1) of the Lanham Act on the basis that the term 'trolley bags' is merely descriptive and thus not entitled to trademark protection or registration." Compl. at 4:11-14; First Amend. Ans. at 3, ¶¶ 20-22.

In 2018, Plaintiff alleges that its "Lotus Bags began to receive local and national media attention, and their online presence on sites like Amazon began to increase" as "they became one of the most popular reusable bag sellers on Amazon." Pltff. Oppo. at 8:18-22.

From February 2018 through August 2019, Trolley Bags filed forty-three (43) complaints with Amazon alleging Plaintiff's infringement of the 828 Patent, which resulted in Amazon removing Plaintiff's product from its website in twenty-five (25) of those complaints.  Defendants' and Counterclaimants' Motion for Summary Judgment, ECF No. 80-1 ("Defs. Mot.") at 8:10-13; Compl. at 5:8-10; Pltff's Oppo. at 8:26-28; Defendants' Reply in Support of Their Motion for Summary Judgment, ECF No. 93 ("Defs. Reply") at 6:11-16.  Defendants argue that "[f]or the 18 times that Amazon did not remove Plaintiff's listings, six were for administrative reasons, such as inadvertent failure to link the '828 patent in the submission or because the complaint was duplicative." Defs. Reply at 6:15-18.  Defendants concedes that in twelve (12) instances, Amazon initially determined that Plaintiff's bags were not infringing the 828 Patent.  Defs. Reply at 6:20-23.

The parties agree that after Amazon would remove Plaintiff's bags due to Defendants' complaints, Plaintiff would then appeal to Amazon for reinstatement, and Amazon would re-list the bags.  Defs. Mot. at 8:13-14; Pltff. Mot. at 10:10-13; *see also* Compl. at 5, ¶ 28:20-22.  Whenever this occurred, as soon as Defendants realized the product had been reinstated, Trolley Bogs would again follow Amazon's stated process of resubmitting a notice of infringement, which would again, get reviewed and result in the removal of Plaintiff's products.  Defs. Mot. at 8:14-17; *see also* Compl. at 5, ¶ 28:22-24. "This cycle continued for around 18 months," and Defendants submitted more than a dozen

3:18-cv-02109-BEN-LL

complaints.  Defs. Mot. at 8:17; *see also* Compl. at 5, ¶ 28:22-24.

On December 18, 2018, Plaintiff's co-owners, Jennifer Duvall ("Ms. Duvall") and Farzan Dehmoubed ("Mr. Dehmoubed"), were granted U.S. Design Patent No. D835,912 for reusable shopping bags (the "912 Patent"), which Defendants allege is invalid for numerous reasons, including but not limited to lack of novelty, obviousness relative to prior art, which includes European Community Design No. 002682302-0001.  First Amend. Ans. at 12:1-9.  Defendants allege that the European Design was not cited during the examination of the 912 Patent.  *Id.* at 12:7-9.  Shortly after the 912 Patent was granted, Plaintiff submitted complaints with third-party retailers like Amazon.com against Defendants and/or Defendants' products for infringing the 912 Patent.  First Amend. Ans. at 12:9-12; *see also* Plaintiff's Answer to First Amend. Ans., ECF No. 33 at 4, ¶ 23.

Plaintiff alleges that Defendants have negligently misrepresented facts to Amazon, including but not limited to failing to represent that (1) Trolley Bags disclaimed the term 'trolley bags' as unprotectable under trademark law; (2) Plaintiff's product does not fall within the scope of the 828 Patent; and (3) Trolley Bags, not Berghoff, holds the alleged patent and trademark rights.  Compl. at 5:11-19.  Plaintiff also alleges that "[d]ue to Amazon's partially automated system, defendants' wrongful, false, and misleading complaints has caused temporary interruption and interference with plaintiff's listing and sale of products."  *Id.* at 6:1-7.  Plaintiff pleads that "defendants have prevented sales of at least $150,000 during the temporary periods of being delisted by Amazon's system."  *Id.*

**B.**   **Procedural History**

On September 11, 2018, Plaintiff filed a lawsuit against Defendant pleading claims for relief for (1) declaratory judgment of non-infringement of the 828 Patent against Trolley Bags; (2) declaratory judgment of non-infringement of the Trademark TROLLEY BAGS and U.S. Trademark Reg. No. 5,126,274 against Trolley Bags; (3) interference with prospective of contractual economic relations against all Defendants; (4) negligent misrepresentation against all Defendants; (5) unfair competition against all Defendants, 15 U.S.C. § 1125; (6) unfair competition pursuant to California's Unfair Competition Law,

CAL. BUS. & PROF. CODE § 17200 (the "UCL"); and (7) common law unfair competition. Compl., ECF No. 1.

On October 24, 2018, Defendants filed an answer to Plaintiff's complaint along with counter-claims for (1) infringement of the 828 Patent and (2) common law trademark infringement and unfair competition. Ans., ECF No. 14. On October 30, 2018, Plaintiff filed an answer to Defendants' counterclaims. ECF No. 17.

On February 19, 2019, Defendants filed a Motion for Leave to File a First Amended Answer and Counterclaims to Join New Parties, ECF No. 27, which Plaintiff did not oppose, ECF No. 28, and the Court granted on March 21, 2019, ECF No. 31.

On March 28, 2019, Defendants filed a First Amended Answer and Counterclaims, adding Ms. Duvall and Mr. Dehmoubed as counterdefendants as well as counterclaims for (1) declaratory judgment of invalidity of the 912 Patent; (2) interference with prospective contractual relations; (3) negligent misrepresentation; (4) unfair competition, 15 U.S.C. § 1125; and (5) unfair competition under the common law and California's UCL. *See generally* First Amend. Ans. On March 29, 2019, Plaintiff along with counterdefendants filed an Answer to Defendants' First Amended Counterclaim. ECF No. 33.

On September 18, 2020, both parties filed respective motions for summary judgment. ECF Nos. 80, 83. On October 26, 2020, both parties opposed each other's motion for summary judgment, ECF Nos. 89, 90. On November 2, 2020, both parties filed reply briefs in response to each other's opposition briefs. ECF Nos. 93, 95.

## III. <u>LEGAL STANDARD</u>

### A. <u>Summary Judgment</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

#### 1. *<u>Patent Invalidity</u>*

"Design patents are presumed valid and, thus, a moving party seeking to invalidate a design patent at summary judgment must submit such clear and convincing evidence of

facts underlying invalidity that no reasonable jury could find otherwise." *Spigen Korea Co. v. Ultraproof, Inc.*, 955 F.3d 1379, 1383 (Fed. Cir. 2020). "In order for a design patent to be valid, it must be: (1) new, (2) original, (3) ornamental, (4) nonobvious to a person of ordinary skill in the art, and (5) not primarily for the purpose of serving a functional or utilitarian purpose." *Barofsky v. Gen. Elec. Corp.*, 396 F.2d 340, 342 (9th Cir. 1968). Accordingly, if a Court concludes that a design patent is obvious to a person of ordinary skill in the art, non-ornamental, and/or functional, it may hold the patent invalid. *See id.*

"For design patents, the ultimate inquiry for obviousness is whether the claimed design would have been obvious [at the time of invention] to a designer of ordinary skill who designs articles of the type involved." *Spigen*, 955 F.3d at 1383-84 (internal quotations omitted). In order to find a design patent invalid as obvious, courts must undertake a two-step test, by finding that (1) a primary reference exists, "the design characteristics of which are basically the same as the claimed design," and (2) reasons, such as prior art references, to modify the primary reference's design to create a design that has the same overall visual appearance as the claimed design, also exist. *High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301, 1311-12 (Fed. Cir. 2013).

In order to examine whether a similar article of manufacture possesses the same design characteristics as the claimed design patent in dispute, courts undertake a factual inquiry by analyzing the *Graham* factors, set forth by the United States Supreme Court, by examining: (1) "the scope and content of the prior art"; (2) "differences between the prior art and the claims at issue"; (3) "the level of ordinary skill in the pertinent art"; and (4) relevant objective secondary considerations of nonobviousness, including "[a] commercial success, [b] long felt but unsolved needs, [and] [c] failure of others...." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18 (1966)) (internal quotation marks omitted); *see also Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358 (Fed. Cir. 2011) (affirming summary judgment on the basis of obviousness); *see also ZUP, LLC v. Nash Mfg., Inc.*, 896 F.3d 1365, 1374 (Fed. Cir. 2018), *cert. denied,* 139 S. Ct. 1211 (2019) (providing that "[o]bviousness is

ultimately a legal determination, and a strong showing of obviousness may stand 'even in the face of considerable evidence of secondary considerations.'").  The motivation behind the obviousness inquiry is that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp."  *KSR*, 550 U.S. at 421.  When pursuit of these known options "leads to the anticipated success, it is likely the product not of [patent protectable] innovation but of ordinary skill and common sense," such that "the fact that a combination was obvious to try might show that it was obvious under § 103."  *Id.*

For summary judgment, where the moving party challenges the validity of a patent, like Plaintiff does in this case, it must prove by clear and convincing evidence that a jury "could reasonably find . . . that the claimed invention was obvious."  *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1353 (Fed. Cir. 2013).  Because obviousness presents a question of law for the Court, "a district court can properly grant, as a matter of law, a motion for summary judgment on patent invalidity when the factual inquiries into obviousness present no genuine issue of material facts" by simply applying the law to the undisputed facts.  *Id.*

When ruling on such a motion for summary judgment, courts apply federal circuit law to issues unique to patent law.  *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1230 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 3091 (2011).  On the other hand, courts will apply regional circuit law to substantive issues that are not unique to patent law or procedural issues.  *See, e.g.*, *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 952–53 (Fed. Cir. 1990) ("When this court considers questions on appeal involving substantive matters not exclusively assigned to the Federal Circuit, our general practice is to apply to related procedural issues the appropriate regional circuit law."); *Regents of Univ. of Cal. v. Affymetrix, Inc.*, 326 F.R.D. 275, 278 (S.D. Cal. 2018) ("Where issues are not unique to patent law, the law of the circuit in which the dispute arises is applicable."); *Am. Fireglass v. Moderustic, Inc.*, 365 F. Supp. 3d 1062, 1083 (S.D. Cal. 2019), *reconsideration denied,* No. 15-CV-2866 JLS (BGS), 2019 WL 4918042 (S.D. Cal.

Oct. 4, 2019) ("In cases involving alleged false assertions of patent rights, the law of the regional circuit in which the district court sits governs claims of unfair competition."); *but see Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1574 (Fed. Cir. 1996) (providing that "[w]hile unfair competition is not unique to our jurisdiction, a question concerning whether alleged inequitable conduct in the prosecution of a patent application constitutes unfair competition clearly does impact our exclusive jurisdiction," warranting application of federal circuit law).

### 2. *Patent Infringement*

Design patent infringement is a question of fact, which the patent holder most prove by a preponderance of the evidence. *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1129 (Fed. Cir. 2019). "The 'ordinary observer' test is the sole test for determining whether a design patent has been infringed" and "originates from the Supreme Court's *Gorham* decision." *Id.* Under the test set forth by the United States Supreme Court in *Gorham Mfg. Co. v. White*, 81 U.S. 511, 528 (1871), "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other."

The infringement analysis for design patents places less importance on the actual design-patented product because courts need only compare the design patent's claims or drawings with the accused product (rather than comparing the patented product with the accused product). *See generally OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1399-1400 (Fed. Cir. 1997) (comparing the plaintiff's design figures to the defendant's product); *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1302-03 (Fed. Cir. 2010) (same); *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1294 (Fed. Cir. 2010) (noting that "design patents are typically claimed according to their drawings, and claim construction must be adapted to a pictorial setting").

When it is not patently obvious that the accused product or design differs from the

patented design, reference to the prior art can provide a useful tool to analyze infringement. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) (en banc). Where the claimed design closely resembles the designs of prior art, minor "differences between the accused design and the claimed design assume more importance to the eye of the hypothetical ordinary observer." *Columbia Sportswear*, 942 F.3d at 1129. Where the moving party seeks summary judgment of non-infringement, the party must "support its motion [for summary judgment] with evidence of non-infringement." *Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1308-09 (Fed. Cir. 2006) ("In the light of *Celotex,* we conclude that nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations.").

### 3.  *Trademark Infringement*

Courts apply the law of the regional circuit to claims for trademark infringement. *High Point*, 730 F.3d at 1317.  "'[S]ummary judgment is generally disfavored in the trademark arena' due to 'the intensely factual nature of trademark disputes.'" *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 932 (9th Cir. 2017); *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010). "However, 'this is not invariably so.'" *Marketquest Grp., Inv. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1255 (S.D. Cal. 2018).  "Claims or affirmative defenses in a trademark infringement action that lack a sufficient evidentiary basis under the applicable standard of proof, or for which there are only questions of law for the court to resolve, are appropriate for summary resolution." *Id.*

In order to prevail on a federal common law trademark infringement claim, the party alleging infringement must establish (1) a protected trademark and (2) the use of that trademark by a party accused of infringing on the trademark is likely to cause consumer confusion. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985). The first step in claiming infringement requires the plaintiff to show a "valid, protectable trademark." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046

(9th Cir. 1999). "The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness." *Calista Enters. v. Tenza Trading Ltd.*, 43 F. Supp. 3d 1099, 1115 (D. Or. 2014) (citing 15 U.S.C. § 1052). "Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "Which category a mark belongs in is a question of fact." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).

The plaintiff bears the ultimate burden of proving the claimed trademark is valid and protectable in a trademark infringement action. *Zobmondo*, 602 F.3d at 1113 (citing *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.,* 419 F.3d 925, 927-28 (9th Cir. 2005)). However, "federal registration provides 'prima facie evidence' of the mark's validity and entitles the plaintiff to a 'strong presumption' that the mark is . . . protectable." *Id.*; *see also Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.,* 694 F.2d 1150, 1156 (9th Cir. 1982) ("Abandonment of a trademark, being in the nature of forfeiture, must be strictly proved."); *Edwin K. Williams & Co. v. Edwin K. Williams & Co. E.,* 542 F.2d 1053, 1059 (9th. Cir. 1976) ("[A] person who asserts insufficient control [of a trademark] must meet a high burden of proof."). As to the second step, the Ninth Circuit has indicated that the "Lanham Act's likelihood of confusion standard is [also] predominantly factual in nature." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997).

## IV. **DISCUSSION**

Because this case implicates complex issues of design patent law—including international patent issues, trademark law, and unfair competition law, a brief summary of the protections provided by these areas of law facilitates the Court's decision on these cross-motions for summary judgment.

A patent is defined as "[t]he right to exclude others from making, using, marketing, selling, offering for sale, or importing an invention for a specified period (20 years from the date of filing), granted by the federal government to the inventor if the device or process

is novel, useful, and nonobvious."  Garner, Brian A., Black's Law Dictionary, PATENT (11th ed. 2019) (citing 35 U.S.C. §§ 101-103); *see also* 35 U.S.C. § 101 (governing "inventions patentable" and providing "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or . . . improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.").  The Patent Act of 1952, later revised by the Leahy-Smith America Invents Act ("AIA"), created the USPTO to grant and issue patents, set out the requirements and procedures for securing a patent, and provides a federal cause of action for patent infringement.  35 U.S.C. § 1, *et seq.*  The AIA allows the USPTO to grant protection for three  types of patents: (1) utility patents, which protect new, nonobvious, and useful products, processes, machines, devices, and/or other inventions and "comprise the vast majority (approximately 95%) of all issued patents," covered by 35 U.S.C. § 101; (2) "design patents, for nonfunctional features of an item, *e.g.,* its look or shape," so long as they are new, original, and ornamental designs for an article of manufacture,  covered by 35 U.S.C. § 171; and (3) "plant patents, *e.g.,* a sexually reproduced plants or grafted plants," addressed by 35 U.S.C. § 161.  *R.R. Donnelley & Sons, Co. v. United States*, 40 Fed. Cl. 277, 279, n. 6 (1998).

While a utility patent covers how a product works, *see* 35 U.S.C. § 101, a design patent covers how a product looks, *see* 35 U.S.C. § 171(a).  *See also L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993) ("A design patent is directed to the appearance of an article of manufacture.").  Thus, unlike a utility patent, "[a] design patent protects the non-functional aspects of an ornamental design as seen as a whole and as shown in the patent." *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1370-71 (Fed. Cir. 2006).  If a product feature "is essential to the use or purpose of the article . . . or affects the cost or quality," then, the feature is functional, and therefore, not protected by a design patent. *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850-51, n. 10 (1982).  On the other hand, if a product feature is not essential to the function or purpose of the item, then, the feature is not functional and may be protected. *Id.*  A design patent can cover a portion of an article of manufacture or the entire article, 35 U.S.C. §

-12-

101; however, when examining whether the patent is invalid as functional courts look to the entire design as opposed to whether one or two features in isolation serve functional purposes, *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed. Cir. 1993). Although utility and design patents differ in terms of what they protect, the provisions of the AIA relating to utility patents also "apply to patents for designs, except as otherwise provided." 35 U.S.C. § 171(b). Thus, "[d]esign patents are subject to the same conditions on patentability as utility patents, including the nonobviousness requirement of 35 U.S.C. § 103." *In re Borden*, 90 F.3d 1570, 1574 (Fed. Cir. 1996).

The AIA provides that the following defenses apply to a lawsuit alleging the validity or infringement of a patent: (1) "[n]oninfringement, absence of liability for infringement or unenforceability," (2) "[i]nvalidity of the patent or any claim in suit on any ground specified in part II as a condition for patentability," or (3) "[i]nvalidity of the patent or any claim in suit." 35 U.S.C. § 282(b). "Only in those cases in which invalidity for lack of invention is so clearly apparent on the face of the patent that no testimony can change such conclusion is the court authorized in granting a summary judgment." *Baker v. Webb*, 112 F. Supp. 394, 394 (D. Or. 1953).

Design patents protect the visual impression—or "ornamentality" of a product— by rewarding inventors who develop innovative products with a limited time right to exclude others from making the product. *See* 35 U.S.C. §§ 101, 154, 171. Trademark law also protects the visual impression of a product but with the consumer (rather than the inventor) in mind: It serves to protect a consumer's expectation that when they purchase a product with a particular configuration, it comes from a particular source. *See generally* 15 U.S.C. § 1127 (noting that trademarks are used "to indicate the source of the goods"). Thus, while design patent infringement requires the patent holder to show that the accused product is substantially similar to the design patent drawings, trademark infringement requires proving that (1) a particular design has come to identify its source of manufacture (e.g., through the requisite distinctiveness and/or secondary meaning) and (2) a likelihood of consumer confusion. Because the tests differ, a design may find protection under the

-13-

patent laws but not under the trademark laws. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 214 (2000). Thus, patent law protects an inventor's right to exclude others from selling that inventor's innovative product, *see* 35 U.S.C. §§ 101, 154, 171, while "[t]rademark and unfair competition law protect against the misleading use of another's mark." *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1132 (9th Cir. 2015).

As analyzed below, Plaintiff has filed a motion for summary judgment pertaining to Plaintiff's claims for relief seeking a declaratory judgment of invalidity and non-infringement as well as Defendants' counterclaims for patent and trademark infringement. Defendants, on the other hand, moved for summary judgment as to Plaintiff's tort claims for unfair competition. As discussed below, the Court grants Plaintiff's motion for summary judgment; grants in part and denies in part Defendants' motion for summary judgment; and grants in part and denies in part both parties' respective motions to seal.

## A.   <u>Plaintiff's Motion for Summary Judgment</u>

Plaintiff seeks summary judgment as to (1) Plaintiff's First Claim for Relief for declaratory judgment of non-infringement of the 828 Patent and Defendants' related First Counterclaim for infringement of the 828 Patent as well as (2) Plaintiff's Second Claim for Relief seeking a declaratory judgment of non-infringement of the Trademark and Defendants' related Second Counterclaim, for common law trademark infringement.

Plaintiff sets out three grounds for summary judgment: First, Plaintiff argues that the Court should grant summary judgment that Plaintiff's Lotus Bags do not infringe upon Defendants' 828 Patent because "numerous differences in the Lotus Bag design confirms that it is 'plainly dissimilar' from the '828 Patent." Pltff. Mot. at 11:1-18. Second, the 828 Patent is invalid "as functional, obvious over the prior art and indefinite." *Id.* at 11:1-22. Third, Defendants' trademark failed to acquire secondary meaning. *Id.* at 11:23-25. Defendant responds that the Court should deny Plaintiff's motion for summary judgment because "Plaintiff does not event attempt to demonstrate the absence of a genuine issue of material fact," but "[i]nstead, . . . merely argues why fiercely disputed factual issues should

be resolved in its favor." Defs. Oppo. at 7:8-17. Defendants also argue that Plaintiff fails to cite any evidence in support of its argument that the 828 Patent is invalid. *Id.* at 7:18-21. In reply, Plaintiff argues that it "analyzes exactly what the law dictates" for granting a motion for summary judgment—the "relevant distinctions and major differences that, when viewed as a whole, establish that the Accused Product and the design of the '828 Patent are plainly dissimilar." Pltff. Reply at 2:8-13 (citing *Richardson*, 597 F.3d at 1295. Next, Plaintiff argues that Defendants seek to minimalize undisputed dissimilarities without denying that they exist. *Id.* at 2:14-17. Plaintiff also contends that Defendants fail "to provide any direct evidence of secondary meaning required to establish that its 'TROLLEY BAG' mark is protectable under common law trademark," and their "proffered circumstantial evidence . . . simply falls far short of the standard required by the Ninth Circuit to establish secondary meaning." *Id.* at 2:22-25. Thus, Plaintiffs argue that "[b]ecause there is no genuine dispute of material fact with regard to [its] common law trademark claim, the Court should grant summary judgment in [its] favor." *Id.* at 2:26-27.

For the reasons outlined below, the Court grants Plaintiff's Motion for Summary Judgment concluding (1) the 828 Patent is invalid as (a) functional and (b) obvious; (2) even if the 828 Patent is valid, Plaintiff did not infringe the patent; and (3) Plaintiff did not infringe on Defendants' trademark. However, the Court denies Plaintiff's Motion for Summary Judgment with respect to indefiniteness because even though the Court determines that the 828 Patent is invalid it does not do so on the basis of indefiniteness.

## 1. *The 828 Patent is Invalid*

Once the USPTO grants a design patent for a "new, original and ornamental design," 35 U.S.C. § 171, it will "be presumed valid," 35 U.S.C. § 282(a), and an alleged infringer must overcome the statutory presumption of validity by clear and convincing evidence, *e-Numerate Sols., Inc. v. United States*, 149 Fed. Cl. 563, 573 (2020). With a design patent, "the commercial success is attributable to the design, and not to some other factor, such as a better recognized brand name or improved function." *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1443 (Fed. Cir. 1984). Further, "[a] patented design is defined by the

-15-

drawings in the patent, not just by one feature of the claimed design." *KeyStone*, 997 F.2d at 1450. The Federal Circuit "has recognized that design patents 'typically are claimed as shown in the drawings,' and that claim construction 'is adapted accordingly.'" *Egyptian Goddess*, 543 F.3d at 679. "For that reason," the Federal Circuit "has not required that the trial court attempt to provide a detailed verbal description of the claimed design, as is typically done in the case of utility patents." *Id.*

Plaintiff argues that the 828 Patent is invalid because the design of 828 Patent (1) is dictated by function, (2) obvious, and (3) indefinite. Pltff. Mot. at 24:2-29:21. Defendants respond that Plaintiff's reliance only on its invalidity contentions renders its motion for summary judgment of invalidity facially insufficient because those contentions are not evidence. Def. Oppo. at 14:1-11. Further, because patents are presumed valid, they argue they are under no obligation to present affirmative evidence to rebut Plaintiff's contention the patents-in-suit are invalid unless Plaintiff introduces facts that could lead a reasonable factfinder to conclude that Plaintiff can prove invalidity. *Id.* at 14:12-19. In reply, Plaintiff argues it was not required to list every combination of prior art in support of its obviousness contention, and its Motion shows there are no genuine disputes of material fact with regard to the obviousness of the 828 Patent, which invalidates the patent. Pltff. Reply at 8:1-20.

After considering the parties briefs, the record in this case, and the applicable law, the Court finds the 828 Patent's design is dictated by function and obvious.

### a. *The design of the 828 Patent is dictated by function*

Plaintiff argues that "[t]he entire patented design of the '828 Patent is dictated by function." Pltff. Mot. at 24:24-25. Defendant responds that (1) even if a design component has functional uses, the inquiry is whether a design is primarily functional or primarily ornamental; (2) functionality is a question of fact; and (3) Plaintiff has failed to introduce facts that would mandate a reasonable fact-finder to conclude the 828 Patent is invalid as purely functional. Def. Oppo. at 15:3-13. Defendants also argue that just because the size of the trolley carts was considered when determining the size of the trolley bags, that does not mean that the size of the bags was defined by the size of the carts, especially considering

-16-

that the bags do not fit in all carts. *Id.* at 1-7. As such, the bags are not primarily functional. *Id.* In its reply brief, Plaintiff argues its analysis addressed not only the size of but also the shape of the bags with regard to alternative design. Pltff. Reply at 6:5-9.

"[I]f the design claimed in a design patent is dictated solely by the function of the article of manufacture, the patent is invalid because the design is not ornamental." *Best Lock Corp. v. Ilco Unican Corp.*, 94 F.3d 1563, 1566 (Fed. Cir. 1996); *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148 (1989) ("To qualify for protection, a design must present an aesthetically pleasing appearance that is not dictated by function alone, and must satisfy the other criteria of patentability."); *see also Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) ("[A] design patent cannot claim a purely functional design—a design patent is invalid if its overall appearance is 'dictated by' its function"). Thus, invalidity due to functionality creates an affirmative defense to a claim of design patent infringement, which must be proven by clear and convincing evidence. *L.A. Gear*, 988 F.2d at 1123. Even though a design patent's design may not be "dictated by solely by function," the design may contain both functional and ornamental elements, but only if the scope of the design patent claim is "limited to the ornamental aspects of the design." *Sport Dimension*, 820 F.3d at 1320. As a result, in case where a claimed design patent has both functional and non-functional elements, the court must construe the claim by identifying the non-functional (e.g., ornamental) aspects of the design as shown in the patent. *Id.*; *see also Application of Carletti*, 328 F.2d 1020, 1022 (C.C.P.A. 1964) ("It is clear that appellants never invented an 'ornamental design'" as "[t]he appearance of appellants' gasket seems as much dictated by functional considerations as is the appearance of a piece of rope, which, too, has ribs and grooves nicely arranged."). Consequently, in this case, even if Defendant's product has a functional aspect, it will not necessarily invalidate the validity of the 828 Patent.

In determining whether a design claim is dictated by function, courts consider whether (1) "the protected design represents the best design," (2) "alternative designs would adversely affect the utility of the specific article," (3) "there are any concomitant

utility patents," (4) "the advertising touts particular features of the design as having specific utility," and (5) "there are any elements in the design or an overall appearance clearly not dictated by function." *Sport Dimension*, 820 F.3d at 1322. Here, the Court concludes that (1) the 828 Patent design represents the best design; (2) alternative designs would adversely affect the utility of the specific article; (3) there are concomitant utility patents; (4) Defendants' advertisements tout particular features of the design as having specific utility; and (5) the color and logo of the bag appear to be the only elements in the design or overall appearance clearly not dictated by function. These factors weigh in favor of a conclusion that Defendants' trolley bags are dictated by function. Specifically, the size, handles, poles, and mesh all appear to serve primarily functional rather than ornamental purposes.

### i. Best Design and Alternative Designs

"When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose." *PHG Techs., LLC v. St. John Companies, Inc.*, 469 F.3d 1361, 1367 (Fed. Cir. 2006); *see also L.A. Gear*, 988 F.2d at 1123 (noting that even though certain elements of a design patent covering an athletic sneaker had a utilitarian purpose, the district court correctly found the claimed design to be valid because a number of other athletic shoe designs achieved the same function as the claimed design in different ways). "[I]f other designs could produce the same or similar functional capabilities, the design of the article in question is likely ornamental, not functional." *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1378 (Fed. Cir. 2002). For instance, in *Gorham*, the Supreme Court determined that scroll work on the handle portion of flatware was purely ornamental, 81 U.S. at 528, where other flatware accomplished the same function. If a design contains both functional and ornamental features, the patent owner must show the perceived similarity between a patented and accused product is based on only the ornamental features of a design. *OddzOn*, 122 F.3d at 1405. Perceived similarities based on functional features, however, is irrelevant. *See id.*

Plaintiff argues that the first and second factors, pertaining to the best and alternative designs, favor a finding that Defendants' 828 Patent design is dictated by function because

-18-

"the patented design clearly represents the best design of any proposed alternatives, and those alternative designs adversely affect the functionality of the patented design."  Pltff. Mot. at 26:3-5.  Defendants responds that there are alternative designs that can accomplish the same functional purpose as the 828 Patent's bag proportions, such as by choosing to use two bags instead of one, which establishes "the claimed design is not 'dictated' by function."  Def. Oppo. at 16:18-17:3 (citing *Sport Dimension*, 820 F.3d at 1320).  Plaintiff responds that "changing the bag design by making it larger is not a true alternative because it would adversely affect the utility of the specified article."  Pltff. Reply at 6:12-16.

In *Best Lock Corp. v. Ilco Unican Corp.*, the Federal Circuit affirmed the district court's determination that a design patent for the blade of a key was invalid as functional.  94 F.3d at 1567.  In that case, the parties agreed that "the key blade must be designed as shown in order to perform its intended function—to fit into its correspondence lock's keyway."  *Id.* at 1566.  The parties noted that "[a]n attempt to create a key blade with a different design would necessarily fail because no alternative blank key blade would fit into the corresponding key lock."  *Id.*  Due to the fact that no alternative design would allow the underlying article to perform its intended function (e.g., fit into the key lock), the Federal Circuit determined the district court did not clearly err by finding that the claimed key blade design was dictated by function, and therefore, invalid. *Id.* at 1567.

Plaintiff argues that like the key blade in *Best Lock*, the 828 Patent was designed specifically to perform its intended function of fitting into a shopping cart.  Pltff. Reply at 6:16-24.  Further, as Plaintiff notes, "TB UK's alleged alternative designs consist of the same basic shape and are thus not true alternatives" by merely proposing varying sizes.  *Id.* at 7:4-7.  The Court agrees that like the key blade at issue in *Best Lock*, an alternative design—such as differently shaped bags in triangles or circles, would directly impact the functionality of the bags by requiring more or less bags, preventing ease of use of the horizontal poles, or making the bags more difficult to carry.  Thus, Trolley Bags' products seems equally as functional as the key blade found invalid for functionality in *Best Lock*.

Both parties relied on the case of *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.* in

-19-

their briefing as support for why the alternative design factor weighed in favor or against this Court finding the 828 Patent invalid for functionality.  796 F.3d 1312, 1328 (Fed. Cir. 2015).   In *Ethicon*, the Federal Circuit emphasized that just because the article of manufacture claimed within a design patent has a functional purpose does not mean the entire design is *per se* invalid as functional.  796 F.3d at 1314-15.  The *Ethicon* plaintiffs sued the defendants for alleged infringement of several utility and design patents related to "surgical instruments that use ultrasonic energy created by blades vibrating at high frequencies to cut tissue and blood vessels."  *Id.*  On appeal, the Federal Circuit, *inter alia*, construed the patent and reversed the district court's grant of invalidity based on functionality.  *Id.* at 1315.  It held that "[t]he district court evaluated the claimed designs using too high a level of abstraction, focusing on the unclaimed utilitarian aspects of the underlying article instead of the claimed ornamental designs of that underlying article."  *Id.*

In evaluating whether the claimed design was invalid as functional, the *Ethicon* court examined the district court's analysis of alternative designs.  *Id.* at 1331.  The patent holder had "presented evidence of alternative ornamental designs that could provide the same or similar functionality of the underlying ultrasonic shears," attempting to show the design was not invalid as functional.  *Id.*  However, the Federal Circuit concluded that first, the district court's determination of invalidity due to functionality on the basis "that the [alternative] designs did not work 'equally well' apparently describe[d] the *preferences* of surgeons for certain basic design concepts, not differences in *functionality* of the differently designed ultrasonic shears."  *Id.*  Thus, the decision warranted reversal because preferences were an inappropriate consideration under the functionality analysis.  *Id.* "Second, to be considered an alternative, the alternative design must simply provide 'the same or similar functional capabilities.'"  *Id.*  This is because "to be patentable, there cannot only be one 'possible [ornamental] form of the article that could perform its function."  *Id.*

In *Ethicon*, there was "no dispute that the underlying ultrasonic shears could still function in the same manner with [an alternative design, i.e.,] a differently-shaped open trigger, activation button, and torque knob, and different relative locations of the trigger,

-20-

button, and torque knob." *Ethicon*, 796 F.3d at 1331.  Thus, those aspects of the patent were functional; however, the Federal Circuit held that the claim could be construed to eliminate the functional aspects of the design while still permitting coverage of the design's ornamental aspects.  *Id.* at 1334.  It reasoned that the functionality of certain elements did not preclude those elements from having protectable ornamentation because the ornamental designs were, albeit functional, were not "essential to the use of the article itself." *Id.* (noting that "the district court ignored the facts that the trigger has a particular curved design, the torque knob has a particular flat-front shape, and the activation button has a particular rounded appearance").  In validating the patent, the court reiterated that the defendant had "not shown by clear and convincing evidence that no [alternative] designs . . . allow the underlying ultrasonic shears to perform their intended function." *Id.*

Here, the only evidence of alternative designs Defendants have presented is that their bags could be smaller or bigger such that they would or would not fill the entire cart.  Def. Opp. at 16-18:17-11.  However, they would still be in the same shape [e.g., rectangular] and structure.  *Id.*  The Court finds that unlike *Ethicon*, where even though certain surgeons preferred one design, alternative designs were available to accomplish the same purpose, 796 F.3d at 1331, here, alternative designs might impact the utility and cost of the trolley bags.  For instance, if the bags were smaller in size, they would not be able to carry as many products, which would directly impact their utility.  However, smaller bags might also be lighter, easier to carry, and cheaper in price.  *See, e.g.*, *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850-51, n.10 (1982) (providing that if a product feature "is essential to the use or purpose of the article . . . or affects the cost or quality of the article," then, the feature is functional, and therefore, not protected by a design patent).  Alternatively, if Defendants increased the size of the bags, less bags would fit in one cart, each individual bag would be heavier, and the bags might cost more.  *Id.*  It appears that Defendants' one proposed alternative design (e.g., varying the size) directly impacts the utility of the 828 Patent, favoring a finding of functionality.  *See id.*

Both parties discuss the cases of *OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d

1396 (Fed. Cir. 1997) and *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186 (Fed. Cir. 1988). Plaintiff pointed to these cases to support its argument that "the basic configuration or structure of a design is unprotected even if alternative designs could be created using the same concept or elements." Pltff. Mot. at 25:21-26:2. Defendant argues that both cases are pre-*Egyptian Goddess* case, and there, the courts "considered whether a court should use claim construction to eliminate functional elements from the scope of a design patent." Def. Oppo. at 17 12-19. The court finds only *OddzOn* helpful and relevant in analyzing the patent dispute in this case.

In *OddzOn*, the Federal Circuit affirmed the decision of the Northern District of California in granting the defendant's motion for summary judgment on the plaintiff's design patent claim, trade dress claim, and state-law unfair competition claims. 122 F.3d at 1409. *OddzOn* involved a plaintiff toy manufacturer who brought suit against competitors, alleging design patent infringement, trade dress infringement, and state-law unfair competition. *Id.* at 1400. The plaintiff sold a popular Vortex tossing ball, which consisted of "a foam football-shaped ball with a tail and fin structure" and had been subject to the plaintiff's design patent, the 001 Patent. *Id.* at 1399. The defendant, also a toy and sporting goods company, sold a competing line of "Ultra Pass" balls, which the plaintiff alleged infringed on its patent. *Id.* at 1399-1400. Both products are shown below:



| Plaintiff's Vortex Ball: | Defendant's Ultra Pass Ball: |
|---|---|

*Id.* The plaintiff claimed that the Ultra Pass balls were likely to be confused with the Vortex packaging. *Id.* at 1400. In response, the defendant claimed that the plaintiff's patent was invalid. *Id.* On cross-motions for summary judgment, like those at issue in this case, "the district court held that the patent was not shown to be invalid and was not infringed." *Id.*

The court held that "[b]ecause the presence of a tailshaft and fins has been shown to

-22-

be necessary to have a ball with similar aerodynamic stability to OddzOn's commercial embodiment, such general features are functional and thus not protectable as such." *Id.* In construing the claim on the patent in suit, the district court had "carefully noted the ornamental features that produced the overall 'rocket-like' appearance of the design." *Id.* at 1405 (quoting *Durling v. Spectrum Furniture Co.,* 101 F.3d 100, 104 (Fed. Cir. 1996) ("A proper interpretation of [the patentee's] claimed design focuses on the visual impression it creates."). The plaintiff argued "that the various features identified by survey respondents, including the ends of the fins, the football shape, the rocket-like tail, and a ball in front with triangular fins in back, are ornamental 'because they are not required for a tossing ball.'" *Id.* at 1406. The court, however, noted that that while the plaintiff correctly pointed that there were many potential alternative designs for "tossing balls," it was "undisputed that the ball in question is specifically designed to be thrown like a football, yet travel farther than a traditional foam football." *Id.* "It is the football shape combined with fins on a tail that give the design these functional qualities." *Id.* "The tail and fins on OddzOn's design add stability in the same manner as do the tail and fins found on darts or rockets," and as such, "are no less functional simply because 'tossing balls' can be designed without them." *Id.* However, "[those] functional characteristics do not invalidate the design patent, but merely limit the scope of the protected subject matter." *Id.* That did not mean that the design as a whole was unprotectable, so the Court agreed with the lower court's claim construction, which limited "the scope of the patent to its overall ornamental visual impression, rather than to the broader general design concept of a rocket-like tossing ball." *Id.* at 1405. "Because no reasonable jury could conclude other than that the patented design is ornamental, novel, and nonobvious," the court affirmed "the district court's judgment that the patent was not proved invalid." *Id.*

In the present case, unlike the invalid claims for the Vortex Ball in *OddzOn*, which were necessary to have a ball with aerodynamic stability, 122 F.3d at 1404, the claimed features of the 828 Patent, which include horizontal poles, handles, and mesh, are not necessary to carry groceries. On the contrary, any bag without those features could still

carry groceries.  However, Defendants' trolley bags do not have an "overall appearance" or "visual impression" like the Vortex Ball, and if the poles, handles, and mesh are removed, the visual impression would be more or less the same (as the product would still be a bag); however, the purpose of the bags (e.g., fitting in a shopping while standing upright) would not be accomplished without the horizontal poles as they would likely collapse or fold onto themselves into the cart.  Thus, while the *OddzOn* court found the design patent for the Vortex ball valid, despite some functional aspects, this Court finds this case distinguishable given the lack of an overall visual impression in conjunction with the functionality of the claimed features.

Although the Court defers to the drawings in construing the 828 Patent,[2] the Court describes the claim at issue as a foldable, fabric bag with a mesh bottom, two handles at the top, and no pockets.  *Compare* Compl. at 14 (describing the 828 Patent claim, filed on November 18, 2014, as a claim for an "ornamental design for a foldable bag") *with* First Amend. Ans. at 21 (describing Plaintiff's 912 Patent, filed on July 3, 2017, as for "[a]n ornamental design for a trolley bag, as shown and described").  Plaintiff argues that the "size of the bags was chosen based on 'two considerations: one was the shopping trolley, and the other was also practical usage, as in too large or too small." Pltff. Mot. at 24:26-25:1.  Plaintiff points out that Trolley Bags' expert "proposed alternative designs such as larger bags or bags with more shallow dimensions," but "such designs are certainly not the best design" and would "adversely affect the functionality of the patented design." *Id.* at 25:21-24.  As discussed, the only alternative design mentioned by Plaintiff in briefing is having more or less bags, varying in size.  Less bags would make the bags heavier and more difficult to carry.  More bags would make each bag lighter but would also limit the size and quantity of items that each bag can hold.  As a result, the Court finds that the size of both bags (1) is roughly equivalent and (2) does not weigh strongly in favor of it being the best design, unless Plaintiff's reference to size is limited to the width of the bags (e.g.,

---

[2]    Both parties in this case agree that the figures should govern the court's construction of the 828 Patent.  *See* Pltff. Mot. at 8:10-11; Def. Oppo. at 17:23-24.

so they fit in a shopping cart) rather than the depth.  That being said, the factor of alternative designs appears to directly impact the functionality of the bag system, which weighs in favor of a finding of invalidity.

### ii.   Concomitant Utility Patents

The third factor analyzes whether the design patent holder possesses concomitant utility patents.  "Concomitant" is defined as "[a]ccompanying; incidental."  Garner, Brian A., *Black's Law Dictionary*, (11th ed. 2019).  Thus, courts, when examining the third factor, examine whether the party claiming infringement has a "co-pending" or incidental utility patent.  *See, e.g.*, *Skechers U.S.A., Inc. v. Eliya, Inc.*, No. CV1602820SJOAGRX, 2017 WL 3449594, at *5 (C.D. Cal. Mar. 14, 2017) (finding factor three weighed against a finding of functionality because the "the defendant did "not establish that the other utility patent references are 'co-pending,' as they appear to have been issued before the Asserted Patents were issued"); *see also Ethicon*, 796 F.3d at 1332 (in evaluating functionality for its invalidity analysis, a district court found that defendant "applied for utility patents that included figures similar to those of the claimed designs").  "An expired utility patent has vital significance . . . for a utility patent is strong evidence that the features therein claimed are functional."  *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 23 (2001).

Plaintiff argues that the presence of concomitant utility patents, including an Irish Patent Grant to Paul Doyle "confirms the functional nature of the patented design."  Pltff. Mot. at 26:6-8.  Defendants respond that Plaintiff's argument ignores that the USPTO "considered the Doyle reference during prosecution of the '828 Patent and necessarily concluded that it did not establish the purely functional nature of the '828 Patent when it issued it."  Def. Oppo. at 18:7-19.  Defendants further contend that even if the Doyle Patent is a concomitant utility patent, *Sport Dimension* 820 F.3d 1316 shows that its mere existence does not render the 828 Patent invalid.  *Id.* at 18:20-27.  Plaintiff responds by pointing out that Defendants "do not even attempt to argue that various design elements are not specifically claimed in Doyle," but instead, argue the Doyle Patent "should not be

considered simply because it was disclosed by the inventor during prosecution of the 828 Patent." Pltff. Reply at 7:8-13. Plaintiff also argues the Doyle Patent describes every material element of the 828 Patent as functional, meaning Defendants cannot overcome the evidence of functionality of the material elements claimed in their patent. *Id.* at 7:13-17.

The plaintiff in *Sport Dimension, Inc. v. Coleman Co.*, like Plaintiff here, filed a declaratory judgment action in the Central District of California seeking a judgment that it did not infringe on the defendant's patent, and that the defendant's patent was invalid. 820 F.3d at 1318-19. On appeal, the Federal Circuit held, *inter alia*, that the district court erred by failing to consider how functional elements contributed to the design's overall ornamentation. *Id.* The court noted that the district court had found that the defendant had "filed a co-pending utility patent disclosing the design patent's armbands and torso tapering and touting the utility of those features." *Id.* at 1322. The Federal Circuit "did not disagree with those findings." *Id.* However, it disagreed with the district court's conclusion that the armbands and tapered side torso served a functional purpose. *Id.* The court emphasized that while in *OddzOn*, *Richardson*, and *Ethicon*, the court "construed design patent claims so as to assist a finder of fact in distinguishing between functional and ornamental features," it did not "eliminate a structural element from the claimed ornamental design even though that element served a functional purpose." *Id.* at 1321. The district court in *Sport Dimension*, however, had eliminated whole aspects of the claimed design when construing the claim at issue by excluding the left and right armband and the torso side tapering. *Id.* Thus, the case was remanded not because its ultimate conclusion that the design functional was incorrect, but rather, because the district court had improperly construed the claim. *Id.* As a result, Defendants' reliance on this case for the proposition that a concomitant utility patent does not render the 828 Patent invalid as functional is inapposite. *Sport Dimension* does not diminish the important of concomitant utility patents, especially because the Federal Circuit did not disagree with the district court's finding regarding the concomitant utility patent. *Id.* at 1322.

In this case, Irish Patent Application No. S2009/0718 filed on September 18, 2009

by Paul Doyle is for a "re-usable bag system" (the "Doyle Patent").  *See* Ex. G to Pltff. Mot., ECF No. 83-9 at 2.  The Doyle Patent, as shown, below, has drawings that appear to be "practically the same" as the 828 Patent:

| Doyle Patent: | 828 Patent: |
|---|---|
|  | |

*Id.* at 17, 23.  The Doyle Patent is expired but shows its "current proprietor" as "Trolley Bags Ltd."  *Id.* at 25.  The record in this case confirms that Trolley Bags' own website states that "Trolley Bags UK Ltd is the global distributor of the patented Trolley Bag-Shopping Bag System and associated products," and that "Trolley Bags™ Shopping Bags were invented in Ireland by Paul Doyle in 2010 following many months of design and refinement."  Declaration of Cody R. LeJeune in Support of Pltff. Mot. ("LeJeune Decl."), ECF No. 83-2 at 2:20-21; *see also* Ex. H to Pltff. Mot., ECF No. 83-10 at 5.  In sum, the Doyle Patent is Trolley Bags' own patent in Ireland.  As a result, even though the Doyle Patent is expired, if it was a utility patent, it would qualify as a co-pending utility patent by the same owner, which would provide strong evidence of functionality for the 828 Patent.  *TrafFix*, 532 U.S. at 23.  However, the Doyle Patent does not technically qualify as a concomitant utility patent given that Ireland does not have a "utility patent" category.  *See, e.g.*, Audrey Horton, *Recent Developments in European Intellectual Property Harmonization*, Intell. Prop. L. Newsl., WINTER 1998, at 17, 19 (noting "[t]he concept of a utility model is not known at all in the UK, Sweden or Luxembourg," but that "12 member states provide very varied forms of protection of the 'utility model' type, such as the 'short

-27-

term patent' (Ireland)").  While the Doyle Patent may qualify as a utility patent, the Court does not venture to make any such determination given the Doyle Patent is not before the Court (except to the extent that the 828 Patent is Trolley Bags' own application for a patent for the same product protected by the Doyle Patent but within the United States).

In discussing obviousness, the parties refer to U.S. Patent Number 5,046,860 to Timothy P. Brennan (the "Brennan Patent"), filed on August 2, 1990.  Pltff. Mot. at 27:17-28.  The Brennan Patent is, in fact, a utility patent because it is not preceded by a "D," and according to the USPTO website, only "[n]on-utility patents have prefixes."  *See* http://patft.uspto.gov/netahtml/PTO/help/helpflds.  htm#  Current_US_Class/SubClass (noting that "[f]or example, design patent #123,456 is actually D123,456.").  Although neither party attached the Brennan Patent documents, such documents are publicly accessible,[3] and the Court takes judicial notice of the Brennan Patent because it finds it relevant to the inquiry into concomitant utility patents.  *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1001 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019) (noting that "[c]ourts may take judicial notice of some public records, including the records and reports of administrative bodies"); *see also GeoVector Corp. v. Samsung Elecs. Co.*, 234 F.Supp.3d 1009, 1016 n.2 (N.D. Cal. 2017) (taking judicial notice of Korean patent application); Fed. R. Evid. 201.  Here, the Brennan Patent describes a "reusable shopping bag assemblies . . . so that a shopper does not have to use disposable plastic or paper shopping bags."  *Id.*  The Brennan Patent is a utility patent; however, it is not a co-pending utility patent filed by the same owner of the design patent at issue in this case (e.g., Trolley Bags).

---

[3]     The Brennan Patent may be accessed through the USPTO website at the following link:  https://pdfpiw.uspto.gov/.piw?PageNum=0&docid=05046860&IDKey=0790AE6A DF23&HomeUrl=http%3A%2F%2Fpatft.uspto.gov%2Fnetacgi%2Fnph-Parser%3FSect1 %25%203DPTO1%2526Sect2%3DHIT%20OFF%2526d%3DPALL%2526p%3D1%252 6u%3D%25%2025252Fnetahtml%25252FPTO%25252Fsrchnum.%20htm%2526r%3D1 %2526f%3DG%2526l%3D50%2526s1%3D5%2C046%2C860.PN.%2526OS%3DPN%2 F5%2C046%2C860%2526RS%3DPN%2F5%2C046%2C860





This Court has not found a case indicating that a concomitant utility patent must be filed by the same owner for the same product as opposed to a co-pending utility patent for a similar product. *But see* Perry J. Saidman, *Functionality and Design Patent Validity and Infringement*, 91 J. Pat. & Trademark Off. Soc'y 313, 324 (2009) (noting that "concomitant utility patents" involve "obtaining a design patent and a utility patent on the same product to respectively protect ornamental and functional features"). Because it is unclear whether a co-pending utility patent must be filed by the same owner of the design patent at issue, and the Brennan Patent, unlike the Doyle Patent, is not owned by Defendants, the Court finds this factor neither weighs in favor of nor against Defendants.

### iii.   Advertisement of Functional Elements

Plaintiff argues that Defendants' "advertisements promote the utilitarian and functional benefits of the patented design, thus confirming that the '828 Patent is invalid as functional." Pltff. Mot. at 27:6-8. Defendants respond that (1) "even if advertisements promoted the utility of certain elements of the claimed design, that does not render the claimed design invalid as 'purely functional,'" and (2) Plaintiff's arguments as to advertisements are limited to attorney arguments rather than actual evidence. Def. Oppo. at 19:1-12. Plaintiff counters by noting that Defendants' Opposition does not dispute the advertisements tout specific functional features of the bags, and thus, those advertisements confirm the design of the 828 Patent is dictated by function. Pltff. Reply at 7:18-26.

-29-

In this case, "the advertising touts particular features of the design as having specific utility." *Sport Dimension*, 820 F.3d at 1322.  The advertisements for Defendants' bags describe them as "[a] complete system of 4 different sized reusable bags attached together with Velcro that are used to pack the grocery shopping right at checkout as your goods are scanned."  Ex. H to Pltff. Mot., ECF No. 83-10 at 2.  They elaborate that "[t]he 4 colour coded bags simply fan out and spread across the top of any supermarket trolley, allowing you to pack the way you want."  *Id.*  The advertisements also instruct users to "[u]se the big bag at one end for the bulkier, lighter items and smaller, heavier items in the small bag at the front."  *Id.*  While these advertisements mention design or ornamental aspects of the bags, such as the color, they undeniably tout the utility of the bags.  Plaintiff's current website also touts that "[e]ach durable bag holds up to 15kg and are designed to make your shopping trip easier and more convenient."  https://trolleybags.com/trolley-bags-product-ranges/trolley-bags-original/.  It boasts that "[t]he simple system can halve the time at the checkout as packing is quicker and easier without the hassle of holding bags open."  *Id.*  Plaintiff's expert, Tim Fletcher, notes that Defendants' website shows that the differently sized bags are advertised as fitting into differently sized carts from different stores:

| STYLE | FITS CART | CART DIMENSIONS (CENTIMETERS) | STORE EXAMPLES |
|---|---|---|---|
| Trolley Bags™ Express Shopping Bags | Shallow | 87.5x(46-57)x(38-54.5) | Metro, Lowes, etc. |
| Trolley Bags™ Original Shopping Bags | Standard | 80x(51×62)x(29-43) | Kroger, Publix, Winn-Dixie, etc. |
| Trolley Bags™ Big Cart Shopping Bags | Club | 91x(61-73)x(28-35.5) | Sam's Club, BJ's, Costco, etc. |

Ex. D to Pltff. Mot., ECF No. 83-6 at 27; *see also* https://packingsorted.com/what-are-they/.  Mr. Fletcher also measured the dimensions of each bag, compared them to the dimensions of shopping carts, and found them to be as follows:

/ / /

| | 828 Design | | | Dimensions of Cart | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Width** | **Depth** | **Height** | **Width** | **Depth** | **Height** |
| **Bag 1 – Back of Cart (Widest & Tallest)** | **20 $\frac{1}{8}$"** | **9 $\frac{1}{2}$"** | **20 $\frac{1}{4}$"** | **21"** | **35 $\frac{3}{4}$"** | **19 $\frac{1}{2}$"** |
| **Bag 2** | 19 $\frac{3}{8}$" | 8 $\frac{3}{8}$" | 19 $\frac{3}{4}$" | N/a | N/a | N/a |
| **Bag 3** | 16 $\frac{1}{8}$" | 6 $\frac{5}{8}$" | 17 $\frac{5}{8}$" | N/a | N/a | N/a |
| **Bag 4 – Front of Cart (Narrowest & Shortest)** | **13 $\frac{7}{8}$"** | **6 $\frac{5}{8}$"** | **16"** | **14 $\frac{3}{4}$"** | | **15 $\frac{7}{8}$"** |
| **Total:** | N/a | **31 $\frac{1}{8}$"** | N/a | N/a | N/a | N/a |

Ex. D to Pltff. Mot., ECF No. 83-6 at 22-29.

Based on this information, Mr. Fletcher concluded "the Depths of the Defendants' bags are functional, dictated by function, as they were designed to fit the capacity of a standard sized shopping cart." Ex. D to Pltff. Mot., ECF No. 83-6 at 30. However, the Court notes that an examination of the actual 828 Patent itself reveals that the size and dimensions of the bags are not mentioned in the patent, and as such, are not protectable features. *See* Ex. A to Compl. Rather, the 828 Patent limits its protection to "[t]he ornamental design for a foldable bag," not a bag system. *See id.* Thus, the Court construes the claim as limited to the design of one rectangular bag of no particular height or dimension, with opposing parallel poles and handles attached to the top of the bag, as shown in the 828 Patent drawings. *KeyStone*, 997 F.3d at 1450; *OddzOn*, 122 F.3d at 1405; *Egyptian Goddess*, 543 F.3d at 679. However, the advertisements reference the durability of the bags, the fact that they can expedite checkout time, and that they ease "the hassle of holding bags open." These advertisements emphasize purely functional rather than ornamental features. Further, the advertisements tout how the bags fan out and spread across the cart, which is due to the horizontal poles. Thus, even though the dimensions focused on by Mr. Fletcher of the bag are not part of the claimed design, the Court nonetheless agrees that Defendants' advertisements of their trolley bags tout the functional features of the design. As a result, this factor weighs in favor of a finding of functionality.

   b. *The 828 Patent would have been obvious at the time of invention*

Section 103 of the AIA specifies as a condition for patentability that the subject matter be non-obvious: "A patent for a claimed invention may not be obtained . . . if the

differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103[4]; *see also Bos. Sci. SciMed, Inc. v. Iancu*, 811 F. App'x 618, 622 (Fed. Cir. 2020) (setting forth the analysis for evaluating whether a patent claim is invalid as obvious). "Prior art" is defined as "[k]nowledge that is publicly known, used by others, or available on the date of invention to a person of ordinary skill in an art, including what would be obvious from that knowledge." Garner, Brian A., *Black's Law Dictionary*, ART (11th ed. 2019). Prior art includes information (1) "in applications for previously patented inventions"; (2) "published more than one year before a patent application is filed"; and (3) "in other patent applications and inventor's certificates filed more than a year before the application is filed." *Id.*

---

[4]    Design patents, which are addressed by 35 U.S.C. § 171, are subject to the requirements of (1) 35 U.S.C. § 102, which pertains to the requirement for novelty and addresses whether an invention is anticipated by prior art, and (2) 35 U.S.C. § 103, which pertains to obviousness and is addressed above. *Int'l Seaway*, 589 F.3d at 1238. Section 102 of the AIA sets forth the novelty requirement and requires that "[a] person shall be entitled to a patent unless" the claimed item for which the person seeks a patent was (1) prior art or (2) described in a previous patent issued that named another inventor. 35 U.S.C. § 102(a)-(c). In the context of design patents, the Federal Circuit examines the novelty of designs by determining whether the design patent-in-suit is anticipated under the "substantially the same test" applied for infringement of design patents in *Gorham*. Janice Mueller and Daniel Harris Brean, *Overcoming the "Impossible Issue" of Nonobviousness in Design Patents*, 99 Ky. L.J. 419, 540-41 (2011). Under this test for anticipation, courts inquire into whether, in the eye of an ordinary observer, two designs are "substantially the same" as opposed to creating a new impression. 69 C.J.S. Patents § 113; *see also Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1313 (Fed. Cir. 2001) ("For infringement or anticipation to be found the two designs must be substantially the same."). The test for obviousness under section 103, however, differs in that it analyzes whether the claimed design would have been obvious to a designer of ordinary skill in the art by examining whether there is a primary reference that is "basically the same." *Spigen*, 955 F.3d at 1383. In this case, Plaintiff has sought summary judgment on the basis of obviousness, not on anticipation. Although the tests are similar, the Court analyzes only obviousness given Plaintiff has not challenged the 828 Patent on the grounds of anticipation under prior art.

The party challenging the validity of the patent must prove by clear and convincing evidence that a jury "could reasonably find, based on the evidence produced by the accused infringer, that the claimed invention was obvious." *Plantronics*, 724 F.3d at 1353. For design patents, the ultimate inquiry in this obviousness analysis "is whether the claimed design would have been obvious [at the time of invention] to a designer of ordinary skill who designs articles of the type involved." *Spigen*, 955 F.3d at 1383-84 (internal quotations omitted). "More specifically, the inquiry is whether one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design." *Durling*, 101 F.3d at 103.

"Before one can begin to combine prior art designs, however, one must find a single reference, 'a something in existence, the design characteristics of which are basically the same as the claimed design.'" *Durling*, 101 F.3d at 103. Only if a court locates this "primary reference" may "other [secondary] references be used to modify [the primary reference] to create a design that has the same overall visual appearance as the claimed design." *Id.* Such "secondary references may only be used to modify the primary reference if they are 'so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Id.*

In sum, this obviousness inquiry requires the finder of fact to employ a two-step inquiry, finding (1) "a single [primary] reference, a something in existence, the design characteristics of which are basically the same as the claimed design" exists and (2) "other [secondary] references may be used to modify it [the primary reference] to create a design that has the same overall visual appearance as the claimed design." *High Point*, 730 F.3d at 1311-12. As outlined below, this Court finds that (1) primary references contain design characteristics that are basically the same as the 828 Patent, and as a result, (2) other references, like the Brennan Patent, modified these primary references to create a design with the same overall visual appearance of the claimed design in the 828 Patent.

### i.   Primary references exist

The first part of the two-part test for obviousness also entails a two-part evaluation:

-33-

As part of the "first step, a court must both (1) discern the correct visual impression created by the patented design as a whole; and (2) determine whether there is a single reference that creates basically the same visual impression." *High Point*, 730 F.3d at 1312 (internal quotations omitted); *see also Durling*, 101 F.3d at 103.

As to the first sub-step of step one, the Court must "discern the correct visual impression" created by the 828 Patent. *High Point*, 730 F.3d at 1312. This "inquiry focuses on the visual impression of the claimed design as a whole and not on selected individual features." *Borden*, 90 F.3d at 1574; *see also Durling*, 101 F.3d at 104. This is because "[w]ords cannot easily describe ornamental designs." *Sport Dimension*, 820 F.3d at 1320 (citing *Dobson v. Dornan,* 118 U.S. 10, 14 (1886) (explaining that a claim "is better represented by the photographic illustration than it could be by any description, and a description would probably not be intelligible without the illustration")). Thus, "[a] design patent's claim is thus often better represented by illustrations than a written claim construction." *Id.* However, even though a court need not undertake a formal claim construction as in a utility patent case,[5] it may, in some cases, be required to translate the visual impression of a design patent into words. *See, e.g.*, *Durling*, 101 F.3d at 103 ("Unlike the readily available verbal description of the invention and of the prior art that exists in a utility patent case, a design patent case presents the judge only with visual descriptions. Given the lack of a visual language, the trial court must first translate these visual descriptions into words—*i.e.,* into a common medium of communication."). A

---

[5]     In fact, "detailed verbal claim constructions increase 'the risk of placing undue emphasis on particular features of the design and the risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole.'" *Sport Dimension*, 820 F.3d at 1320. However, courts "have often blessed claim constructions, for example, where the court helped the fact finder 'distinguish between those features of the claimed design that are ornamental and those that are purely functional.'" *Id.* Thus, while the *Sport Dimension* court agreed with the district court's conclusion that "the *PHG* factors indicate[d] that the design patent's armbands and side torso tapering serve a functional purpose," it disagreed with the manner in which the district court construed the claim. *Id.* at 1321-22.

-34-

district court's verbal description of a claimed design should "evoke a visual image consonant with the claimed design." *Id.*

As stated, the Court finds that the 828 Patent claim is a for "[t]he ornamental design for a foldable bag, as shown and described." Compl. at 14. All ten drawings in the 828 Patent show one bag (rather than a system of bags), and as such, the Court construes the claim and visual impression as one bag rather than the bag system. *Id.* at 14-24. The visual impression of the bag, as shown below, shows a rectangular or box-shaped bag with solid lines shown on the edges of the bag, two poles attached to the top opposing sides of the bag, with handles attached to the bag extending up and over the poles. *Id.* at 14. The handles have dotted lines on the portions attached to the bag, and there are other dotted lines that appear to indicate shadowing. *Id.* The 828 Patent explicitly states that "[t]he broken lines shown in the drawings are included for the purpose of illustrating environmental structure and form no part of the claimed design." *Id.*



*See* Compl. at 14. In sum, the visual impression is a rectangular bag with opposing parallel poles and handles attached to the top of the bag, as shown in the 828 Patent drawings.

As to the second sub-step of step one, the Court must decide whether a primary reference exists that creates "basically the same" visual impression. *High Point*, 730 F.3d at 1312. Courts may not invalidate a design patent on grounds of obviousness without a primary reference. *Durling*, 101 F.3d at 105. Thus, in order to complete the first step of the obviousness analysis, a court, after discerning the correct visual impression, must determine whether a prior art design qualifies as a primary reference. *Spigen*, 955 F.3d at 1383. Only where the court finds "some suggestion in the prior art to modify the basic

-35-

design with features from the secondary references" will courts proceed to consider secondary references. *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1462 (Fed. Cir. 1997). In other words, without a primary reference, the court need proceed to the second step and may not hold the patent invalid. *See, e.g.*, *Durling*, 101 F.3d at 104-05 (reversing the district court's decision where the record contained no prior art designs creating "basically the same visual impression" as the claimed design, and "[w]ithout such a primary reference, it is improper to invalidate a design patent on grounds of obviousness.").

As stated, "[a] primary reference is a single reference that creates basically the same visual impression as the claimed design." *Spigen Korea Co.*, 955 F.3d at 1383 (internal quotations omitted). "To be basically the same, the designs at issue cannot have substantial differences in the[ir] overall visual appearance[s]." *Id.* (internal quotations omitted). Further, "if 'major modifications' would be required to make a design look like the claimed design, then the two designs are not 'basically the same.'" *Id.* (quoting *In re Harvey*, 12 F.3d 1061, 1063 (Fed. Cir. 1993)). "Slight differences in design, however, do not necessarily preclude a basically the same finding." *Id.* (internal quotations omitted). Courts should compare the design patent side-by-side with the other reference to determine if the two designs create the same visual impression. *See, e.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1330 (Fed. Cir. 2012) (comparing images of the claimed design to images of the asserted primary references); *Titan Tire*, 566 F.3d at 1375, 1382-83 (same); *Durling*, 101 F.3d at 102 (same); *Borden*, 90 F.3d at 1572-73 (same); *In re Harvey*, 12 F.3d 1061, 1067-68 (Fed. Cir. 1993) (same). "Unlike . . . a utility patent, a patented ornamental design has no use other than its visual appearance, and its scope is 'limited to what is shown in the application drawings.'" *Harvey*, 12 F.3d at 1064 (internal citations omitted). "Therefore, in considering prior art references for purposes of determining patentability of ornamental designs, the focus must be on appearances and not uses." *Id.*

Referring back to the *OddzOn* case, the Federal Circuit held "as a matter of first impression," that prior art was relevant subject matter for courts to consider when inquiring into obviousness. 122 F.3d at 1403-04. The Federal Circuit agreed "with the district court

-36-

that none of the cited designs, including the two confidential disclosures, render[ed] the patented design obvious, either individually or in combination." *Id.* at 1404. In construing the claim in the patent in suit, the district court had "carefully noted the ornamental features that produced the overall 'rocket-like' appearance of the design." *Id.* at 1405. However, "[t]he existence of prior art simply showing a ball with a tailshaft and fins, without more, is not sufficient to render the patented design obvious." *Id.* "Because none of the prior art cited by Just Toys exhibit[ed] ornamental characteristics that [were] the same as or similar to OddzOn's design," the court concluded "that the district court did not err in holding that the cited references would not have rendered the patented design obvious." *Id.* at 1404.

Here, because the 828 Patent was issued on February 28, 2017, an examination of prior art would involve limiting examination to patent applications preceding that date. Plaintiff's cited prior art includes (1) Registered Community Design No. 001726472-0001 ("RCD 0001"), Pltff. Mot. at 83-1 at 21:15; (2) Registered Community Design No. 001726472-0002 ("RCD 0002"), *id.* at 83-1 at 22:14; and (3) the Doyle Patent, which Plaintiff contends serves as a primary reference. *id.* at 23:3, 27:16-17. Plaintiff also argues that the Brennan Patent and RCD 0001 qualify as relevant secondary references. *Id.* at 27:19-20. Defendants apparently concede that RCD 0001, RCD 0002, and the Doyle Patent qualify as prior art but dispute that the Doyle Patent is a primary reference. Def. Oppo. at 12:1-5. Defendant argues that "Doyle does not 'create basically the same visual impression' as Defendants' '828 Patent, and thus, does not qualify as a 'primary reference' necessary for an obviousness challenge." *Id.* at 22:4-7. However, Defendants seem to confuse the test because their expert's attempts to distinguish the Doyle Patent as a primary reference—although labeled as a discussion of the "difference between the overall designs"—focuses on design features rather than the overall visual appearance. *Id.* at 22:3-16; *see Durling*, 101 F.3d at 104. Defendants' expert claims that a different handle design and location; horizontal rods that differ in length and design; and a less rectangular shape and proportions necessitate a conclusion that the Doyle Patent is not a primary reference. *Compare* Def. Oppo. at 22:3-16 *with Durling*, 101 F.3d at 104 ("By focusing on the design

concept of Durling's design rather than its visual appearance, the district court erred" because "the focus in a design patent obviousness inquiry should be on visual appearances rather than design concepts"). However, Defendants fail to address the fact that slight differences will not prevent the Court from finding a primary reference, *Spigen*, 955 F.3d at 1383, and these differences appear to be nothing more than slight. Further, Defendants do not rely on a side-by-side comparison in opposing Plaintiff's claims of obviousness, and the reasoning for this seems obvious itself: A side-by-side comparison shows that the primary reference (e.g., the Doyle Patent) creates basically the same visual impression:

| Doyle Patent: | 828 Patent: |
|---|---|
|  |  |

*See* Pltff. Mot. at 28:1-9.

Thus, the Court concludes that the Doyle Patent, which also consists of a rectangular (albeit less angled) bag with two poles attached to the top of the opposing sides of the bag with handles attached to the side of the bag, creates "basically the same visual impression," such that the Doyle Patent qualifies as a primary reference. The slight differences do not impede this conclusion as a matter of law. *Spigen*, 955 F.3d at 1383. That being said, this conclusion is complicated by a tangential issue that neither side addressed in their briefing: As discussed above, the Court did not consider the Doyle Patent in its functionality inquiry because it (1) is not a United States Patent and (2) is also the same patent as the 828 Patent at issue in this case.[6] Separate and aside from the fact that neither party addressed the fact

---

[6] That the Doyle Patent is for arguably the same product, is owned by Trolley Bags, and expired raises issues of double-patenting, which are discussed in further detail below.

that the Doyle Patent and 828 Patent are essentially one and the same, the parties also failed to address whether a foreign patent permissibly qualifies as prior art for the obviousness inquiry. Nonetheless, and as discussed below, this Court determines that the Doyle Patent qualifies as prior art for purposes of the obviousness inquiry.

On September 18, 2009, Paul Doyle filed the Doyle Patent, entitled "re-usable bag system," listing the United Kingdom and Ireland as priority counties. https://eregister. patentsoffice.ie/register/PTRegister.aspx?idappli=S2009/0718.[7] *See also* Bjurstrom Infringement Report, ECF No. 83-5 at 23 ("The inventor of the '583 Patent is Paul Doyle, whom I understand was the prior owner of Trolley Bags UK Ltd. and the creator of earlier versions of Defendants' Trolley Bags. Sample"). Approximately six years later, on November 18, 2015, Trolley Bags filed its 828 Patent application, listing the Doyle Patent on its U.S. Patent application under "Foreign Patent Documents." *Id.* On January 18, 2016, two months after Trolley Bags filed its United States patent application, a change of proprietorship was filed with the Intellectual Property Office of Ireland, assigning the rights to the Doyle Patent to Trolley Bags. *Id.* On September 17, 2019, the Doyle Patent expired. *Id.*; *see also* ECF No. 83-9 at 25.

The AIA allows an inventor applying for patent protection in the United States to have the patent "relate back" to the earlier filed foreign patent application. In other words, the U.S. Patent will be effective as of whatever date the patent applicant filed for the foreign patent for purposes of determining prior art. However, this benefit only applies if (1) the patent application identifies the foreign patents in the U.S. patent application and (2) applies for U.S. Patent protection within twelve months of securing the foreign patent. As outlined below, even though Trolley Bags identified its foreign patents in the 828 Patent application, it cannot receive the benefit of a priority date because it did not apply for a U.S. Patent within twelve months of securing the foreign patent. *See, e.g.*, *Bos. Sci.*, 497

---

[7]   Because neither party disclosed this information in their moving papers, the Court takes judicial notice of the patent application as a public record. *See GeoVector*, 234 F.Supp.3d at 1016 n.2 (taking judicial notice of Korean patent application).

F.3d at 1296-97 (holding that 35 U.S.C. § 119(a) does not permit "an applicant for a United States patent to benefit from the priority of a foreign application previously filed by an entity that was not acting on behalf of the U.S. applicant at the time of filing"). Therefore, the Doyle Patent qualifies as prior art.

"To determine patentability, a hypothetical person is presumed to know all the pertinent prior art, whether or not the applicant is actually aware of its existence." *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1992), *as revised on reh'g* (Feb. 1, 1993). Thus, actual knowledge of prior art is not required, *see id.*, and in this case, Trolley Bags was not only presumed to have knowledge of prior art, like the Doyle Patent, but did, in fact, have some knowledge as evidenced by listing the Doyle Patent on the 828 Patent application.

In both *Carlson* and *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1375 (Fed. Cir. 2006), at the time the patent holder filed for patent protection in the United States, a foreign patent or publication disclosed the relevant designs, and because those courts found those foreign documents qualified as invalidating prior art under section 102, the documents also rendered the patents in suit obvious under section 103. 983 F.2d at 1039; 445 F.3d at 1375. Similarly, here, at the time Defendants filed the 828 Patent, the Doyle Patent, a foreign patent publication, was publicly available. Thus, depending on the contents and filing date of that document, it may or may not invalidate the 828 Patent.

The public disclosure of an invention will not qualify as prior art to the claimed invention if it was made (1) less than one year before the filing date of the claimed invention in the United States, and (2) by a joint inventor or owner. 35 U.S.C. § 102(b). Further, "[f]or purposes of determining whether a patent or application for patent is prior art to a claimed invention under subsection (a)(2), such patent or application shall be considered to have been effectively filed . . . as of the actual filing date of the patent or the application for patent." 35 U.S.C. § 102(d)(1). However, a "patent saving provision" allows a United States patent application to relate back to a previous patent filed in another country such that it will be deemed filed as of the filing date of a foreign patent application. 35 U.S.C. § 102(d)(2); *In re Mulder*, 716 F.2d 1542, 1545 (Fed. Cir. 1983); 35 U.S.C. §

-40-

119(a). Nonetheless, this protection only applies "if the application in this country is filed within 12 months from the earliest date on which such foreign application was filed." 35 U.S.C. § 119(a). Further, "in accordance with the conditions and requirements of subsections (a) through (d) of section 119, a national application shall be entitled to the right of priority based on a prior filed international application which designated at least one country other than the United States." 35 U.S.C. § 365(a). However, here, Trolley Bags did not meet the conditions and requirements of subsections (a) through (d) of section 119 to allow it to claim priority and relate back to the Doyle Patent for several reasons.

First, for the 828 Patent to receive the benefit of relating back to the Doyle Patent, the 828 Patent would have had to have been filed (1) within a year of the Doyle Patent or by August 18, 2011 and (2) by a joint inventor. Here, the 828 Patent was not filed until November 18, 2015 and (2) at the time of filing was not jointly owned. Further, the Doyle Patent would have to qualify as the same patent in order to give the 828 Patent the benefit of priority. Here, particularly in light of the parties' failure to brief this issue much less provide evidence as to how the 828 Patent might not be the same patent, the Court concludes that there is an absence of evidence creating a genuine issue of fact as to whether the 828 Patent and Doyle Patent are different patents. Although Defendants have presented evidence of "slight modifications," the Court finds this evidence insufficient to create a genuine issue of fact as to whether the two designs are not "basically the same."

Second, as to the joint ownership issue, the provision governing assignment of patents provides: "A disclosure shall not be prior art to a claimed invention under subsection (a)(2) if . . . . the subject matter disclosed and the claimed invention . . . were owned by the same person or subject to an obligation of assignment to the same person" *before* the "effective date of the claimed invention." 35 U.S.C. § 102(b)(2)(C). Here, Trolley Bags did not become the owner of the Doyle Patent until January 18, 2016, several months after it filed the 828 Patent on November 18, 2015. As such, the Doyle Patent qualifies as prior art and does not qualify for exception under 35 U.S.C. § 102(b)(2)(C). Further, for 35 U.S.C. § 119 to save the 828 Patent from having the Doyle Patent qualify

as prior art, the Doyle Patent would have needed to have been filed within a year of the filing of the 828 Patent, or in other words, between November 18, 2014 and November 18, 2015.  Because the Doyle Patent was filed on September 18, 2009, well before that date, the 828 Patent cannot relate back to the Doyle Patent.  In sum, the Doyle Patent qualifies as prior art because even if it had been jointly owned at the time Trolley Bags filed for a patent in the United States, the United States application was filed more than twelve months after the Doyle Patent was filed in Ireland.  Further, under section 119, a patent application will not receive "this right of priority unless a claim is filed . . . identifying the foreign application by specifying the application number on that foreign application, the intellectual property authority or country in or for which the application was filed, and the date of filing the application, at such time during the pendency of the application."  35 U.S.C. § 119(b)(1).  Here, Trolley Bags filed no such qualifying application.

In sum, the Doyle Patent qualifies as prior art to the 828 Patent.  *See, e.g.*, *LG Display Co. v. AU Optronics Corp.*, 709 F. Supp. 2d 311, 339 (D. Del. 2010) (holding that a Japanese patent application qualified as prior art for purposes of determining whether the patent in suit was invalid as obvious where the Japanese patent application had been published before the patent in suit's application in the United States); *Delta Frangible Ammunition, LLC v. Sinterfire, Inc.*, 663 F. Supp. 2d 405, 418 (W.D. Pa. 20090, *dismissed,* 450 F. App'x 947 (Fed. Cir. 2010) (finding that summary judgment should be entered in the defendants' favor because the patent claims were invalid due to obviousness as the claims were present in a prior British patent applications so as to place a person of ordinary skill in possession of the invention); *I. U. Tech. Corp. v. Research-Cottrell, Inc.*, 641 F.2d 298, 307 (5th Cir. 1981) (holding that the district court properly considered references to a Japanese Patent, East German patent, and four articles when considering prior arts against which to test obviousness of the patent at issue); *Nuance Commc'ns Inc. v. Tellme Networks Inc.*, 707 F. Supp. 2d 472, 493-94 (D. Del. 2010) (holding that a prior Japanese patent had disclosed the inventive aspects of a patent at issue, and thus, the claims were obvious).

This case is further complicated by yet another matter related to the foreign patent

-42-

issues not briefed by the parties: Ruling that the 828 Patent is valid may contravene the principle against double patenting.  "The doctrine of double patenting is intended to prevent a patentee from obtaining a time-wise extension of [a] patent for the same invention or an obvious modification thereof." *In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1375 (Fed. Cir. 2008).  "The judicially created doctrine of obviousness-type double patenting 'prohibit[s] a party from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent.'"  *Id.*  To determine "double patenting, a one-way test is normally applied, in which 'the examiner asks whether the application claims are obvious over the patent claims.'"  *Id.*  Here, it is possible that Trolley Bags intentionally acquired the Doyle Patent after applying for the 828 Patent in an attempt extend the protection of the Doyle Patent in violation of the principle against double-patenting.  However, this issue was not briefed by the parties, and the Court refrains from speculating on this issue given it, nonetheless, has determined below the patent is invalid, and thus, there is no risk of double patenting.

Now that the Court has determined that the Doyle Patent may qualify as prior art or a primary reference, it must return to its analysis of whether the two designs are "basically the same" design, keeping in mind that "'[s]light differences' in design . . . do not necessarily preclude a 'basically the same' finding." *Spigen*, 955 F.3d at 1383 (quoting *MRC Innovations,* 747 F.3d at 1333.  Both parties rely primarily on their expert reports for the obviousness inquiry.  However, this is not helpful to the Court's determination.  This is because obviousness is a question of law, so while the Court may consider expert opinions with respect to the underlying *Graham* factors, it must ignore them with respect to the ultimate issue of obviousness, which remains a legal determination for the Court.  *See, e.g.*, *KSR*, 550 U.S. at 426-27 ("To the extent the court understood the *Graham* approach to exclude the possibility of summary judgment when an expert provides a conclusory affidavit addressing the question of obviousness, it misunderstood the role expert testimony plays in the analysis.").  Thus, expert opinions on legal conclusions may not defeat summary judgment.  *See KSR*, 550 U.S. at 426-27; *see also Telemac Cellular*

-43-

*Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316 (Fed. Cir. 2001) (holding "broad conclusory statements offered by Telemac's experts are not evidence and are not sufficient to establish a genuine issue of material fact"). Even expert testimony purporting to contradict the clear disclosure of prior art references may not defeat summary judgment. *Jamesbury Corp. v. Litton Indus. Prods. Inc.*, 756 F.2d 1556, 1563 (Fed. Cir. 1985) (overturning a jury verdict on the issue of anticipation), *overruled in part by A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992). In sum, expert opinions on legal conclusions have little relevance given the Court determines issues of law. *KSR*, 550 U.S. at 426-27.

Trolley Bags itself claims "there are numerous significant differences between the overall designs" of the 828 and Doyle Patents. Def. Oppo. at 22:7-9. Defendants rely on the Bjurstrom Expert Report for those differences. *Id.* at 22:9-16. Again, obviousness is a legal issue for the Court, and thus, while the Court can consider Ms. Bjurstrom's opinions as to individual *Graham* factors, it must disregard them as to the ultimate obviousness inquiry. *KSR*, 550 U.S. at 426-27. Meanwhile, Plaintiff's expert, Tim Fletcher, opined that a designer of ordinary skill in the art ("DOSITA") "would conclude that the prior art references[, including the Doyle Patent,] are identical in all material respects and are substantially the same as the bag claimed in the '828 Patent" due to "the overall similarities." Expert Report of Tim Fletcher, ECF No. 83-6 at 13. He also examined the RCD designs, noting that "[t]he RCD is a form of EU design patent protection, similar to a US Design Patent," while "the Doyle Irish Patent Grant would be similar to a US Utility Patent." *Id.* at 11. He provided the below comparison of the 828 Patent and the RCD 0001:

 

Tim Fletcher Report, ECF No. 83-6 at 11.

Here, while the Court has no obligation to accept Mr. Fletcher's opinion, the Court's independent analysis reveals that no reasonable jury could arrive at a conclusion other than that the 828 Patent is basically the same as not only the Doyle Patent but also the RCD patents. The Court finds that the designs of these primary references are basically the same as the design of the 828 Patent.

ii.    <u>Secondary references modify the primary reference to create the same overall visual appearance as the 828 Patent</u>

Plaintiff uses the Doyle Patent as a primary reference and argues that when comparing the 828 Patent to the Doyle Patent, the only difference is that handle stitching, but when compared to the Brennan Patent, which contains such stitching, the hypothetical combination is nearly identical to the 828 Patent. Pltff. Mot. at 27:16-28.

Once a court finds a primary reference, other references—or what the case law refers to as "secondary references"—may be used to modify the primary reference to create a design that has the same overall visual appearance as the claimed design. *High Point*, 730 F.3d at 1311. However, secondary references may only modify a primary reference if the secondary references are "so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other." *Durling*, 101 F.3d at 103. In order to correctly apply this approach, courts must apply the *Graham* factors[8] to the design patented invention as a whole, to determine whether a similar (or even the same) article of manufacture possesses the design characteristics of the design patent claim in dispute, such that the claimed invention is merely an obvious variant. *Hupp*, 122 F.3d at 1462. In other words, courts determine obviousness "by ascertaining whether

---

[8]    "The *Graham* factors, considered in determining obviousness for utility patents—(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness—are applied in determining obviousness for design patents." Matthews, Robert A. Jr., 4 *Annotated Patent Digest* § 29:31 (October 2020); *see also Hupp* 122 F.3d at 1462 ("Invalidity based on obviousness of a patented design is determined on factual criteria similar to those that have been developed as analytical tools for reviewing the validity of a utility patent under § 103, that is, on application of the *Graham* factors.").

-45-

the applicable prior art contains any suggestion or motivation for making the modifications in the design of the prior art article in order to produce the claimed design." *Id.* Thus, "[a] finding of obviousness cannot be made without determining whether the invalidating prior art shows or renders obvious the ornamental features of the claimed design." *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1379 (Fed. Cir. 2002).

"An invention may be a combination of old elements disclosed in multiple prior art references." *Plantronics*, 724 F.3d at 1354. The Supreme Court has held "that common sense can be a source of reasons to combine or modify prior art references to achieve the patented invention." *Id.* Courts have found motivation to combine either "explicitly or implicitly in [1] market forces; [2] design incentives; [3] the interrelated teachings of multiple patents; [4] any need or problem known in the field of endeavor at the time of invention and addressed by the patent; and [5] the background knowledge, creativity, and common sense of the person of ordinary skill." *Id.* (internal quotations omitted).

Plaintiff's expert, Tim Fletcher, concluded that "US Patent No. 5,531,366 ('Strom') is [also] a Primary Reference because Strom and the '828 Patent have Design Characteristics that are basically the same." ECF No. 83-6 at 17. He opined that "[a] DOSITA would have been motivated to combine Strom (Embodiment 1) with RCD '0001," resulting in the 828 Patent. ECF No. 83-6 at 19.



| RCD 0001: | Strom: | 828 Patent: |
|---|---|---|

ECF No. 83-6 at 28

Plaintiff argues the only difference between the 828 Patent and the Doyle Patent is the presence of detailed handle stitching extending vertically on the length of the bag. Pltff. Mot. at 27:16-28, 28:16-19. However, Plaintiff points out that the same handle stitching is present on the Brennan Patent and RCD 0001 references. *Id.* As such, Plaintiff argues

-46-

"the hypothetical combination is nearly identical to the '828 Patent." *Id.* at 72:18-22.



Defendants respond that Plaintiff's arguments of obviousness fail because (1) the Court set a deadline for "each party opposing a claim of [patent] infringement [to] serve Invalidity Contentions," and Plaintiff's contentions did not identify obviousness as a basis for invalidity[9]; (2) Plaintiff cites no evidence in support of its obviousness contentions; and

---

[9]     Defendants argue that Plaintiffs failed to disclose some of the prior art that they rely upon for arguing concomitant utility patents and obviousness in their infringement contentions, and as such, should be barred from relying on those patents as prior art now. Def. Oppo. at 19:15-23.  The Court considers all relevant prior art for three reasons:

First, Defendants elaborate that the Court's Scheduling Order set a deadline "for 'each party opposing a claim of infringement to serve Invalidity Contentions,'" and Plaintiff failed to disclose their contentions in that filing.  *Id.* at 19:16-18 (citing ECF No. 24, ¶ 3; S.D. Cal. Pat. R. 3.3).  Local Patent Rule 3.3(a) requires "each party opposing a claim of patent infringement" to serve on all parties a set of "Invalidity Contentions," which must include "[t]he identity of each item of prior art that allegedly anticipates each asserted claim or renders it obvious."  It also requires each prior art patent to "be identified by its

-47-

(3) Defendants have shown there is a factual dispute, and that the prior art and 828 Patent have substantial differences.  Def. Oppo. at 19:15-23, 20:17-24, 22:3-20.

Defendants refer to the case of *Deflecto, LLC v. Dundas * Jafine Inc.*, 142 F. Supp. 3d 835, 844 (W.D. Mo. 2014) where the court denied a motion for summary judgment as a basis for this Court to do the same.  In *Deflecto*, the defendant asserted that the plaintiff's patents were invalid after the plaintiff sued for patent infringement.  *Id.* at 842-43.  When

---

number, country of origin, and date of issue." *Id.*  Plaintiff's invalidity contentions notably did not include the country of origin or date of issue of prior art.  *See* ECF No. 89-5 at 1-5.  Local Rule 3.3 further provides that "[i]f obviousness is alleged, an explanation of why the prior art renders the asserted claim obvious, including an identification of any combinations of prior art showing obviousness" must be included in the Invalidity Contentions." *Id.*  Defendants argue they would be prejudiced if the Court were to allow Plaintiff to rely on new theories due to lack of adequate time to refute them.  Def. Oppo. at 20:5-11.  However, the scope of the patent rules provides that they "apply to all civil actions filed in or transferred to this court which allege infringement of a utility patent."  S.D. Cal. Pat. R. 1.3.  As noted, this case involves a design patent, not a utility patent.

Second, Defendants also cite to *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-cv-5341, 2014 WL 690161, at * (N.D. Cal. Feb. 21, 2014) for the proposition that "[a]ny invalidity theories not disclosed . . . are barred, accordingly, from presentation at trial (whether through expert opinion testimony or otherwise." *Id.* at 20:2-5.  However, cases like *MediaTek*, where the Court struck portions of expert reports due to the plaintiff's failure to disclose some of their invalidity contentions are inapposite because the patent rules applied to that case but do not apply to this case.  *Id.* at *1, 7.  Further, even though the Patent Rules do not apply to this case, if they did, they would not require the Court to refrain from considering additional contentions that were not included in the Invalidity Contentions.  To do so would contravene the Court's preference for determining cases on the merits.  *See, e.g.*, *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984) (providing that "a case should, whenever possible, be decided on the merits"); *see also United States v. Signed Pers. Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010) (referring the "policy of favoring judgment on the merits").  The Court will consider relevant prior art in determining this case on the merits.

Third, Defendants also argue that invalidity contentions are not evidence, and as such, should not be relied on by the Court when determining a motion for summary judgment.  Def. Oppo. at 20:17-26.  The Court agrees that invalidity contentions are not evidence.  *See, e.g.*, *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11 Civ. 5341, 2014 WL 2859280, at *8 (N.D. Cal. June 20, 2014) ("[I]nfringement contentions, plainly, are not evidence standing on their own.").

1   the defendant moved for summary judgment on the grounds that, *inter alia*, the patents

2   were invalid because they were obvious in light of prior art, the court held that the

3   defendant "failed to satisfy its burden to provide 'clear and convincing' evidence that the

4   patents are invalid," and thus, denied summary judgment. *Id.* at 844.  It reasoned that while

5   the defendant frequently stated in its briefs that what would have been obvious, it did not

6   provide evidentiary support for this and only occasionally cited to its expert report. *Id.*

7       Defendants also rely on the case of *Spigen Korea Co. v. Ultraproof, Inc.* to support

8   their argument that the Court should deny summary judgment.  955 F.3d at 1385.  In

9   *Spigen*, the Federal Circuit reversed the district court's grant of summary judgment on the

10  issue of invalidity and obviousness because it determined the district court had improperly

11  participated in fact-finding.  *Id.* at 1384-85.  It noted that the two parties along with their

12  experts had contrasting positions, with the plaintiff's expert testifying that the patents were

13  not similar, much less basically the same, while the defendant argued the two designs were

14  basically the same.  *Id.* at 1384-85.  As a result, the court noted that "[i]n the light of the

15  competing evidence in the record, a reasonable factfinder could conclude that the '218

16  patent and the Spigen Design Patents have substantial differences, and, thus, are not

17  basically the same." *Id.* at 1385; *but see Telemac Cellular Corp. v. Topp Telecom, Inc.*,

18  247 F.3d 1316 (Fed. Cir. 2001) (providing that conclusory statements offered by experts

19  fail to establish a genuine issue of material fact).

20      Defendants argue that in this case, as in *Spigen*, "there is a similar factual dispute."

21  Def. Oppo at 22:3-4.  They point out that their expert testified, like the *Spigen* expert, "that

22  Doyle does not 'create basically the same visual impression' as Defendants' '828 patent,

23  and thus does not qualify as a 'primary reference' necessary for an obviousness challenge."

24  *Id.* at 22:4-7.  However, Defendants explain that those differences are (1) "an entirely

25  different handle design and location," (2) "horizontal rods that differ in design and do not

26  extend as far beyond the bag," and (3) the Doyle Patent "is less rectangular and appears to

27  have different proportions than the design of the '828 Patent." *Id.* at 22:9-16.  Defendants

28  also point out that, like the *Spigen* expert, their expert also provided side-by-side

-49-

comparisons, showing the differences between the two bags.  *Id.*  Defendants refer the Court to her comparison, a portion of which is shown below:



| '828 Patent (Ex. 1) | '583 Patent (Ex. 11) |
|---|---|
| FIG. 1 | Fig. 1 |

ECF No. 89-4 at 31-34.

These drawings show that with respect to the allegedly "entirely different handle design and location," the handles are, in fact, the same.  Rather, the Doyle Patent merely illustrates the flexibility of the handles while the 828 Patent shows the handles in an upright position.  ECF No. 89-4 at 31.  As to the alleged difference pertaining to the horizontal rods, which allegedly "differ in design and do not extend as far beyond the bag," the Court concludes that the drawings show that the horizontal rods on both the Doyle Patent and the 828 Patent extend beyond the bag, and because the parties did not provide the dimensions to allow the Court to compare the rods of the two bags, it is unclear how much farther beyond the bag the 828 Patent rods may extend when compared to the Doyle Patents. However, again, these slight differences do not preclude a finding that the bags are basically the same, *Spigen*, 955 F.3d at 1383, especially where Defendants failed to provide the dimensions of both bags to compare when such information is presumably in their control given Trolley Bags owns both patents.  Third, Defendants argue that the Doyle Patent is "less rectangular and appears to have different proportions" than the 828 Patent. Def. Oppo. at 22:9-16.  As to the differing proportions, again, Defendants failed to provide the dimensions for the Doyle Patent.  The dimensions of the bag are also not claimed in the patent.  As to the shape of the bags, both bags appear to be rectangular in shape, although the Doyle Patent has curved edges.  Thus, the Court finds Ms. Bjurstrom's Report and side

-50-

by side comparison show the two bags are basically the same despite her conclusion to the contrary, which the Court is not required to accept.  *See KSR*, 550 U.S. at 426-27.

Defendants also fail to present evidence as to the *Graham* factors or secondary references, but even if they did, this would be unlikely to overcome the Court's finding of obviousness.  *See ZUP, LLC*, 896 F.3d at 1375 (noting, albeit it in a utility patent case, that "[w]here a claimed invention represents no more than the predictable use of prior art elements according to established functions, as here, evidence of secondary indicia are frequently deemed inadequate to establish non-obviousness").  In the absence of such evidence, Defendants have failed to rebut Plaintiff's evidence that the 828 Patent represents nothing more than an obvious modification of the Doyle Patent by combining it with the Brennan Patent.

The Court concludes that a designer of ordinary skill in the art would have thought to combine the numerous prior art that highly resembles the 828 Patent to create the product claimed in the 828 Patent.  Thus, the 828 Patent is invalid based on the Court's finding of obviousness.

c.  *Indefinite*

The definiteness requirement for a patent stems from 35 U.S.C. § 112(b), which requires that a "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention."  Thus, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *see also Ancor Techs., Inc. v. Apple, Inc.,* 744 F.3d 732, 737 (Fed. Cir. 2014) (noting that definiteness requires a claim to be "sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent.") (citation omitted).  The *Nautilus* test, however, dealt with a utility patent in which courts undertake a claim construction, and as such, courts have adapted the test to the design patent context,

-51-

which focuses primarily on a patent's visual appearance. *Deckers Outdoor Corp. v. Romeo & Juliette, Inc.*, No. 215CV02812ODWCWX, 2016 WL 7017219, at *3-4 (C.D. Cal. Dec. 1, 2016).[10]   In 2018, the Federal Circuit adapted the *Nautilus* test to the design patent context holding that "a design patent is indefinite under § 112 if one skilled in the art, viewing the design as would an ordinary observer, would not understand the scope of the design with reasonable certainty based on the claim and visual disclosure." *Maatita*, 900 F.3d at 1377.[11]   "Although absolute clarity is not necessary, a claim is indefinite if it is not amenable to construction or is unsolubly ambiguous." *Times Three Clothier, LLC v. Spanx, Inc.*, No. 13 CIV. 2157 DLC, 2014 WL 1688130, at *6 (S.D.N.Y. Apr. 29, 2014) (internal citations and quotations omitted).

With respect to design patent drawings, "[a] visual disclosure may be inadequate— and its associated claim indefinite—if it includes multiple, internally inconsistent drawings." *Maatita*, 900 F.3d at 1375; *see also Times Three Clothier*, 2014 WL 1688130, at *7-9 (holding design patents directed to ornamental designs for an undergarment invalid for indefiniteness because the drawings were inconsistent with respect to material aspects of the claimed design).  However, "[e]rrors and inconsistencies between drawings do not merit a § 112 rejection . . . if they 'do not preclude the overall understanding of the drawing as a whole.'" *Maatita*, 900 F.3d at 1375.   "The purpose of § 112's definiteness

---

[10]   Although *Deckers* called into question whether *Nautilus* applied to design patents because "[t]he Federal Circuit has not yet applied *Nautilus* to design patents," 2016 WL 7017219 at *3, the Federal Circuit eventually applied *Nautilus* to a design patent in *In re Maatita*, 900 F.3d 1369, 1376-77 (Fed. Cir. 2018).

[11]   Although both parties discussed the *Times Three Clothier* test, which required that "errors and inconsistencies in the patent drawings must be material and of such magnitude that the overall appearance of the design is unclear," No. 13 CIV. 2157 DLC, 2014 WL 1688130, at *6 (S.D.N.Y. Apr. 29, 2014), the Central District of California in *Deckers*, rejected that test in favor of a modified version: "[A] design patent is invalid for indefiniteness if the errors and inconsistencies in the patent drawings are of such magnitude that the drawings, taken as a whole, fail to inform, with reasonable certainty, those skilled in the art about the overall appearance of the design," 2016 WL 7017219, at *3-4. However, both of these tests preceded the Federal Circuit's holding in *Maatita*, and as such, this Court defers to the test adopted by the *Maatita* court.

-52-

requirement, then, is to ensure that the disclosure is clear enough to give potential competitors (who are skilled in the art) notice of what design is claimed—and therefore what would infringe." *Id.* at 1376; *see also Carnegie Steel Co. v. Cambria Iron Co*., 185 U.S. 403, 437 (1902) (stating that "any description which is sufficient to . . . serve as a warning to others of what the patent claims as a monopoly, is sufficiently definite to sustain the patent"). In sum, the definiteness of a design patent is determined from the drawings. *Richardson*, 597 F.3d at 1294. If the drawings are insufficient to allow an understanding of the drawing as a whole, the patent will be declared invalid. *Maatita*, 900 F.3d at 1375.

In this case, Plaintiff argues that based on inconsistencies in the 828 Patent drawings, the 828 Patent is invalid as indefinite because an ordinary observer would not understand the scope of the patented design. Pltff. Mot. at 29:20-21. Plaintiff points to the below discrepancies, arguing that "an ordinary observer would not understand the scope of the design with reasonable certainty based on the claim and visual disclosure." *Id.* at 29:1-4:

| Alleged Inconsistency: | Alleged Inconsistent Figure: | Additional 828 Figures: |
|---|---|---|
| Plaintiff alleges the piping is inconsistent when Figure 1 and Figures 3 and 4 are compared. | <br>FIG. 1 | <br>FIG. 3    FIG. 4 |
| Plaintiff alleges the shape of the handles is inconsistent when Figures 4 and 5 are compared to Figure 6. | <br>FIG. 6 | <br>FIG. 4    FIG. 5 |

Defendants respond that (1) Plaintiff's invalidity argument contains only attorney argument, (2) "[t]he law does not demand absolute perfection in design patent figures to satisfy the definiteness requirement," and (3) any minor inconsistencies are "exceedingly minor" and would not cause an ordinary observer to be unable to understand the scope of the design.  Def. Oppo. at 23:12-13-25:9.

The Court sees no inconsistencies in the areas highlighted by Plaintiffs with respect to the solid lines, and to the extent that Plaintiff refers to the dotted lines in the drawings, such lines are not part of the asserted claim for the 828 Patent.  *Maatita*, 900 F.3d at 1372. Thus, the solid lines define the scope, which is clear, while the dotted lines provide the context of the claimed invention and in no way limit the scope of the claimed design. Consequently, to the extent the piping Plaintiff alleges is inconsistent refers to the vertical dotted lines, such lines are not part of the claimed design and cannot cause the design to fail for indefiniteness.  However, the Court finds that the drawings show piping along the bottom of all sides of the bag and sees no inconsistencies in this.  Further, the Court agrees with Defendants that the alleged inconsistency with respect to the handles in Figures 4, 5, and 6 is not an inconsistency but rather is meant to show that the flexibility of the handles.

The Court finds that to the extent Plaintiff moves for summary judgment as to the 828 Patent on the basis of indefiniteness, the motion is denied.  The 828 Patent is not indefinite.  However, this ruling bears little import given the Court has, as outlined above, granted Plaintiff's motion for summary judgment as to invalidity on the grounds of functionality and obviousness.  Although the Court could refrain from ruling on infringement due to its determination that the 828 Patent is invalid because if there is no valid patent, there can be no infringement, the Court nonetheless addresses Plaintiff's arguments as to infringement.

### 2. *Even if the 828 Patent were Valid, Plaintiff has not Infringed it*

"The 'ordinary observer' test is the sole test for determining whether a design patent has been infringed" and "originates from the Supreme Court's *Gorham* decision." *Columbia Sportswear*, 942 F.3d at 1129 (citing *Egyptian Goddess*, 543 F.3d at 678).  "[I]f,

-54-

in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same,[12] if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." *Gorham*, 81 U.S. at 528. The ordinary observer has been defined as the retail customer who buys and uses the products at issue. *See, e.g.*, *Columbia Sportswear*, 942 F.3d at 1129-30 (noting that "[c]onsidering the designs side-by-side, the court found that 'even the most discerning customer would be hard pressed to notice the differences between Seirus's HeatWave design and Columbia's patented design.'"). This "ordinary observer is considered to be familiar with prior art designs." *Id.* at 1129 (citing *Egyptian Goddess*, 543 F.3d at 681).

In order to find design patent infringement, the ordinary observer test requires the finder of fact to conclude that the similarities of the overall designs—rather than the similarities of ornamental features in isolation—of the claimed design patent and accused product would cause the ordinary retail customer to purchase one product believing it to be the other. *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1343 (Fed. Cir. 2020) ("Under the 'ordinary observer' test, a court must consider the ornamental features and analyze how they impact the overall design."); *see also KeyStone*, 997 F.2d at 1450 (providing that "one cannot establish design patent infringement by showing similarity of only one part of a patented design if the designs as a whole are substantially dissimilar"). As with invalidity, when analyzing infringement, the only relevant similarities are the similarities pertaining to non-functional design aspects, and "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *OddzOn*,

---

[12]   Whereas analyzing obviousness requires a conclusion that the *patented design* is basically the same as a *primary reference*, and as result, the claimed design would have been obvious in light of prior art, a finding of infringement requires concluding that the non-functional, ornamental aspects of the *patented design* and *accused product* are substantially the same. *OddzOn*, 122 F.3d at 1399-1400, 1405; *Unette Corp. v. Unit Pack Co.*, 785 F.2d 1026, 1028 (Fed. Cir. 1986).

122 F.3d at 1405. Although the ordinary observer test does not entail an "element-by-element comparison, "it also does not ignore the reality that designs can, and often do, have both functional and ornamental aspects." *Id.*; *see also Amini*, 439 F.3d at 1372 ("The trial court is correct to factor out the functional aspects of various design elements, but that discounting of functional elements must not convert the overall infringement test to an element-by-element comparison."). For an accused product to infringe a design patent, it "must appropriate [only] the novel ornamental [rather than functional] features of the patented design that distinguish it from the prior art." *Amini*, 439 F.3d at 1371.

With design patents, the infringement analysis is purely visual, requiring courts to compare the claimed design with both the accused design or product. *Egyptian Goddess*, 543 F.3d at 678. If a court sees no immediately apparent dissimilarities upon comparison, it should then compare the claimed design and accused design or product to relevant prior art, with which the ordinary observed is considered to be familiar. *See id.*; *see also Columbia Sportswear*, 942 F.3d at 1129. When doing so, the patented product itself carries less weight as the Court must compare the patented design (e.g., the claims or drawings) to the accused product (rather than the patented design to the accused design or patented product to the accused product). *See, e.g.*, *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1302-06 (Fed. Cir. 2010) (using visual claim charts that compared the claimed design to the accused product to find infringement). Thus, as with the obviousness analysis, courts will often utilize visual claim charts. *Richardson*, 597 F.3d at 1294. However, with infringement, claim charts will compare the drawings of the *design* patent from various angles to the *accused product*, and the preferred approach is to avoid describing a design patent verbally by relying only on the drawings. *See, e.g.*, *Crocs*, 598 F.3d at 1302-06 (providing that "[a]s a rule, the illustration in the drawing views is its own best description"); *see also MRC Innovations, Inc. v. Hunter Mfg., LLP*, 747 F.3d 1326, 1332 (Fed. Cir. 2014) (holding that "the district court did not err by failing to provide an express verbal description of the claimed design; rather, it described the claimed design in the context of comparing it to the prior art").

In order to meet the preponderance of the evidence burden of proof,[13] a party claiming patent infringement must prove "that infringement was more likely than not to have occurred." *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341, n.15 (Fed. Cir. 2005) (internal citations omitted).   Because the ultimate issue of infringement is a question of fact, *Columbia Sportswear*, 942 F.3d at 1129, infringement issues that require courts to draw inferences from the known facts are typically not well-suited to summary judgment because all such inferences must be drawn against the moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Further, because a patent holder must show that every limitation in the design patent is present in the accused product, it is easier for the accused party to demonstrate factual disputes to preclude a summary judgment of infringement.   *3rd Eye Surveillance, LLC v. United States*, No. 15-501C, 2020 WL 7021437, at *3 (Fed. Cl. Nov. 20, 2020).   A moving party seeking a judgment of non-infringement, on the other hand, does not "have to support its motion [for summary judgment] with evidence of non-infringement." *Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1308-09 (Fed. Cir. 2006) ("In the light of *Celotex,* we conclude that nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations.").   In sum, noninfringement is more likely to be amenable to summary judgment than infringement because the patent holder must show *every limitation* of a claim is found in the accused device to secure a summary judgment of infringement whereas an accused infringer need only show that its product lacks *a single limitation* to avoid infringement.   *See 3rd Eye*

---

[13]    Infringement issues are generally more amenable to summary judgment than invalidity issues due to the lower burden of proof (e.g., preponderance of the evidence as supposed to clear and convincing).   *See OddzOn*, 122 F.3d at 1403-04 (affirming the district court's grant of summary judgment on validity because the defendant and accused infringer had not established obviousness by clear and convincing evidence while also affirming the holding that the plaintiff had not established the defendant infringed the patent by a preponderance of the evidence).

*Surveillance*, 2020 WL 7021437 at *3 (stating that the infringer's "failure to meet even one element within a claim, literally or by its substantial equivalent, negates a finding of infringement"). In other words, the accused infringer's burden on summary judgment is more likely to be satisfied due to the narrower scope of proof required. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Consequently, motions for summary judgment on noninfringement are common.

In this case, Plaintiff argues that its product has many "features that result in the Accused Product's overall appearance being 'plainly dissimilar' compared to the patented design of the '828 Patent." Pltff. Mot. at 19:4-7. Plaintiff contends these distinguishing features include "(1) longer handles; (2) an additional handle; (3) interior pockets; (4) mesh/translucent bottoms; (5) detailed handle stitching that extends the length of the bag; and (6) the Lotus logo." *Id.* at 19:7-10. Thus, Plaintiff argues that "there is no potential for an ordinary observer to be deceived into thinking they are buying the claimed design when they purchase the Accused Product." *Id.* at 20:17-18. Plaintiff contends that this finding warrants the Court granting summary judgment of noninfringement to Plaintiff regarding the 828 Patent. *Id.* at 20:22-23.

Defendants respond that Plaintiff's bags have three embodiments—two without mesh and one with mesh, and because Plaintiff's Motion only addresses its mesh embodiment, the Court should deny summary judgment as to the non-mesh embodiments because Plaintiff failed to address those embodiments. Def. Oppo. at 8:19-27; *but see 3rd Eye Surveillance*, 2020 WL 7021437 at *3. As to the mesh embodiment, Defendants contend that Plaintiff relies only on "inapplicable case law and attorney argument to highlight supposed differences," which is insufficient for summary judgment. *Id.* at 10:1-6. Next, Defendants argue that Plaintiff applied the incorrect legal test "by applying an element-by-element analysis based on alleged differences" rather than looking at the overall design. *Id.* at 10:12-23. Then, Defendants aver that the issue of whether the differences are substantial or significant is a question of fact for the jury, not an issue of the law for the Court to determine on summary judgment. *Id.* at 10:24-11:6. Finally,

Defendants argue that their evidence proves infringement because (1) Defendants' expert testified at length as to why an ordinary observer would consider Plaintiff's bags to be substantially the same, *id.* at 11:11-13, and (2) when Defendants reported Plaintiff's bags to Amazon for design patent infringement, "Amazon reviewed these reports and consistently removed Plaintiff's listings from its site," *id.* at 12:21-25.

Plaintiff responds that first, its Motion defines its product as all three embodiments, which it clearly demonstrated through the side by side chart of the design of the 828 Patent compared to its three embodiments on pages 3 through 4 of its Motion.  Pltff. Reply at 3:13-16.   Thus, Defendants' argument that Plaintiff waived any argument of non-infringement with respect to the non-mesh embodiments fails.  *Id.*  Second, Plaintiff notes that two of its embodiments, not just one, contain mesh.  *Id.* at 3:17-18.  Plaintiff also contends that Defendants' Opposition fails to address whether the presence of a mesh bottom, detailed handle stitching that extends along the length of the bag, an additional handle, or a prominent logo affect the overall design appearance of their product when compared to the 828 Patent so as to prevent a finding of infringement.  *Id.* at 3:20-24.  Third, Plaintiff responds that despite Defendants' contention that Plaintiff applied the incorrect test, well-settled law establishes that "several differences create a dissimilar overall appearance."  Pltff. Reply at 3:25-28.  Fourth, Plaintiff argues that Defendants' arguments on infringement based on their expert analysis and e-mails from Amazon likewise fail to defeat Plaintiff's Motion for Summary Judgment.  Reply at 4:14-16.  Plaintiff notes that Defendants' expert "failed to consider any differences between the Accused Product and the design of the 828 Patent."  *Id.* at 4:15-16.  Plaintiff also argues that Defendants' expert applied the incorrect test by considering whether the accused product is closer to the patented design or prior art rather than whether the accused design has strong similarities to prior art.  *Id.* at 4:19-25.  Finally, Plaintiff points out that Defendants' reliance on the Amazon e-mails cuts both ways given that after removing Plaintiff's products, Amazon also restored the products stating, "[a]fter reviewing your notice of infringement, we determined that the products you reported are not substantially

similar to your patented design." Pltff. Reply at 4:26-5:5.  Plaintiff also distinguishes the cases relied on by Defendant by pointing out that those case involved utility patents rather than design patents, and design patents merely "involve analyzing whether a purchasing [sic] would purchase one bag mistaking it to be the other." *Id.* at 5:6-18.

Plaintiff argues summary judgement is warranted regardless of whether the Court compares the 828 Patent and Lotus Bags in the context of prior art or not.  As the Court analyzes below, the Court finds that only after considering prior art is summary judgment warranted because in the absence of prior art, the products appear substantially similar.

a. *Without considering prior art, the products are substantially the same.*

In some instances, the claimed design patent and accused design will be sufficiently distinct that it will be clear without reviewing prior art that a finding of infringement would be improper because the patent holder "has not met its burden of proving the two designs would appear 'substantially the same' to the ordinary observer, as required by *Gorham*." *Egyptian Goddess*, 543 F.3d at 678.

Plaintiff argues that due to the "numerous distinguishing features, the overall appearance of the Accused Product looks plainly dissimilar from the design claimed by the '828 Patent." Pltff. Mot. at 20:15-16.  Thus, Plaintiff urges the Court to grant a summary judgment of noninfringement in Plaintiff's favor because an ordinary observer could not be deceived into thinking they are buying Defendants' product when they purchase Plaintiff's product. *Id.* at 20:16-23.  According to Plaintiff, the 828 Patent and Lotus Bags are so dissimilar the Court need not resort to an examination of prior art. *Id.* at 17:22-27.

Plaintiff refers the Court to the case of *Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 934 (Fed. Cir. 2014) in support of its argument that the Court need not resort to examination of the prior art.  In *Anderson*, the Federal Circuit affirmed the district court's dismissal of a complaint for failure to state a claim after the plaintiff sued a corporation for infringement of her design patent for an absorbable disposable undergarment. *Id.* at 929. The court concluded that the district court had properly ruled that plain differences existed

-60-

between the accused products and the patented design, including but not limited to the accused product having a boxer-short-style layer over it, which the patented design lacked, while also missing the "inverted-U-section" of the patented design. *Id.* at 934. In the alternative, however, the court concluded the accused product was indistinguishable from a publication which qualified as prior art to the claimed patented design at issue. *Id.* Thus, the court reasoned that if the accused product infringed the patented design, then, the patented design must closely resemble the prior art and would also be invalid in light of the prior art (e.g., the publication). *Id.* However, the court declined to address the invalidity issue due to the fact that it had already decided to affirm the court's judgment of noninfringement. *Id.*; *see also Int'l Seaway*, 589 F.3d at 1243 ("Because we cannot say that these differences are insignificant as a matter of law, a genuine issue of material fact exists as to whether the designs would be viewed as substantially similar in the eyes of the ordinary observer armed with the knowledge of the prior art.").

Unlike the *Anderson* court, which concluded the accused product was plainly dissimilar such that consideration of prior art was not necessary to find noninfringement, 570 F. App'x at 934, this Court finds the products are not plainly dissimilar without reference to prior art. In the present case, at first glance, the Court concludes that an ordinary observer would, in fact, find the 828 Patent and Lotus Bags/912 Patent substantially similar such that, disregarding the different logos[14], a reasonable consumer

_____

[14] Plaintiff argues that its Lotus logo is one of its distinguishing features. Pltff. Mot. at 20:17-18. In analyzing whether the design patent is similar or dissimilar to the accused product, however, the Court does not consider the logos on either design/product. First, the logos fall under the ambit of trademark protection, which is analyzed below. Second, the logos are not part of the drawings submitted to the USPTO. *See, e.g.*, *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 990 (Fed. Cir. 1993) (noting that "[p]roper application of the *Gorham* test requires that an accused design be compared to the claimed design, not to a commercial embodiment"). For example, in *Payless*, Payless, like Plaintiff here, filed a complaint for declaratory judgment against Reebok, seeking a declaration that Payless' footwear did not infringe on Reebok's trademarks, trade dress, or design patents. *Id.* at 986. Reebok, in turn, filed a counterclaim, alleging, *inter alia*, trademark infringement, patent infringement, and unfair competition claims. *Id.* at 986.

would be confused into being one believing it to be the other. As shown below, a comparison of both parties' designs as well as of both parties' actual products indicates they are extremely similar and have only subtle differences:

| | Defendant TB's Patent: | Plaintiff's Patent: |
|---|---|---|
| Patent No.: | 828 Patent | 912 Patent |
| Drawings: |  FIG. 5  FIG. 8  FIG. 9 |  FIG. 1  FIG. 3  FIG. 5 |

As part of its allegations, Reebok contended that Payless' XJ 900 model infringed the trade dress of Reebok's U.S. Patent Des. 326,353. *Id.* at 987. The Federal Circuit held that "the district court was improperly influenced by features extraneous to the claimed design." *Id.* at 990. In particular, it pointed out that the district court "found that the design of Payless' XJ 900 model was distinguishable from the design claimed in the '353 patent because the XJ 900 had additional black coloring and did not have the logo 'PUMP' that is printed on the orange basketball on the tongue of the Reebok shoe." *Id.* However, "[n]one of those cited features . . . is part of the claimed designs and thus they may not serve as a valid basis for comparison in a design patent infringement analysis." *Id.* Thus, to consider the logos of the bags as a potentially distinguishing feature would be improper. *See id.*

| | | |
|---|---|---|
| **Pictures:** *See* ECF No. 80-9 at 13-16 |  |   Logo / VELCRO HANDLE |
| |   NO POCKETS, NO REMOVABLE POLES NO VELCRO CLOSURES |   EGG & WINE HOLDERS |
| |  |   Large Lotus Logo    Straps go around entire bag |
| |   NO INSULATED BAG NO CLOSURE SMALL HANDLES NO REMOVABLE POLES |   Velco Closure / INSULATION |

-63-

  

Without examining prior art, and excluding the logos, the bags are not plainly dissimilar, so the Court proceeds to analyze the products in light of prior art.

### b. *When considering prior art, the products differ.*

When a claimed design patent and accused design "are not plainly dissimilar, resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of the claimed and accused designs with the prior art, as in many of the cases discussed above and in the case at bar." *Egyptian Goddess*, 543 F.3d at 678. "The patentee must establish that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design." *Richardson*, 597 F.3d at 1295. "In such cases, it is a simple matter to identify the point of novelty and to determine whether the accused design has appropriated the point of novelty,[15] as opposed to copying those

---

[15] Although courts no longer apply a point of novelty test where the patent owner must prove that the similarities between the patented design and accused product are attributable to "the novelty which distinguishes the patented device from the prior art," courts still consider the patented design in the context of prior art. *Lanard Toys*, 958 F.3d at 1344 (concluded that "as a matter of claim construction, the district court undoubtedly

aspects of the claimed design that were already in the prior art." *Egyptian Goddess*, 543 F.3d at 671. "Where there are many examples of similar prior art designs, . . . differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art." *Id.* at 678.

"If the accused design has copied a particular feature of the claimed design that departs conspicuously from the prior art, the accused design is naturally more likely to be regarded as deceptively similar to the claimed design, and thus infringing." *Egyptian Goddess*, 543 F.3d at 677. Thus, "[i]f the claimed design consists of a combination of old features that creates an appearance deceptively similar to the accused design, even to an observer familiar with similar prior art designs, a finding of infringement would be justified." *Id.* at 677-78. However, if the patented design consists of a combination of old features from prior art that creates an appearance that is not similar to the accused product, a finding of infringement is not justified. *Id.*

Plaintiff argues that because the design of its bags shares similar features with prior art that are not present in Defendants' design, the Court cannot find infringement, and as such, should grant summary judgment of noninfringement in Plaintiff's favor. Pltff. Mot. at 24:8-21. As an example, Plaintiff points out that with respect to its products: (1) RCD 0001 contains a mesh/translucent feature, an additional carrying handle, and detailed handle stitching that extends the vertical length of the bag that are also present in Lotus Bags and the 912 Patent but not in the 828 Patent, *id.* at 21:15-18; (2) RCD 0002 contains the mesh/translucent design that is not present in the 828 Patent, *id.* at 22:14-28; and (3)

_____

considered the points of novelty of the patented design over the prior art"). "When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art." *Id.* (citing *Egyptian Goddess*, 543 F.3d at 676). If the patented design is close to the prior art designs, minor differences between the patented design and accused product's design are likely to be important to the eye of the hypothetical ordinary observer. *Lanard Toys*, 958 F.3d at 1344.

-65-

the Doyle Patent discloses the addition of a carrying handle and detailed handle stitching extending vertically through the length of the bag, *id.* at 24:1-14.  Defendants respond that their expert "explained why Plaintiff's accused products are substantially more similar to the patented design than to each of the prior art references identified by Plaintiff."  Def. Oppo. at 12:12-20 (citing unclear portions of the Bjurstrom report, which Defendants argue show that the shape, handle location, design, and horizontal rods of Plaintiff's bags are substantially similar to Defendants bags while the handle design and location as well as rod configuration are substantially different from the Doyle Patent and RCD designs).[16]

In *Seirus Innovative Accessories, Inc. v. Cabela's Inc.*, 827 F. Supp. 2d 1150, 1153-57 (S.D. Cal. 2011) (Huff, J.), a case cited by Plaintiff, the court granted the defendants' motion for summary judgment of non-infringement as to a patent covering the ornamental design of a neck protector, referred to as the 652 Patent.  The *Seirus* plaintiff filed suit against the defendants, contending that the defendants' Neck Gaiter infringed on the plaintiff's 652 Patent, and the defendants filed an answer asserting various counterclaims and affirmative defenses, including non-infringement.  *Id.* at 1153, 1156.  The court pointed out that the accused product (e.g., the Neck Gaiter) and the prior art both had diagonal zippers while the 652 Patent was "limited to a design with a vertical zipper."  *Id.* at 1156.  The court rejected the plaintiff's argument that consideration of the zippers ignored the 652 Patent as a whole by placing undue emphasis on the zippers.  *Id.*  It reasoned that the Federal Circuit has reiterated that "[w]hen the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art."

---

[16]     Defendants cite to various portions of the Bjurstrom report throughout their opposition by citing only to the Exhibit letter and paragraph rather than the ECF number and page number.  This made it difficult for the Court to review Defendants' citations given the number of exhibits along with the fact that some of the paragraph citations were either incorrect or did not state what Defendants asserted.  In the future, and with trial approaching, the Court asks the parties to refer to the ECF number of any reports or exhibits at least for the first time any such report is referenced in a brief.

*Id.* at 1156-57 (citing *Egyptian Goddess,* 543 F.3d at 676).  As a result, it concluded that "an ordinary observer familiar with the prior art would be drawn to the difference in the two zippers, and would be able to distinguish the Neck Gaiter from the design of the 'D652 Patent."  *Id.* at 1157.  Thus, the Court ruled there was "no triable issue of material fact applying the standards in *Egyptian Goddess* to these facts," granted the defendants' motion for summary judgment, and concluded the Neck Gaiter did not infringe the 652 Patent.  *Id.*

Similar to *Seirus*, where the Court found the ordinary observer would be able to distinguish the Neck Gaiter from the claimed 652 design patent on the basis of the zipper difference, which was present in the prior art, 827 F. Supp. 2d at 1156, this Court agrees with Plaintiff that the features that distinguish the Lotus Bags from the 828 Patent are present in the prior art.  Those features distinguishing the Lotus Bags from the 828 Patent include but are not limited to the (1) mesh translucent feature; (2) additional carrying handle; and (3) detailed handle stitching extending down the vertical length of the bag.  As shown below, all of these distinguishing features are present in the prior art:

| Distinguishing Features Present in 912 Patent but not in 828 Patent: | 828 Patent: | Lotus Bags/912 Patent: | Prior Art: |
|---|---|---|---|
| Mesh/ Translucent Feature | FIG. 1 |  | RCD 0001<br>RCD 002 |

-67-



Pltff. Mot. at 21-23.

Finally, "a design patent is not a substitute for a utility patent," so "[a] device that copies the utilitarian or functional features of a patented design is not an infringement unless the ornamental aspects are also copied, such that the overall 'resemblance is such as to deceive.'" *Lee*, 838 F.2d at 1189. Here, the Court finds that even if Plaintiff had copied features from Defendants' design, a finding of infringement would still not be warranted because if Plaintiff copied any features, those features were functional and not protectable.

Because the distinguishing features of the 828 Patent are present in the prior art, even if the Court had found the 828 Patent valid, the Court finds Plaintiff has not infringed. Plaintiff's Motion for Summary Judgment on the basis of non-infringement is granted.

### 3. *Trademark Infringement*

"The Lanham Act defines a trademark as 'any word, name, symbol, or device, or any combination thereof' used by any person 'to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'" *Marketquest*, 316 F. Supp. 3d at 1256 (citing 15 U.S.C. § 1127). "In effect, the trademark is the commercial substitute for one's signature." Garner, Brian A., *Black's Law Dictionary*, (11th ed. 2019).

-68-

Plaintiff seeks summary judgment as to Trolley Bags' counterclaim for trademark infringement by arguing that its use of the term "Lotus Trolley Bag" does not infringe on Defendants' claimed Trademark of "TROLLEY BAGS." *See* Pltff. Mot. at 33:8-12. As a preliminary matter, the Court notes that neither party makes explicitly clear—neither in the pleadings nor the briefing pertaining to these cross-motions for summary judgment— whether the trademark at issue pertains to the term "trolley bags," Trolley Bags' logo, and/or a combination of the two. An examination of the two logos indicates that the logos themselves appear to be markedly different:



| Plaintiff's Logo: | Trolley Bags' Logo: |
|---|---|
| ECF No. 83-5 at 36. | ECF No. 83-4[17] |

*See, e.g.*, *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1165 (9th Cir. 2009) ("A side-by-side comparison of the two marks speaks for itself" and showed that the marks were "drastically different," meaning that no reasonable jury could find a likelihood of

---

[17]   Despite both parties providing the Court with more than 1,231 pages of exhibits to review related to these cross-motions for summary judgment, none of those documents contained a clear photograph of Trolley Bags' logo. However, Plaintiff's Motion contained the USPTO Notice of Suspension regarding Trolley Bags' U.S. Trademark Application No. 87531929, *see* ECF No. 83-4, which contained a link stating, "VIEW YOUR APPLICATION FILE," which allowed the Court to access public records containing Trolley Bags' application for trademark protection as well as its trademark specimen, which is shown above. This application may be accessed here: https://tsdr.uspto.gov/documentviewer?caseId=sn87531929&docId=RFA20170721074812#docIndex=5&page=1 (the "Application"). The Court takes judicial notice of the Application *sua sponte*. *See GeoVector*, 234 F.Supp.3d at 1016 n.2.

   Both parties are also reminded that pursuant to Section 2(e) of the Electronic Case Filing Manual, all parties are required to submit courtesy copies to chambers of any filings exceeding twenty (20) pages.

confusion).  As such, the Court construes the claims at issue as pertaining only to the use of the term "trolley bags."  Further, Trolley Bags' Application seems to confirm this conclusion because under "Mark Information," it has a subcategory for "Mark," which merely lists the words "TROLLEY BAGS."  *See* Application.  Under "Mark Statement," it also says "[t]he mark consists of standard characters, without claim to any particular font style, size, or color."  *Id.*  However, under "Specimen," it does display the logo above.  Nonetheless, the Court proceeds by analyzing the mark in dispute as pertaining only to the use of the term "trolley bags."

In order to prevail on a federal common law trademark infringement claim, the party alleging infringement must establish (1) a protected interest (e.g., a trademark) and (2) the use of that protected interest by the party accused of infringing on the trademark is likely to cause consumer confusion.  *Levi Strauss*, 778 F.2d at 1354.  "To receive federal protection, a trademark must be (1) distinctive rather than merely descriptive or generic; (2) affixed to a product that is actually sold in the marketplace; and (3) registered with the U.S. Patent and Trademark Office."  Garner, *Black's Law Dictionary*, TRADEMARK.  Unregistered trademarks, like the one at issue here, "are protected under common-law only, and distinguished with the mark 'TM.'"  *Id.*  To receive common law trademark protection, a trademark must prove distinctiveness by showing it "(1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning."  *Two Pesos*, 505 U.S. at 769.

Plaintiff argues that Defendants' trademark infringement claims fail because the term "TROLLEY BAG" (1) is merely descriptive; (2) has not acquired secondary meaning; and (3) causes no likelihood of confusion.  Pltff. Mot. at 29:22-12.  Defendants respond that they "have sufficient evidence that the TROLLEY BAGS mark is distinctive, either because it is suggestive (and thus inherently distinctive) or because it has acquired secondary meaning."  Def. Oppo. at 26:14-16.  They base this argument on the fact that the term trolley itself "is not a common term for a shopping cart in the United States."  *Id.* at 26:16-18.  Plaintiff responds by arguing that Defendants concede they can only establish entitlement to trademark protection through secondary meaning but have presented no such

1  evidence.  Pltff. Reply at 8:21-25.  Thus, Plaintiff argues that in the absence of evidence of
2  secondary meaning, Plaintiff should receive summary judgment on Defendants'
3  counterclaim for trademark infringement.  *Id.*

4      "The plaintiff bears the ultimate burden of proof in a trademark-infringement action
5  that the trademark is valid and protectable."  *Zobmondo*, 602 F.3d at 1113.  However,
6  "federal registration provides 'prima facie evidence' of the mark's validity and entitles the
7  plaintiff to a 'strong presumption' that the mark is a protectable mark."  *Id.* (citing, *inter
8  alia*, 15 U.S.C. §§ 1057(b), 1115(a)).  Here, the UPSTO denied Defendants federal
9  registration.  "[W]hen a mark is not registered, the presumption of validity does not apply."
10  *Yellow Cab*, 419 F.3d at 928.  Thus, when a party claims a trademark is not protected due
11  to genericness "in an infringement case involving an unregistered mark," as Plaintiff claims
12  in this case,[18] the party claiming trademark protection, which in this case is Trolley Bags,
13  "has the burden of proof to show that the mark is valid and not generic."  *Id.*

14      The Lanham Act allows for registration of a trademark so long as the trademark does
15  not consist of, *inter alia*, (1) a mark so resembling another mark registered in the USPTO
16  "as to be likely, when used on or in connection with the goods of the applicant, to cause

17
18  ---

[18]   Defendants claim that Plaintiff argues their disclaimer of the term before the USPTO
19  means that Defendants also disclaimed any right to common law trademark protection.
20  Def. Oppo. at 29:18-30:25 (citing Pltff. Mot. at 20:24).  While the Court does not construe
the cited portion of Plaintiff's Motion as advancing that argument, it agrees with
21  Defendants that if Plaintiff intended to advance that argument, it would not warrant
granting summary judgment in favor of Plaintiff and against Defendants.  The Lanham Act
22  explicitly states that a disclaimer will not "prejudice or affect the applicant's or registrant's
rights then existing or thereafter arising in the disclaimed matter."  15 U.S.C. § 1056(b);
23  *see also Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*, 448 F.3d
1118, 1125 (9th Cir. 2006) ("Registration under the Lanham Act has no effect on the
24  registrant's rights under the common law, which requires a mark to have been used in
commerce before a protectible ownership interest in the mark arises."); *Official Airline
25  Guides, Inc. v. Goss*, 856 F.2d 85, 87 (9th Cir. 1988) (noting that the plaintiff's disclaimer
of the claimed trademarked phrase in its registration did not deprive it of any common law
26  rights it may have had in the disclaimed matter).  Thus, Defendants are correct that even in
27  the presence of a disclaimer of the rights provided by federal registration, Defendants may
28  still prove entitlement to common law trademark protection.

confusion'" or (2) a mark that when used on or in connection with the goods is (a) merely descriptive or deceptively misdescriptive of them, (b) "primarily geographically descriptive of them," (c) "primarily geographically deceptively misdescriptive of them," (d) "is primarily a surname," or (e) "compromises any matter that, as a whole, is functional." 15 U.S.C. § 1052. Here, Defendants concede that the USPTO rejected their trademark application as merely descriptive but argue that this does not prevent them from proving trademark protection by establishing secondary meaning. Def. Oppo. at 30:17-20. Thus, the presumption of validity does not apply, and Trolley Bags must prove the mark is valid rather than generic. *Yellow Cab*, 419 F.3d at 928.

"In ruling on a motion for summary judgment, our inquiry 'necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.'" *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010). The Ninth Circuit has indicated that the "Lanham Act's likelihood of confusion standard is predominantly factual in nature." *Wendt*, 125 F.3d at 812. "'[S]ummary judgment is generally disfavored in the trademark arena' due to 'the intensely factual nature of trademark disputes.'" *Marketquest Grp.*, 862 F.3d at 932; *see also Fortune Dynamic*, 618 F.3d at 1031. "However, 'this is not invariably so.'" *Marketquest Grp.*, 316 F. Supp. 3d at 1255. "Claims or affirmative defenses in a trademark infringement action that lack a sufficient evidentiary basis under the applicable standard of proof, or for which there are only questions of law for the court to resolve, are appropriate for summary resolution." *Marketquest Grp.*, 316 F. Supp. 3d at 1255-56. As outlined below, this Court concludes that despite "the intensely factual nature of trademark disputes," Plaintiff has shown that Defendants lack evidence sufficient to create a genuine issue of fact that Plaintiff's Lotus Trolley Bag caused a likelihood of confusion. Thus, the Court grants Plaintiff's Motion for Summary Judgment on the basis of noninfringement as to Defendants' claimed trademark.

a.   *The distinctiveness of the mark*

The first step in claiming infringement requires the mark maker to show a "valid, protectable trademark." *Brookfield*, 174 F.3d at 1046. "The existence and extent of

-72-

trademark protection for a particular term depends on that term's inherent distinctiveness." *Calista Enters. v. Tenza Trading Ltd.*, 43 F.Supp.3d 1099, 1115 (D. Or. 2014) (citing 15 U.S.C. § 1052). "Marks are often classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos*, 505 U.S. at 768. "Which category a mark belongs in is a question of fact." *Zobmondo*, 602 F.3d at 1113. "Suggestive, arbitrary, and fanciful marks are considered 'inherently distinctive' and are automatically entitled to federal trademark protection because 'their intrinsic nature serves to identify a particular source of a product.'" *Id.* "'Generic' marks, or 'common descriptive' names for what a product is, are the weakest category and receive no trademark protection." *Marketquest*, 316 F. Supp. 3d at 1257. "A 'descriptive' mark may be entitled to protection *only* if it has acquired distinctiveness through secondary meaning." *Id.*

Here, the parties apparently agree that the mark belongs either in the descriptive or suggestive category, Def. Oppo. at 30:17-20; Pltff. Mot. at 31:6-7 (arguing that the "mark is clearly descriptive"), and as such, there is no genuine issue of material fact if the Court determines that the alleged mark fails to qualify under one of those categories. Defendants argue their trademark falls within the categories of either a descriptive or suggestive mark. Def. Oppo. at 26:14-16. Plaintiff argues that because the term "TROLLEY BAG" merely describes the product itself, it receives no trademark protection. Pltff. Mot. at 30:16-31:12. Defendants argue the record establishes that the mark is a generic term outside the United States, but within the United States, it is suggestive, and thus, protectable. *Id.* at 27:20-24.

i.   <u>The term Trolley is not generic in the United States</u>

"*Generic marks* give the general name of the product; they embrace an entire class of products." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n. 8 (9th Cir. 1998). "For instance, 'Liquid controls' is a generic term for equipment for dispensing and mixing liquids, and 'Wickerware' is a generic term for wicker furniture and accessories, because those terms simply state what the product is." *Id.* (internal citations

-73-

omitted).

Trademarks may be generic in a foreign country and suggestive within the United States. *See, e.g.*, *Anheuser-Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 642 (8th Cir. 1984) (holding that the district court correctly declined consideration of the Australian experience regarding whether the term "LA" meant "low alcohol beer" because the case involved U.S. trademark law, meaning the Australian experience was not relevant); *UGG Holdings, Inc. v. Severn*, No. CV04-1137-JFW FMOX, 2005 WL 5887187, at *6 (C.D. Cal. Feb. 23, 2005) (granting the plaintiff's motion for summary adjudication "[b]ecause there is no genuine issue of material fact as to the validity and protectability of Plaintiff's trademark" where the defendant was infringing on the plaintiffs' trademark but had argued the term "ugg" is generic in Australia, and thus, the court should apply the doctrine of foreign equivalents to find that the term is unprotectable in the United States); *Carcione v. Greengrocer, Inc.*, No. S-78-561, 1979 WL 25110, at *1-2 (E.D. Cal. Oct. 12, 1979) (denying the defendant's motion for summary judgment on the ground that the term "Greengrocer" is a generic term, and therefore, not protected by trademark law because there was an issue of material fact: Even though both parties agreed the term "greengrocer" was generic in Britain, they disagreed as to whether it was generic in the United States).

Here, Defendants concede that that "[t]he record establishes that the term 'trolley' is a generic term outside the United States." Def. Oppo. at 27:20-21. However, they contend it is suggestive within the United States. *Id.* at 27:20-23. They further argue the term is distinctive and protectable within the United States because the term "trolley" is not a common term for a shopping cart in the United States. *Id.* at 26:16-18. Both parties agree that the dictionary defines "trolley" as "a wheeled cart or stand pushed by hand and used for moving heavy items, such as shopping in a supermarket or luggage at a railway station." Pltff. Mot. at 31:9-12; Def. Oppo. at 18-24. The Court notes that as Defendants have pointed out, the dictionary definition relied upon by both parties is shown as a British term. Def. Oppo. at 18:18-24. However, contrary to Defendants' assertion that both of Plaintiff's corporate witnesses and co-founders confirmed that "the term 'trolley bags' … is not

-74-

1   common in the United States," Def. Oppo. 9 at 27:11-19 (citing to Jennifer Duvall's

2   Deposition Transcript, ECF No. 89-11 at 10, and Farzon Dehmoubed's Deposition

3   Transcript, ECF No. at 80-8 at 14), reference to the citations given confirms those witnesses

4   did not, in fact, testify to that effect.

5        Based on the evidence cited by both parties, Plaintiff has failed to show the absence

6   of a genuine issue of fact as to whether the term "trolley" is generic within the United

7   States.  Rather, the evidence in the record supports a finding that a reasonable jury would

8   conclude the term is not, in fact, generic.  As such, in order to prevail on its Motion for

9   Summary Judgment, Plaintiff must prove that the term is descriptive or suggestive.

10              ii.    The term Trolley Bag is suggestive rather than descriptive

11       Whether a mark is descriptive or suggestive is a hotly disputed issue because

12  descriptive marks only receive trademark protection if secondary meaning is proved while

13  suggestive marks "receive trademark protection without proof of secondary meaning."

14  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142, n. 3 (9th Cir. 2002).  Plaintiff

15  argues that because the term "trolley bag" merely describes the qualifies or characteristics

16  of the product, it is merely descriptive and not entitled to trademark protection.  Plff. Mot.

17  at 31:6-12.  Plaintiff relies on the example cited by several courts that "Honey Baked Ham"

18  has been held to be "a descriptive term for a ham that has been baked with honey."

19  *Kendall-Jackson*, 150 F.3d at 1047 n.8; *Marketquest Grp.*, 316 F. Supp. 3d at 1258.

20  Defendant responds that because the average American consumer would not understand

21  trolley to refer to a shopping cart, the term "trolley bag" would not be understood by the

22  average consumer as describing a bag for a shopping cart.  *See generally* Def. Oppo.

23       "*Descriptive marks* define qualities or characteristics of a product in a

24  straightforward way that requires no exercise of the imagination to be understood."

25  *Kendall-Jackson*, 150 F.3d at 1047 n. 8.  "A trademark is descriptive if it describes the

26  product to which it refers or its purpose." *Self-Realization Fellowship Church v. Ananda

27  Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995).  "If a consumer must use

28  imagination or any type of multistage reasoning to understand the mark's significance, then

-75-

the mark does not *describe* the product's features, but *suggests* them." *Kendall-Jackson*, 150 F.3d at 1047 n. 8.  "Such a mark is therefore classified as 'suggestive' rather than 'descriptive.'" *Id.*  "Examples of *suggestive marks* include 'Air Care' for a service that maintains medical equipment used for administering oxygen, and 'Anti–Washboard' for a soap that makes scrubbing unnecessary when washing clothes." *Id.*

The term "trolley bag" does, in fact, describe the product.  However, the Court finds that the average consumer would not understand "trolley bag" to describe a bag for a shopping cart but rather would require "multistage reasoning to understand the mark's significance" (e.g., knowing that trolley is a term for a shopping cart in the United Kingdom). *Kendall-Jackson*, 150 F.3d at 1047 n. 8.  Accordingly, the Court determines that the term "trolley bag" is a suggestive mark.

Because the Court determines the claimed mark is suggestive, proof of secondary meaning is not required for the mark to receive trademark protection. *Entrepreneur Media*, 279 F.3d at 1142, n. 3.  However, if the Court had found the mark to be descriptive, secondary meaning would be required, and the Court finds that Defendants' scant cited evidence in the record did not create a genuine issue of fact as to secondary meaning.  As a result, if the Court had found the mark descriptive, the lack of evidence of secondary meaning sufficient to create a genuine issue of fact would have resulted in Defendants' claimed trademark receiving no protection.  However, having concluded Defendants established a genuine issue of fact as to whether they have a protectable mark by presenting evidence of a suggestive mark, Plaintiff must establish an absence of evidence of likelihood of confusion in order to prevail on its motion for summary judgment of non-infringement of Defendants' claimed mark. *Levi Strauss*, 778 F.2d at 1354.

> b.  *In the absence of evidence showing a likelihood of confusion, there is no genuine issue of fact as to non-infringement*

Likelihood of confusion is a question of material fact. *Levi Strauss*, 778 F.2d at 1356, n.5.  "The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of

-76-

the goods or services bearing one of the marks or names at issue in the case." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2011).  "Eight factors, sometimes referred to as the *Sleekcraft* factors, guide the inquiry into whether a defendant's use of a mark is likely to confuse consumers." *Fortune Dynamic*, 618 F.3d at 1030.  Those eight factors consider the following: (1) strength of the mark, (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) type of goods and the degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines. *Rearden*, 683 F.3d at 1209, (citing *Sleekcraft*, 599 F.2d at 348-49).

"The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are not intended to be a 'rote checklist.'" *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (quoting *Rearden*, 683 F.3d at 1209).[19]  "Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Brookfield*, 174 F.3d at 1054; *see also Stone Creek*, 875 F.3d at 432 ("Two particularly probative factors are the similarity of the marks and the proximity of the goods.").  "A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Rearden*, 683 F.3d at 1209. Considering "the open-ended nature of this multi-prong inquiry, it is not surprising that summary judgment on 'likelihood of confusion' grounds is generally disfavored." *Id.* at 1210.  "However, in cases where the evidence is clear," the Ninth Circuit has "not hesitated to affirm summary judgment on this point." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006).  The Court addresses each *Sleekcraft* factor in

---

[19]    "Not all factors are created equal, and their relative weight varies based on the context of a particular case." *Stone Creek, Inc. v. Omnia Italian Design, Inc.,* 875 F.3d 426, 431 (9th Cir. 2017), *cert. denied*, —U.S.—, 138 S. Ct. 1984 (2018).

3:18-cv-02109-BEN-LL

turn.  However, as with secondary meaning, Defendants have failed to present sufficient evidence as to the *Sleekcraft* factors, such that the Court must grant summary judgment in favor of Plaintiff and against Defendants as to the infringement issue.

i.    <u>Strength of the mark</u>

"The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).  A mark's strength is evaluated based on two components: "the mark's inherent distinctiveness (i.e., its conceptual strength)" and "the mark's recognition in the market (i.e., its commercial strength)." *Stone Creek*, 875 F.3d at 432.

"A mark's conceptual strength 'depends largely on the obviousness of its connection to the good or service to which it refers.'" *JL Beverage Co.*, 828 F.3d at 1107 (quoting *Fortune Dynamic*, 618 F.3d at 1032-33).  "The more distinctive a mark, the greater its conceptual strength; in other words, a mark's conceptual strength is proportional to the mark's distinctiveness." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005).  Suggestive marks, which fall in the middle of the spectrum, "suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product." *JL Beverage Co.*, 828 F.3d at 1107.  In this case, the Court has already ruled that the mark at issue is suggestive at best.

"After identifying whether a mark is generic, descriptive, suggestive, arbitrary, or fanciful, the court determines the mark's commercial strength." *Id*.  Commercial strength "is based on actual market place recognition." *Network Automation Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (internal quotations omitted).  It "may be demonstrated by commercial success, extensive advertising, length of exclusive use, and public recognition." *Adidas Am., Inc. v. Calmese*, 662 F. Supp. 2d 1294, 1303 (D. Or. 2009).  Further, "a suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success" or by advertising expenditures that increase its market recognition. *M2 Software*, 421 F.3d at 1081.

-78-

In this case, Defendants cited to no evidence whatsoever in support of the *Sleekcraft* factors and rather merely conclusorily stated that several of the factors weighed in Defendants' favor.  Notably, the four factors Defendants stated weighed in their favor did not include strength of the mark.  Defs. Oppo. at 31:7-12.  Without evidence creating a genuine issue of fact as to the strength of the mark, summary judgment could be granted in Plaintiff's favor.  However, Defendants discuss evidence of advertising, exclusive use, and public recognition to show secondary meaning, so in an effort to construe all evidence in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), the Court analyzes those issues.

As to advertising, Defendants cited to the amount they spent in advertising to promote their product between November 2016 and August 2019 without providing any detail as to the types of advertisements (e.g., print, television commercials, social media) and/or degree of advertisements (e.g., national, local, etc.).  The Declaration of Joby Cronshaw cited by the Opposition as support for this factor also does not contain this information.  In examining whether advertising is enough to establish secondary meaning, courts examine the advertising's "'amount, nature and geographical scope' with an eye towards how likely the advertising is to expose a large number of the relevant consuming public to the use of the symbol as a trademark or trade name."  *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 875 (9th Cir. 2002).  Here, Defendants have failed to provide any evidence as to the amount, nature, and geographical scope of advertising.

As to exclusive use, Defendants merely state that they have used the mark since at least 2015.  Def. Oppo. at 28:14-17.  As to whether the use of the claimed trademark has been exclusive, Defendants appear to make no argument on this issue beyond stating that they sold bags under the mark from April 2016 and August 2019.  *Id.* at 28:17-20; *see also* Pltff. Reply at 10:16-17 (noting that as to exclusive use, "TB UK provides no argument regarding the length of exclusive use of the mark").  However, as Plaintiff also notes, "the longest period of exclusive use would have been eight (8) months" because "TB UK first used the mark in April 2016" and Plaintiff "started Lotus Bags in the 4th quarter of 2016."

1  Pltff. Reply at 10:16-20.

2       As to public recognition, pertaining to "whether actual purchasers of the product

3  bearing the claimed trademark associated the trademark with the producer," *Japan*

4  *Telecom*, 287 F.3d at 873-75, Defendants merely cite the number of bags they sold from

5  April 2016 to August 2019 under the mark as evidence of this factor.  Def. Oppo. at 28:17-

6  20.  This is not evidence of actual association, and thus, fails to establish public recognition.

7       The Court further finds that Defendants have failed to present evidence as to the

8  commercial strength of the mark given the absence of evidence showing the scope of

9  advertising, exclusivity, and/or public use.  *See, e.g.*, *Brookfield*, 174 F.3d at 1058-59

10  (holding that "the district court did not clearly err in classifying 'MovieBuff' as weak"

11  where the plaintiff claiming trademark infringement presented use of the claimed

12  trademark "MovieBuff" for over five years, expenditures of $100,000 in advertising the

13  mark, and the plaintiff had "not come forth with substantial evidence establishing the

14  widespread recognition of its mark").   The Court finds that no genuine issue of fact exists

15  as to the strength of the mark given Defendants' failure to provide evidence.

16              ii.    Proximity/relatedness of the goods

17       "Related goods are generally more likely than unrelated goods to confuse the public

18  as to the producers of the goods." *Brookfield*, 174 F.3d at 1055.  "For related goods, the

19  danger presented is that the public will mistakenly assume there is an association between

20  the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d

21  at 350.  In addressing this factor, the Court focuses on whether the consuming public is

22  likely to somehow associate Defendant's Lotus Bags with Plaintiff's Trolleybags.

23  *Brookfield*, 174 F.3d at 1056; 4 J. Thomas McCarthy on Trademarks and Unfair

24  Competition, § 24:24 (5th ed. 2017) ("Goods are 'related' if customers are likely to

25  mistakenly think that the infringer's goods come from the same source as the senior user's

26  goods or are sponsored by, affiliated with or connected with the senior user.").  Here,

27  Defendants failed to present any evidence in their opposition as to the relatedness of the

28  goods beyond their conclusory statements that "proximity of the goods" supports a finding

of likelihood of confusion.  The Court, nonetheless, concludes that the two marks, both of which pertain to shopping bags, are related.  This factor slightly weighs in Defendants' favor despite their failure to provide any evidence on the issue.

### iii.    Similarity of the marks

"[T]he similarity of the marks…has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo.com*, 202 F.3d at 1205; *Brookfield*, 174 F.3d at 1054.  "Three general principles help determine whether the marks are similar." *Fortune Dynamic*, 618 F.3d at 1032.  First, "[s]imilarity is best adjudged by appearance, sound, and meaning." *Id.*  Second, even where the marks are identical, "their similarity must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase." *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984).  "Third, similarities are weighed more heavily than differences." *Fortune Dynamic*, 618 F.3d at 1032.  "Packaging is certainly a factor in the overall appearance of a mark in the marketplace." *PowerFood, Inc. v. Sports Science Inst.*, No. C-93-0259 MHP, 1993 WL 13681782, at *6 (N.D. Cal. Mar. 11, 1993).  The Ninth Circuit has held that use of a house mark or distinctive logo on packaging and advertising can reduce the likelihood of confusion.  *Lindy Pen Co., Inc.*, 725 F.2d at 1245 n.4.

In *Lindy Pen Co*., after concluding that the marks themselves were identical if viewed in isolation, the Ninth Circuit looked at how the Lindy's "Auditor's" and Bic's "Auditor's fine point" appeared in the marketplace and held that the appearance of the pens, packaging, and display and promotional materials were dissimilar and readily distinguishable.  725 F.2d at 1245.  The court observed that the pens' dissimilar appearance; dominance of the company marks and logos on the pens themselves; and the dissimilar and distinctive packaging and promotional material overcame the similarity of the marks considered in isolation.  *Id.*; *see also Charles Schwab & Co., Inc. v. Hibernia Bank*, 665 F. Supp. 800, 808 (N.D. Cal. 1987) (the house mark was downplayed in brochures and advertisements while the infringing mark was in bold and more conspicuous mark; therefore, marks were identical); *PowerFood, Inc.*, 2013 WL 13681782, at *7

-81-

("packaging element which renders marks dissimilar is the appearance of conspicuous 'house marks', or producer names, on the labels.")

Defendants conclusorily state that the similarity of the marks strongly supports a finding of likelihood of conclusion. Def. Oppo. at 31:10-12. While Defendants focus on the identical words used in the marks without focusing at all on how the marks appear in the marketplace, the Court must consider both. *See Fortune Dynamic, Inc.*, 618 F.3d at 1032. The Court finds that the two marks, although both containing the term "TROLLEY BAG" in white all capital letters in a Sans Serif typeface, are distinct in the following respects: First, both marks use a different symbol, with Plaintiff's logo containing a lotus flower and Trolley Bags' logo using a shopping cart. Second, Plaintiff's design contains only the logo and words "LOTUS TROLLEY BAG" underneath the flower while Trolley Bags' bags each have numbers on them to indicate bag size, have the term "TROLLEY BAGS" contained within the symbol of the shopping cart, and include the terms "Parking Sorted" with a checkmark, the word "Original" in a script font, and the website. Third, Plaintiff's bags appear to only be available in pastel colors. Defendants' bags, on the other hand, come in primary and secondary colors. Like the *Lindy Pen* court, this Court concludes that even though the marks use the same term, the dominance of the logos on the bags, distinctive packaging, coloring, and overall appearance make the marks dissimilar. Thus, this factor weighs against a finding of infringement.

### iv.   Evidence of Actual Confusion

"[E]vidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion, finding." *Rearden*, 683 F.3d at 1210. Moreover, "[e]vidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely."[20] *Sleekcraft*, 599 F.2d

---

[20]   "In the Ninth Circuit, district courts often rely on three types of evidence to demonstrate actual confusion: (1) evidence of actual instances of confusion; (2) survey evidence; and (3) inferences arising from judicial comparison of the conflicting marks and the context of their use in the marketplace." *HM Elecs. v. R.F. Techs.*, No. 12-CV-2884-MMA (WMC), 2013 WL 120074966, at *5 (S.D. Cal. Oct. 3, 2013).

at 352.  Nevertheless, "[b]ecause of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive."  *Id.* at 353.  Thus, "this factor is weighed heavily only when there is evidence of past confusion…."  *Id.*

Plaintiff argues that "there have been no incidents of actual confusion."  Pltff. Mot. at 33:10.  Defendants have failed to provide any evidence to the contrary.  *See generally* Def. Oppo.  In light of Defendants' failure to direct the Court to any evidence of actual confusion, this factor weighs strongly against a finding of infringement.

v.   <u>Marketing Channels Used</u>

"Convergent marketing channels increase the likelihood of confusion."  *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987).  "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products."  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014).  "The greater the degree of overlap, the more likely there is to be confusion."  *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1180 (C.D. Cal. 2010) (citing *Sleekcraft*, 599 F.2d at 353).

Here, Defendants failed to provide any evidence as to the marketing channels they used compared with the marketing channels used by Plaintiff.  Defendants have not shown how the two parties advertise or market their products.  *See, e.g.*, *Cont'l Lab. Prod., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1001 (S.D. Cal. 2000) (providing that with respect to secondary meaning, even assuming a flyer advertisement drew attention to the product at issue, the plaintiff provided "no evidence as to the number of flyers distributed, how they were distributed and who received them"; thus, there was "no evidence that this brief run of promotional flyers . . . had any effectiveness in creating secondary meaning"); *see also Echo Travel, Inc. v. Travel Associates. Inc.*, 870 F.2d 1264, 1269-70 (7th Cir.1989) (affirming summary judgment against a trademark plaintiff who placed 25,000 promotional posters on college campuses but failed to provide evidence as to the amount of time the posters remained hanging, number of students at various campuses, and other relevant demographic evidence).  From the pleadings and briefs, it is clear both parties used

-83-

the Internet and Amazon.com to advertise.  Nonetheless, such advertising is common with many retailers.  As is, the lack of evidence presented by Defendants as to other convergent marketing channels—such as Instagram, Facebook, commercials, etc.—requires that this factor weighs against a finding of infringement.

> vi.   Type of goods and degree of care likely exercised by purchaser

"In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005).  Courts look both to the "relative sophistication of the relevant consumer," *Fortune Dynamic*, 618 F.3d at 1038, and the cost of the item, *Brookfield*, 174 F.3d at 1060, in determining the degree of care likely to be exercised by the purchaser.  The "reasonably prudent consumer" is expected "to be more discerning— and less easily confused—when he is purchasing expensive items." *Id*.  "On the other hand, when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Id*.

Here, the parties have not presented any evidence as to the cost of their respective products.  They have also failed to present any evidence on the probable degree of care exercised by their consumers.   In the absence of evidence in the record showing that the type of goods and degree of care exercised by purchasers would lend to a likelihood of confusion, the Court finds that this factor weighs against a finding of infringement.

> vii.   Defendant's intent in selecting mark

While "not required for a finding of trademark infringement," *Brookfield*, 174 F.3d at 1059, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public," *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993).  This factor is of "minimal importance." *GoTo.com, Inc.*, at 1208 (declining to attempt to divine the defendant's intent).

Defendants conclusorily argue that the factor of intent in selecting the mark weighs

-84-

in favor of a finding of likelihood of confusion.  Def. Oppo. at 31:10-12.  However, Defendants, although showing that Plaintiff's creators knew of Trolley Bags' products at the time Plaintiff created its own product, have not established intent to appropriate or copy Defendants' trademark.[21]   Because this factor is "minimally important," the Court concludes that this factor is neutral for the purposes of summary judgment.  *See GoTo.com, Inc.*, 202 F.3d at 1208.

### viii.   Likelihood of Expansion of Product Lines

"[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354.  When, however, the parties "already compete to a significant extent," as they do here, this factor is "relatively unimportant" to the likelihood of confusion analysis. *Brookfield*, 174 F.3d at 1060.  Neither party directed the Court to evidence on this issue. Because the parties' goods are already related, the Court finds the factor to be neutral and affords it little weight.

### ix.   Evaluation of the Factors

Plaintiff argues that because "the marks are not confusingly similar, and there have been no incidents of actual confusion," the Court should grant summary judgment in its

---

[21]   Defendants insinuate that Mr. Dehmoubed admitted to copying Defendants' bags. *See* Def. Oppo at 29 (noting that Mr. Dehmoubed testified that he probably purchased one of Defendants' bags in April or May 2017 when designing its own competing bags). However, Mr. Dehmoubed also testified that although he "had seen your client's bag before our bags hit Amazon, . . . it was after we had already designed and had our prototypes and picked the features and functions that we wanted in our bag."  ECF No. 80-8 at 17.  He also testified that he did not make any changes to the Lotus Bags after purchasing one of Defendants' bags.  *Id.*  Thus, contrary to Defendants' suggestion, they have not proven copying.  Further, even if Defendants had provided evidence of copying, which also factors into showing secondary meaning, courts have held that "[e]vidence of deliberate copying does not always support an inference of secondary meaning because 'competitors may intentionally copy product features for a variety of reasons,'" such as choosing "to copy wholly functional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits."  *Seirus Innovative Accessories, Inc. v. Gordini U.S.A. Inc.*, 849 F. Supp. 2d 963, 985 (S.D. Cal. 2012).

favor on Defendants' claim for trademark infringement. Pltff. Mot. at 33:8-12. Defendants argue that Plaintiff's failure to adequately address the fact intensive inquiry of likelihood of confusion somehow constitutes a concession that if Defendants have a protectable mark, there is sufficient evidence of likelihood of confusion. Def. Oppo at 31:4-8. They further contend that several of the *Sleekcraft* factors strongly support a finding of likelihood of confusion. *Id.* at 31:1-28. However, Defendants' only conclusorily allege that several of the *Sleekcraft* factors—such as proximity of the goods, similarity of the marks, marketing channels, and intent in selecting the mark—support a finding of likelihood of confusion without citing to any evidence to support this conclusion. *Id.* at 31:10-12.

Evaluating all the factors and evidence provided by the parties, the Court cannot find that Defendants demonstrated a likelihood of consumer confusion. While the proximity/relatedness of the goods weighed in Defendants' favor, other factors weighed strongly in Plaintiff's favor. The Court also found the factors of intent in selecting the mark and likelihood of expansion of product lines to be neutral. While one of the eight factors favored Defendants, in determining whether a likelihood of confusion of the parties' marks exists, the court does not "merely count beans or tally points." *Stone Creek*, 875 F.3d at 431. "Not all factors are created equal, and their relative weight varies based on the context of a particular case." *Stone Creek*, 875 F.3d at 431. Further, the Court also concluded that Defendants failed to present evidence as to (1) the commercial strength of the mark, (2) actual confusion, (3) marketing channels used, and (4) the type of goods and degree of care exercised by purchasers. Courts must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322; *see also* FED. R. CIV. P. 56(c)(1)(B) (providing that a party moving for summary judgment on the basis that a fact cannot be genuinely disputed may support the party's motion by "showing that the materials cited [in the record] do not establish the . . . presence of a genuine dispute"). As a result, in the absence of evidence on those issues, the Court concludes that there are no genuine issues of material fact, and

the *Sleekcraft* factors weigh in favor of a finding that there was no likelihood of confusion. Therefore, infringement did not occur.

Therefore, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on its trademark infringement claim. The Court enters judgment in favor of Plaintiff as to Plaintiff's Second Claim for Relief seeking a declaratory judgment of non-infringement of the Trademark and against Defendants as to Defendants' related Second Counterclaim, for common law trademark infringement.

### B.   Defendants' Motion for Summary Judgment.

Plaintiff alleges five claims for relief arising out of tort law: the Third Claim for Relief for interference with prospective of contractual economic relations; the Fourth Claim for Relief for negligent misrepresentation; the Fifth Claim for Relief for unfair competition under 15 U.S.C. § 1125; the Sixth Claim for Relief for unfair competition pursuant to Cal. Bus. & Prof. Code § 17200; and the Seventh Claim for Relief for common law unfair competition against. *See* Compl.

Defendants argue they are entitled to summary judgment as to the tort claims because (1) Plaintiff's tort claims are based on Defendants' reports to Amazon, alleging that Plaintiff's products infringe upon Defendants' patent and trademark, but California's litigation privilege and the *Noerr-Pennington* doctrine protect Defendants' statements to Amazon; (2) Plaintiff lacks any affirmative evidence of bad faith rendering Plaintiff's claims preempted by federal patent law; (3) Plaintiff lacks evidence of damages required to sustain any tort claim; and (4) Plaintiff cannot satisfy at least one element of each of the tort claims. Def. Mot. at 2:12-26. Plaintiff responds that because "Defendants' complaints to Amazon were baseless," they should not enjoy protection from litigation as they "fit squarely within the sham exception" to the *Noerr-Pennington* doctrine. Pltff. Oppo. at 10:1-12. Defendants respond that Plaintiff's arguments in opposition must fail because (1) Plaintiff provides no support for its suggestions that Defendants' complaints were objectively baseless or unlawful, and thus, the *Noerr-Pennington* doctrine bars Plaintiff's claims and (2) "[e]ven if Plaintiff could show Defendants' complaints were made in bad

faith—and it cannot—it still could not overcome" the absolute protection provided by the litigation privilege.  Def. Reply at 4:21-28.

As a preliminary matter, in considering Defendants' Motion, which pertains to four claims asserted under California state tort law, the Court applies California law.  *See, e.g.*, *O'Campo v. Chico Mall, LP*, 758 F.Supp.2d 976, 984-85 (E.D. Cal. 2010) ("When federal courts consider claims under state law, they are to apply federal procedural law and state substantive law.") (citing *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938)).  As outlined below, the Court concludes that summary judgment is not warranted on the basis of (1) the litigation privilege as a genuine issue of fact exists as to whether Defendants had a good faith intent to pursue litigation; (2) the *Noerr-Pennington* doctrine because it does not apply to pre-litigation complaints made to a private, third party, like Amazon; (3) Plaintiff's claims being precluded by federal patent law because a genuine issue of fact exists as to whether Defendants' claims were made in bad faith; (4) Plaintiff's claims failing to provide evidence of damages because Plaintiff has provided sufficient evidence to create a genuine issue of fact as to damages; and (5) Plaintiff's failure to prove a required element of two of its tort claims because a genuine issue of fact exists as to Plaintiff's claims for intentional interference with prospective economic advantage and negligent representation.  However, as to Plaintiff's other three tort claims for unfair competition under the Lanham Act, California's UCL, and common law, Defendants have shown Plaintiff's evidence fails to show a genuine issue of fact, and in the absence of such evidence, Plaintiff cannot carry its burden of proof for proving those claims.  Accordingly, the Court grants Defendant's motion for summary judgment as to those claims only and dismisses them *with prejudice*.

### 1.   *Whether the Litigation Privilege or Noerr-Pennington Doctrine Bar Plaintiff's Tort Claims.*

Defendants argue that "California's litigation privilege and the Noerr-Pennington doctrine protect Defendants' presuit communications with Amazon," and as a result, "Defendants are entitled to judgment on Plaintiff's tort claims."  Def. Mot. at 14:3-4. Plaintiff responds by arguing that "Defendants' serial, baseless complaints are not the

-88-

communications that Noerr-Pennington aims to protect," so "[t]he Court should not reward Defendant's [sic] anti-competitive behavior by providing protection for it." Pltff. Oppo. at 10:1-15. Defendants reply that the evidence indicates their claims were not objectively baseless, and as such, neither the bad faith exception to the litigation privilege nor the sham litigation exception to the *Noerr-Pennington* doctrine apply to this case. Def. Reply at 7:14-11:18. As outlined below, the Court finds that it would be inappropriate to grant summary judgment on the basis of the litigation privilege or *Noerr-Pennington* doctrine as a genuine issue of fact exists as to whether Defendants' reports to Amazon were made in bad faith, and the *Noerr-Pennington* doctrine does not apply to this situation.

### a.   *California's Litigation Privilege*

Plaintiff's tort law claims for relief in the complaint arise out of Defendants' acts of reporting Plaintiff to Amazon for patent and trademark infringement. *See, e.g.*, Compl. at 8:19-23, ¶¶ 48-49; *see also id.* at 9:8-10, ¶ 54. Defendants argue the litigation privilege protects the "reporting of suspected wrongdoing to a party capable of remedying it," and because that was what Defendants intended to do when they reported Plaintiff's bags to Amazons, the Court should enter summary judgment in Defendants' favor. Def. Mot. at 14:4-9 (citing *TP Link USA Corp. v. Careful Shopper LLC*, No. 819CV00082JLSKES, 2020 WL 3063956, at *9 (C.D. Cal. Mar. 23, 2020), *reconsideration denied*, 2020 WL 4353678 (C.D. Cal. June 30, 2020)). Plaintiff responds by arguing that the litigation privilege does not extend to hollow threats and determining whether communications were made in good faith or represent mere hollow threats often requires a factual determination, which makes summary judgment inappropriate. Pltff. Oppo. at 18:11-26. Defendants reply that they have "many pieces of evidence of Plaintiff's infringement, undercutting any suggestion that its infringement complaints were 'objectively baseless,'" including but not limited to (1) the fact that Plaintiff's listings were removed after Amazon's review; (2) Defendants' own expert testified that that Plaintiff's bags infringe the 828 Patent; and (3) a comparison of the 828 Patent figures with Plaintiff's bags shows the claim is not objectively baseless. Def. Reply at 8:2-22.

Civil Code, section 47(b) codifies California's litigation privilege and provides that any publication made "[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) . . . other official proceeding authorized by law, or (4) . . . the initiation or course of any other proceeding authorized by law" is privileged.   CAL. CIV. CODE § 47(b).   Case law interpreting the litigation privilege for judicial proceedings has held that "California's litigation privilege applies to any communication '(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that ha[s] some connection or logical relation to the action.'"   *Graham-Sult v. Clainos*, 756 F.3d 724, 741 (9th Cir. 2014) (citing CAL. CIV. CODE § 47(b)).   "The privilege 'immunizes defendants from virtually any tort liability (including claims for fraud), with the sole exception of causes of action for malicious prosecution.'"   *Id.*   As a result, the litigation privilege "presents a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing," *id*, which applies "to a number of torts, including intentional interference," *Visto Corp. v. Sproqit Techs., Inc.*, 360 F. Supp. 2d 1064, 1068 (N.D. Cal. 2005).   Where the parties do not dispute the operative facts, application of the litigation privilege presents a question of law.   *In re Cedar Funding, Inc.*, 419 B.R. 807, 816 (B.A.P. 9th Cir. 2009); *Sengchanthalangsy v. Accelerated Recovery Specialists, Inc.*, 473 F. Supp. 2d 1083, 1087 (S.D. Cal. 2007).   "Any doubt about whether the privilege applies is resolved in favor of applying it." *Kashian v. Harriman*, 98 Cal. App. 4th 892, 913 (2002).

"[T]he policy of encouraging free access to the courts is so important that the litigation privilege extends beyond claims of defamation to claims of . . . interference with contract and prospective economic advantage," *Visto*, 360 F. Supp. 2d at 1071, like those at issue in this case.   In the present case, the parties do not appear to dispute the (1) second prong, pertaining to whether the communications (e.g., Defendants' complaints to Amazon) were made by litigants (e.g., Defendants) or other participants authorized by law (e.g., Amazon) or (2) fourth prong, pertaining to whether the communications have a

connection to the lawsuit.[22]  Thus, the parties appear only to dispute the first prong (e.g., whether the communications were part of a judicial or quasi-judicial proceeding) and third prong (e.g., whether the communications were made to achieve the objects of litigation).

With respect to the first prong, pertaining to whether the communication was made in a judicial proceeding, communications preceding a judicial proceeding "are privileged only if made in connection with proposed litigation contemplated in good faith and under serious consideration." *Visto*, 360 F. Supp. 2d at 1069.  This is because "[n]o public policy supports extending a privilege to persons who attempt to profit from hollow threats of litigation." *Fuhrman v. Cal. Satellite Sys.*, 179 Cal. App. 3d 408 (1986), *disapproved of by Silberg v. Anderson*, 50 Cal. 3d 205 (1990).  However, "[i]t is the *contemplation* of litigation that must be in good faith, not the merits of the actual litigation itself that animates the litigation privilege." *Visto*, 360 F. Supp. 2d at 1069.  In other words, a pre-litigation communication threatening litigation and intending in good faith to follow through, would be privileged even if the party threatening suit ultimately failed to prevail in the lawsuit. On the other hand, if the threatening party would have prevailed in the eventual lawsuit but never intended in good faith to pursue litigation, such a pre-litigation communication would not fall within the confines of the litigation privilege.

---

[22]    To the extent the parties dispute whether the litigation privilege could apply to communications made to/with Amazon, which is not a party to this lawsuit, case law from the Northern District holds that "non-litigants possessing a 'substantial interest in the outcome of the ligation' are 'authorized participants' for purposes of the ligation privilege." *See, e.g.*, *Ingrid & Isabel, LLC v. Baby Be Mine, LLC*, 70 F. Supp. 3d 1105, 1141-42 (N.D. Cal. 2014) (granting the plaintiff's motion for summary judgment as to the defendants' counterclaim because Walmart and Wayfair, as sellers of the product at issue, would have a substantial interest in the litigation by the plaintiff that accused the defendant of selling the product in violation of a patent settlement agreement); *Sharper Image Corp. v. Target Corp.*, 425 F. Supp. 2d 1056, 1078-79 (N.D. Cal. 2006) (holding that to meet the second prong of the litigation privilege, the party seeking to apply the privilege need only show that recipient of the communication "possessed a 'substantial interest' in the ligation"). Although Northern District case law does not bind this Court, these cases suggest the fact that the communications were with Amazon, a non-party, does not prevent application of the litigation privilege.

"One factor supporting a contrary inference [to good faith serious contemplation of future litigation] is . . . [the] subsequent failure to file the threatened action." *See, e.g.*, *Laffer v. Levinson, Miller, Jacobs & Phillips*, 34 Cal. App. 4th 117, 124-25 (1995) (reversing summary judgment because the court found there were triable of fact as to the defendants' good faith serious contemplation of future litigation); *see also Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal. App. 3d 573, 576, n. 5 ["(I)t is unchallenged that the letter was relevant to the lawsuit initiated shortly after the letter was written and after it failed to achieve its objective of settlement"].)  In this case, Defendants did not follow their July 13, 2017 letter advising that they intended to take advantage of all legal remedies, Compl. at 27, with litigation.  Instead, Plaintiff filed suit first, over a year later, on September 11, 2018.  *See id.* Thus, despite plenty of time to pursue their legal remedies, Defendants failed to do so.  Further, the Court cannot determine whether the reports to Amazon contained threats to file suit against Amazon or Plaintiff because neither party submitted the reports to the Court as evidence, only Amazon's responses to the reports.  As such, the lack of evidence that Defendants ever intended to file suit and lack of follow through support Plaintiff's contention that Defendants lacked a good faith intent to pursue litigation, and therefore, the privilege should not apply as a bar to Plaintiff's tort claims. *See Laffer*, 34 Cal. App. 4th at 124-45.

Defendants argue that cases have applied California's litigation privilege where the owner of certain intellectual property reports infringement to a third-party online marketplace.  Def. Mot. at 15:11-16:3 (citing cases).  As support for this position, Defendants argue this case "is nearly indistinguishable from *TP Link*," where the court applied the litigation privilege to similar complaints.  *Id.* at 14:10.  In *TP Link*, the District Court for the Central District of California granted the plaintiff's motion to strike or dismiss various counterclaims asserted by the defendant, including but not limited to for interference with existing and prospective business relationships.  2020 WL 3063956 at *3, 9, 11.  The *TP Link* plaintiff/counter-defendant "engaged in the marketing and sale of computer networking equipment and other computer accessories."  *Id.* at *1.  The

defendant/counter-claimant, on the other hand, was a "third-party seller on Amazon, meaning that it was a downstream purchaser that often listed and sold goods bearing the trademarks and other intellectual properties of . . . other holders of intellectual property rights." 2020 WL 3063956 at *1. The plaintiff alleged that the defendant began marketing and selling products bearing the plaintiff's trademarks, in part, on the Amazon marketplace and "realized unjust financial benefit." *Id.* In response, the defendant stated it purchased the plaintiff's products directly from authorized resellers of the product, and as such, the products it sold were authentic. *Id.* at *2. After several complaints, Amazon decided that the defendant could no longer sell on Amazom.com. *Id.* The plaintiff brought suit for, *inter alia*, (1) violation of the Lanham Act, (2) unfair competition under 15 U.S.C. § 1125(a), (3) unfair competition under California's UCL, (4) common law unfair competition, and (5) common law trademark infringement. *Id.* at *3. In response, the defendants counterclaimed for, *inter alia*, (1) interference with existing and prospective business relationships and (2) violation of antitrust laws. *Id.*

In dismissing the defendant's tort counterclaims arising out of the plaintiff's complaints to Amazon regarding the defendant's products, the *TP Link* court noted that the litigation privilege "is applicable to communications between private parties." 2020 WL 3063956 at *8. It reasoned that "the litigation privilege is intended to protect the sort of communication at issue here, the reporting of suspected wrongdoing to a party capable of halting or remedying it." *Id.* at *9. The court also rejected the defendant's arguments that the litigation privilege did not apply because the reports to Amazon were made in bad faith, with the goal of destroying the defendant's business. *Id.* at *9. Rather, "as an 'absolute' privilege, California's litigation privilege is not subject to qualification based upon the subjective motives or alleged bad faith of a party making a challenged communication." *Id.* Thus, the court ruled that the plaintiff's reports to Amazon were entitled to the litigation privilege even if they were knowingly false, prelitigation communications. *Id.*

Defendants argue that "[t]he undisputed facts here are nearly identical" to those in *TP Link*. Def. Mot. at 14:24. They point out that like the *TP Link* plaintiff who complained

to Amazon that the defendant was selling counterfeit goods, 2020 WL 3063956, at *1-2, Defendants complained to Amazon that Plaintiff was selling products that infringed on their patent and trademark rights, Def. Mot. at 14:24-15:7.  Further, like the *TP Link* defendant who brought counterclaims for interference with prospective business relationships after being reported to Amazon, *id.* at *3, Plaintiff brought suit for, *inter alia*, intentional interference with prospective of contractual economic relations for the same reasons, Compl. at 8.  Thus, Defendants contend that this Court, like the *TP Link* court, should determine that even if Defendants' reports to Amazon were in bad faith, those complaints are still protected by the absolute litigation privilege.  Def. Mot. at 15:9-10. Defendants fail to mention one important aspect in which this case differs from *TP Link*: unlike the defendant-sellers in *TP Link*, who were ultimately barred from selling on Amazon, *id.* at *2, many of Plaintiff's removed products were ultimately reinstated on Amazon.  While the Court agrees this case factually resembles *TP Link*, *TP Link* is also procedurally inapposite as it involved dismissal upon a motion to dismiss rather than a motion for summary judgment after discovery.  Further, *TP Link* is not binding authority on this Court.  Defendants have failed to cite to a similar case that is binding on this Court where the Court granted summary judgment on the basis of the litigation privilege.

In opposing Defendants' Motion, Plaintiff relies on the case of *Visto Corp. v. Sproqit Techs., Inc.*, 360 F. Supp. 2d 1064 (N.D. Cal. 2005) to argue why the litigation privilege should not bar plaintiff's counterclaims against Defendants.  In *Visto*, the plaintiff-owner of various software patents sued the defendant for infringement of the plaintiff's patent. *Id.* at 1066.  In response, the defendant filed various counterclaims against the plaintiff for, *inter alia*, (1) declaration of noninfringement and invalidity of the patent and (2) tortious interference with prospective economic advantage.  *Id.*  The defendant argued that (1) the plaintiff had expressed interest in acquiring the defendant a number of times, and at one point, advised that if the defendant did not agree to the acquisition, it would file suit for patent infringement and (2) the plaintiff's allegations of patent infringement were baseless and made only to disrupt the defendant's financing and interfere with its prospective

business relationships.  360 F. Supp. 2d 1066.  In response to the counterclaims, the plaintiff filed a motion to dismiss the defendant's claims for tortious interference and defamation, arguing they should be dismissed because the litigation privilege protected the plaintiff's alleged wrongful actions (e.g., false allegations of patent infringement made a in prelawsuit demand letter).  *Id.* at 1068.  The court granted the plaintiff's motion to dismiss the state law claims for tortious interference; however, it based the dismissal on the fact that it held the claims to be premature rather than a finding that they were barred by the litigation privilege.  *Id.* at 1066.

In support of its argument that the plaintiff lacked a good faith intent to pursue litigation, the *Visto* defendant noted that the plaintiff had failed to sue (1) on one of the patents that it had alleged was being infringed in its prelitigation demand letter and (2) by the deadline provided, choosing instead to file suit only after the defendant first filed suit in another state.  360 F. Supp. 2d at 1069.  The court first clarified that even though the defendant did not include allegations in its counterclaims regarding lack of good faith intent to pursue litigation, that fact was not dispositive because "[a] plaintiff is not required to plead negative facts to anticipate a defense."  *Id.* at 1070.  Next, the court rejected the plaintiff's attempt to argue that the good faith consideration test did not apply when the prelitigation communications consisted of demand letters written by counsel followed by actual litigation, reiterating that no such bright line rule existed.  *Id.*  Rather, "California courts 'still require that for the privilege to attach to demand letters they must be sent in good faith and actual contemplation of litigation," and such a "determination may turn on a triable issue of fact, depending upon the circumstances."  *Id.* Finally, the court noted that whether a threat to commence litigation was "made as a means of inducing settlement of a claim" rather than "in good faith contemplation of a lawsuit" sufficient to trigger application of the litigation privilege "is a question of fact that must be determined before the privilege is applied."  *Id.* at 1070.  However, "[t]hat a subsequent suit ensued is certainly a factor.  *Id.*  The *Visto* court concluded that enough of a question had been raised.  *Id.* at 1070.  Ultimately, however, the court dismissed the counterclaims on other grounds,

finding them premature, but making sure to note that the dismissal was without prejudice to the defendant's ability to re-file them provided the defendant could satisfy the requisites of the litigation privilege.  360 F. Supp. 2d at 1070-71, 1073.

In *Visto*, the defendant filed counterclaims for (1) declaration of noninfringement and invalidity of the patent and (2) tortious interference with prospective economic advantage.  360 F. Supp. 2d at 1066.  In this case, Plaintiff filed suit seeking nearly identical relief.  However, Defendants' initial demand letter to Plaintiff requested "written assurance with compliance" within fifteen days and advised that it was "made without prejudice to any rights or remedies."  Compl. at 27.  Thus, unlike the *Visto* plaintiff who failed to sue by a deadline provided, Defendants never provided some sort of deadline that if Plaintiff failed to meet would necessarily result in Defendants filing suit.  *Id.*  Further, as Plaintiff noted, the fact that Plaintiff did not include allegations responsive to the defense of litigation privilege in their complaint is not fatal to their tort claims because "[a] plaintiff is not required to plead negative facts to anticipate a defense."  360 F. Supp. 2d at 1070.  However, like the *Visto* court, this Court determines that the issue of whether the threat of litigation was actually made as a means of inducing settlement rather than in good faith contemplation of a lawsuit, "is a question of fact that must be determined before the privilege is applied."  *Id.* at 1070.

In the present case, the Court concludes that whether Defendants had a good faith intent to pursue litigation when they submitted their complaints to Amazon and sent their demand letter is an issue of fact such that it would be inappropriate for the Court to grant summary judgment on the basis of the litigation privilege.  Because the Court finds that an issue of fact exists as to the first prong pertaining to application of the litigation privilege (e.g., whether the communication was made in a judicial proceeding), the Court finds it unnecessary to analyze the remaining disputed third prong (e.g., whether the communications were made to achieve the objects of the litigation).

b.   *Noerr-Pennington Doctrine*

The *Noerr–Pennington* Doctrine provides immunity to private entities from liability

-96-

under federal or state antitrust laws for conduct related to petitioning any branch of government in an attempt to influence the passage or enforcement of laws that might have anticompetitive effects. *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1047 (9th Cir. 2015); *Sosa v. DIRECTTV, Inc.*, 437 F.3d 923, 942 (9th Cir. 2006). The doctrine arises out of the belief that antitrust laws should not be applied in the political arena, and that the First Amendment protects political speech. *See Microsoft*, 795 F.3d at 1047 ("The doctrine originated in two Supreme Court antitrust cases holding that the Petition Clause of the First Amendment prohibits imposing liability under the Sherman Act for 'attempt[ing] to persuade the legislature or the executive to take particular action.'"); *see also E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 670 (1965). Courts have expanded the doctrine "to ensure that 'those who petition any department of the government,' including the courts, 'are immune from . . . liability for their petitioning conduct.'" *Microsoft*, 795 F.3d at 1047. It "requires that, to the extent possible, [courts] construe federal statutes so as to avoid burdens on activity arguably falling within the scope of the Petition Clause of the First Amendment." *Sosa*, 437 F.3d at 942. Courts have concluded that "Noerr immunity bars any claim, federal or state, common law or statutory, that has as its gravamen constitutionally-protected petitioning activity," which can include petitioning the government through the filing of a lawsuit. *See Gen-Probe, Inc. v. Amoco Corp.*, 926, 956 (S.D. Cal. Apr. 24, 1996).

Where the *Noerr-Pennington* doctrine would otherwise apply to a petition to the courts (e.g., a lawsuit) regarding anticompetitive conduct, the sham litigation exception to the doctrine may take away immunity if the lawsuit is objectively baseless. *Theme Promotions, Inc. v. News America Marketing FSI*, 546 F.3d 991, 1007 (9th Cir. 2008). The Ninth Circuit has set forth a two-step, retrospective inquiry to determine whether a single action qualifies as sham petitioning. *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994). "A 'sham' lawsuit is one where the suit is both [1] 'objectively baseless in the sense that no reasonable litigant

could realistically expect success on the merits' and [2] 'an attempt to interfere *directly* with the business relationship of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process.'" *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 351–52 (9th Cir. 2014). The sham exception "encompasses situations in which persons use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 380 (1991).

Defendants argue that Plaintiff's tort claims are barred by the *Noerr-Pennington* doctrine because the doctrine extends to pre-suit infringement notices sent to third-parties, and Plaintiff's claims arise out of Defendants' pre-suit infringement notices to a third party (Amazon). Def. Mot. at 16:4-10. They elaborate that to the extent Plaintiff argues Defendants' petitioning conduct (e.g., their reports to Amazon) is not entitled to immunity because it falls under the sham litigation exception, "[t]here is also no genuine issue of material fact on the 'sham litigation' exception to the Noerr-Pennington doctrine" because Plaintiff cannot "demonstrate that Defendants' reports to Amazon were 'objectively baseless' or based on an unlawful motive." *Id.* at 17:7-19. Plaintiff responds that "because Defendants' actions exhibit a pattern of 'starting legal proceedings without regard to the merits and for the purposes of injuring a market rival,' i.e., 'for purposes of harassment,' the sham exception" to the *Noerr-Pennington* doctrine applies, and Plaintiff's claims are not barred. Pltff. Oppo. at 14:8-10. Defendants reply that the evidence in the case confirms "Defendants' complaints to Amazon were not 'objectively baseless,' and there is no evidence that they were unlawful." Def. Reply at 11:15-16.

In support of their argument that *Noerr-Pennington* applies to this case, Defendants rely on *Thimes Sols. Inc. v. TP Link USA Corp.*, in which the Central District of California held that complaints to Amazon qualified as prelitigation material for purposes of the *Noerr-Pennington* doctrine. No. CV 19-10374 PA (EX), 2020 WL 4353681, at *1, 4-5 (C.D. Cal. June 8, 2020). The *Thimes* plaintiff filed suit for, *inter alia*, interference with existing and prospective business relationships after the defendants submitted twenty-

seven (27) written complaints to Amazon that the plaintiff was infringing on one of the defendants' intellectual property rights.  2020 WL 4353681 at *1.  Although Amazon suspended the plaintiff from the marketplace, the plaintiff appealed and was ultimately reinstated.  *Id.* However, after the defendants submitted additional complaints, the plaintiff was permanently expelled from the Amazon Marketplace.  *Id.*  The defendants moved to dismiss the plaintiff's operative complaint on the basis that the *Noerr-Pennington* doctrine barred the plaintiff's claims, and the Court converted the motion into a motion for summary judgment.  *Id.* The court determined the defendants' 27 complaints to Amazon, claiming the plaintiff was selling counterfeit products, constituted pre-litigation material.  *Id.* at *4.  However, upon consideration of whether the sham exception applied, it denied the motion for summary judgment because the plaintiff raised a triable issue of fact as to the language used in the complaints to Amazon.  *Id.* at *5.  Further, all parties had failed to submit trues copies of the complaints into the record, which prevented the court from performing the necessary analysis to determine whether the complaints were objectively baseless.  *Id.*

Here, the Court finds that despite the voluminous exhibits provided to the Court in conjunction with these motions, the actual complaints to Amazon appear to be missing from the record just as they were in *Thimes*.  At a minimum, the parties have failed to cite their content or direct the Court to their location.  *See, e.g.*, *Wright v. United States Dep't of Justice*, 379 F. Supp. 3d 1067, 1074 (S.D. Cal. 2019) (Burns, J.) (noting that "[j]udges are not like pigs, hunting for truffles buried in the briefs," and "[i]t is not [the] task . . . of the district court[ ] to scour the record in search of a genuine issue of triable fact"; rather, the courts "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.").  In addition to the parties' failure to provide or at least direct the Court's attention to the actual complaints, the Court finds summary judgment inappropriate on another ground, at least with respect to determining whether the *Noerr-Pennington* doctrine applies to this case, which the *Thimes* court failed to address: "*Noerr-Pennington* immunity does not apply to private patent adjudication programs." Hovenkamp, Herbert, et al., *IP and Antitrust: An Analysis of Antitrust Principles Applied*

*to Intellectual Property Law*, § 11.03, IP Antitrust Anal. 9447714, (2018) (Updated Nov. 2020). Defendants, however, argue that pre-lawsuit infringement reports or notices submitted to third parties, like Amazon, are protected under the *Noerr-Pennington* doctrine. Def. Mot. at 16:9-16 (citing, *inter alia*, *Sosa*, 437 F.3d at 940; *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1082 (C.D. Cal. 2010)). Plaintiffs also concede that "Defendants have the right of access to agencies and courts, such as Amazon, to be heard on matter such as when they in good faith believe that their rights are infringed." Pltff. Oppo. at 15:24-25.

Defendants are correct that under the *Noerr–Pennington* doctrine, courts consider "cease-and-desist letters and threats of litigation" as "pre-litigation material . . . immune from suit unless the threatened lawsuit was a 'sham.'" *Rock River*, 745 F.3d at 351. However, where those letters are sent to third-parties, rather than the ultimate parties in a subsequent suit, they are not protected. The reported cases relied on by Defendants are distinguishable because both cases involved pre-lawsuit infringement notices sent to third parties, advising that if those third parties did not cease participating in or facilitating the alleged infringement, those third parties would be sued—or in other words, a petition to the courts would result. For example, in *Sosa*, 437 F.3d at 925-26, 940, the court held that presuit letters sent to non-parties "threatening legal action and making legal representations in the course of doing so" came within the immunity provided by the *Noerr–Pennington* doctrine. However, *Sosa* involved a class action where the defendant "sent tens of thousands of demand letters alleging that the recipients had accessed DIRECTV's satellite television signal illegally and would be sued if they did not quickly settle DIRECTV's claims against them under the Federal Communications Act." *Id.*; *see also EcoDisc*, 711 F. Supp. 2d at 1082 (holding the conduct at issue was "sufficiently related to litigation to fall within the scope of the *Noerr–Pennington* doctrine" where the communications asserted the defendant's intellectual property rights under a licensing agreement and warned licensees violating the agreement could result in litigation).

As another example, in *Rock River*, the Ninth Circuit noted that the plaintiff's claim

-100-

for intentional interference with prospective economic advantage sought to hold the defendant liable based on the cease-and-desist letters and threats of litigation that the defendant made to the plaintiff's business partners. 745 F.3d at 351. While "[u]nder the *Noerr–Pennington* doctrine, such pre-litigation material is immune from suit unless the threatened lawsuit was a 'sham,'" some of the cease and desist letters sent to the plaintiff's business partners threatened to sue those business partners, and as such, there was a threat to petition the government through the courts. *Id.* at 347. Thus, Defendants' authority is distinguishable from the case at hand. Here, Defendants' infringement notices to Amazon were not provided to the Court and do not prove a threat to sue Amazon if it continued to list Plaintiff's allegedly infringing products.

"Noerr-Pennington is a label for a form of First Amendment protection; to say that one does not have Noerr-Pennington immunity is to conclude that one's petitioning activity is unprotected by the First Amendment." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000). In other words, for the *Noerr-Pennington* doctrine to apply in this case, Defendants would need to have a First Amendment right to report Plaintiff for suspected infringement to Amazon. "In determining whether the *Noerr-Pennington* doctrine immunizes a defendant's conduct from liability, the court applies a three-step test." *Evans Hotels, LLC v. Unite Here Local 30*, 433 F. Supp. 3d 1130, 1143 (S.D. Cal. 2020), *reconsideration denied sub nom. Evans Hotel, LLC, v. United Here Local 30, et al.*, 2020 WL 1911557 (S.D. Cal. Apr. 20, 2020). This test examines whether (1) "the plaintiff's lawsuit burdens the defendant's petitioning activities," (2) "the burden on that activities implicates the protection of the Petition Clause," and (3) "the laws the plaintiff is suing under may be construed to preclude the burden on petitioning activity." *Id.*; *see also Sosa*, 437 F.3d at 930. Plaintiff argues that Defendant failed to analyze any of the factors warranting application of the *Noerr-Pennington* doctrine. Pltff. Oppo. at 14:4-5. Plaintiff also argues that "allowing Plaintiff's tort claims to proceed would not burden petitioning." *Id.* at 14:5-6. The Court agrees with Plaintiff. An analysis of the factors reveals that first, the First Amendment only protects citizens from government conduct infringing on free speech.

*See* U.S. CONST., AMEND I (providing that "Congress shall make no law respecting . . . the right of the people . . . to petition the Government for a redress of grievances"). Amazon is a corporation; it is not part of the government.  As a result, there is no constitutionally protected right to "petition" Amazon for a redress of grievances.  Plaintiff's lawsuit, alleging that Defendants' petitioning conduct was unlawful does not infringe on any of Defendants' constitutionally protected rights.  Even though Defendants have a constitutionally protected right to petition the government (via the courts), s*ee, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 341-42 (2010) (concluding that corporations have speech rights under the First Amendment), they do not have a constitutionally protected right to petition Amazon or have that petitioning conduct save them from liability in a lawsuit regarding that petitioning conduct.  Second, even if Plaintiff somehow burdened Defendants' ability to make reports to Amazon, such as if Plaintiff sought an injunction, which Plaintiff has not done, that burden would not implicate a right to petition.  Again, Defendants have no constitutionally protected right to petition Amazon.

In *Garmon Corp. v. Vetnique Labs, LLC*, the court held that it was not persuaded that the *Noerr-Pennington* doctrine provided the defendant "with immunity from the plaintiffs' antitrust claims concerning its participation in Amazon's patent evaluation program or its filing of complaints with Amazon." No. 19 C 8251, 2020 WL 3414983, *4 (N.D. Ill. June 22, 2020).  Just as both parties in this case make shopping cart bags, which they sell on Amazon's website, both the plaintiffs and defendant in *Garmon* made nutritional supplements for pets and sold them on Amazon's website. *Id.* at *1.  The defendant obtained a patent for its nutritional supplement to prevent anal gland diseases in pets. *Id.*  After obtaining the patent, the defendant, like Defendants here, submitted complaints "alleging that certain products sold by the plaintiffs via Amazon infringed the patent." *Id.*  This "initiated proceedings as part of an Amazon-administered program in which patentees can obtain evaluations of their infringement claims against parties that sell products on Amazon's website." *Id.*  The defendant also sent a letter alleging infringement. *Id.*  As a result of Amazon's evaluation, the plaintiffs were barred from listing or selling

their allegedly infringing products through Amazon.  2020 WL 3414983 at *1-2.  The plaintiff re-formulated their products, going out of their way to use ingredients not used in the defendant's claimed patent, but the process repeated itself.  *Id.* at *2.  The *Garmon* plaintiff, like Plaintiff here, sued the defendant seeking a declaratory judgment that the defendant's patent was invalid, or if it was valid, that they had not infringed it.  *Id.* at *1.  The plaintiff, also like Plaintiff here, asserted additional claims for damages and injunctive relief under the Sherman Antitrust Act, 15 U.S.C. § 2, and Lanham Act, 15 U.S.C. § 1125(a)(1).  *Id.*  The defendant moved to dismiss the plaintiffs' antitrust claims under the *Noerr-Pennington* doctrine.  *Id.*

In deciding that the *Noerr-Pennington* doctrine did not apply, the court noted that under the doctrine, "parties 'who petition [the] government for redress are generally immune from antitrust liability.'"  *Garmon*, 2020 WL 3414983 at *3.  Although "[s]uch immunity extends to parties who initiate proceedings before courts and administrative agencies," it fails to "apply where a restraint on trade 'has resulted from private action.'"  *Id.* (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (holding that a private association that imposed anticompetitive restraints through its standard-setting process was not entitled to *Noerr-Pennington* immunity).  "[B]ecause the relevant allegations concern restraints on trade—the removal of the plaintiffs' products from Amazon's website—that 'resulted from private action.," the doctrine did not create immunity.  *Id.* at *4 (citing *Allied Tube*, 486 U.S. at 499).  When considering application of the *Noerr-Pennington* doctrine, "courts do not consider the type of right a party asserted in taking an anticompetitive action . . . but rather the 'source, context, and nature of the anticompetitive restraint at issue.'"  *Id.*  Where, as in *Garmon*, "the anticompetitive restraint was imposed by a company 'unaccountable to the public and without official authority' that might 'have personal financial interests in restraining competition,' the *Noerr-Pennington* doctrine does not provide immunity."  *Id.*  Accordingly, the Court concluded that the *Noerr-Pennington* doctrine did not apply to the plaintiffs' allegations concerning the removal of the products from Amazon." *Garmon*, 2020 WL 3414983 at *3.

This Court, like the *Garmon* court, agrees that the *Noerr-Pennington* doctrine does not apply to immunize a defendant's conduct from liability for tort claims, like intentional interference, where the conduct at issue consists of a report made to a private patent adjudication program, like Amazon.  Thus, the Court denies Defendants' motion for summary judgment on the basis of the *Noerr-Pennington* doctrine.  As a matter of law, Defendants are not entitled to immunity under the *Noerr-Pennington* doctrine for infringement complaints made to Amazon where there is no evidence that those complaints contained a threat of litigation (e.g., a threat to petition a branch of government—i.e., the courts).  Because the Court concludes that the *Noerr-Pennington* doctrine does not apply to provide Defendants with immunity from Plaintiff's complaint sufficient to warrant summary judgment, the Court need not analyze whether the sham exception to the *Noerr-Pennington* doctrine takes away that immunity.  However, even if the Court applied the *Noerr-Pennington* doctrine, a genuine issue of fact would exist as to whether the sham exception would apply to this case in light of the parties' (1) disagreement as to how many complaints Defendants' submitted; (2) failure to submit the complaints to the Court as evidence; and (3) failure to submit evidence pertaining to how Amazon determines whether to remove and/or relist products after receiving complaints for infringement.[23]

/ / /

---

[23]      Under the sham litigation exception to the *Noerr-Pennington* doctrine, courts should deny summary judgment if a reasonable jury, viewing all of the evidence in the light most favorable to the non-moving party, could conclude that the defendants attempted to achieve their aim through the threat of protest, without regard to the results of such protests.  For example, "the fact that defendants lost all protests establishes a sufficient showing of baselessness for the purposes of a summary judgment motion" and "is certainly sufficient to present a triable issue of fact."  *See, e.g.*, *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1256-57 (9th Cir. 1982) (holding "that a single suit, or in this case a single protest, is sufficient to invoke the sham exception.").  Thus, this Court concludes that even if it had found that the *Noerr-Pennington* doctrine applied to this case, case law indicates that—construing the evidence in the light most favorable to the non-moving party, which in this case, is Plaintiff—the fact that Amazon relisted Plaintiff's products after each of Defendants' complaints would, at a minimum, create a triable issue of fact as to application of the sham litigation exception.

1
2

       2.     ***A genuine issue of material fact exists as to whether Defendants acted with bad faith, and Federal Patent Law preempts state law tort claims without such a showing of Bad Faith.***

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

      Defendants argue that "Plaintiff has no affirmative evidence that Defendants acted in "bad faith" by complaining of patent infringement to Amazon," and "[f]ederal patent law preempts Plaintiff's state law tort claims without such a showing." Def. Mot. at 9:1-5. Plaintiff argues that "statements made in bad faith 'are damaging to competition and are not the type of statements protected by patent laws." Pltff. Oppo. at 19:25-26 (citing *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1354 (Fed. Cir. 1999)). Plaintiff responds that "[b]ad faith can be found when patent holders make statements with 'disregard' for the 'incorrectness or falsity' of such statements." *Id.* at 19:27-20:3 (citing *Springs Window Fashions LP v. Novo Indus. L.P.*, 323 F.3d 989, 999 (Fed. Cir. 2003). Plaintiff's position is that "[a] reasonable jury will conclude that Defendants acted in bad faith when they submitted . . . eighty-nine (89) unsuccessful patent infringement claims to Amazon," and as a result, "Plaintiff's tort claims are not preempted by patent law." *Id.* at 20:6-8, 27. Plaintiff also makes an argument that Defendants' founder, Joby Cronkshaw, testified that he (1) retained an attorney to provide an opinion whether Plaintiff's products infringed Trolley Bags' patent, and (2) disclosed the infringement opinion to a third-party but later changed his testimony to clarify that he remembered he did not, in fact, disclose the opinion. *Id.* at 20:9-18. Plaintiff argues that "[r]egardless of whether Cronkshaw actually waived privilege regarding the opinion, Defendants should be compelled to produce the opinion." *Id.* at 20:19-26. However, this argument is inappropriate for consideration on a motion for summary judgment and must be considered as part of a separate motion to compel before the magistrate judge. *See* S.D. Cal. Civ. R. 26.1(e). Defendants dispute any waiver of privilege. Def. Reply at 13:2-21.

25

26

27

28

      As a preliminary matter, courts "apply Federal Circuit law to patent issues as well as to [the] determination on whether state-law tort claims are preempted by federal patent law." *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008). "[P]atentees do not violate the rules of fair competition by making accurate

representations, and are allowed to make representations that turn out to be inaccurate provided they make them in good faith." *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002).   Consequently, federal patent law preempts state-law tort liability, including but not limited to liability for claims of tortious interference and unfair competition, "when a patentee in good faith communicates allegations of infringement of its patent." *Dominant*, 524 F.3d at 1260.   State law tort claims "can survive federal preemption only to the extent that those claims are based on a showing of 'bad faith' action in asserting infringement." *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004).   "Accordingly, to avoid preemption, 'bad faith must be alleged and ultimately proven, [by clear and convincing evidence] even if bad faith is not otherwise an element of the tort claim.'" *Id.* at 1377.   This aligns with the law's recognition of "a presumption that the assertion of a duly granted patent is made in good faith," which can only be overcome "by affirmative evidence of bad faith."   *See, e.g.*, *Springs Window*, 323 F.3d at 999 (affirming summary judgment in the plaintiff's favor on the defendant's counterclaims for tortious interference because the defendant "presented no evidence that would support a finding that [the plaintiff] knew that [a] it was enforcing an unenforceable patent or . . . [b] [the defendant] did not infringe the '857 patent").   Further, "mere allegations that the patent holder has acted in bad faith will not overcome this presumption" the presumption of validity of patent rights.   *Fisher Tooling Co. v. Gillet Outilliage*, No. CV 04-7550 ABC MCX, 2006 WL 5895307, at *7 (C.D. Cal. June 6, 2006).   To avoid summary judgment, a party claiming bad faith patent enforcement, like Plaintiff, "must present affirmative evidence sufficient for a reasonable jury to conclude that the patentee acted in bad faith, in light of the burden of clear and convincing evidence that will adhere at trial." *Springs Window*, 323 F.3d at 999 (concluding that the defendant "failed to meet its burden of putting forward affirmative evidence of bad faith.").

     "A plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless." *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1332

(Fed. Cir. 2012).  This showing of "[b]ad faith includes separate objective and subjective components." *Dominant*, 524 F.3d at 1260.  "To be objectively baseless, the infringement allegations must be such that 'no reasonable litigant could reasonably expect success on the merits.'"  *Id.*  Generally, "a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of information about the existence or pendency of patent rights."  *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 897 (Fed. Cir. 1998); *see also Springs Window*, 323 F.3d at 1000 (holding the defendant failed to raise "a genuine issue of fact on the issue of unenforceability and thus has not satisfied the threshold requirement for . . . bad faith").

In *Dominant Semiconductors*, the Federal Circuit affirmed the decision of the Northern District of California granting the defendant's motion for summary judgment, which had reasoned that it was objectively reasonable for the defendant to rely on the advice of an attorney in the absence of evidence the advice was unreasonable.  *Id.* at 1259-60.  Further, the defendant had produced evidence that its earlier claims of infringement were not objectively baseless by producing the International Trade Commission's denial of the plaintiff's motion for summary judgment of non-infringement and later findings that the plaintiff did, in fact, infringe on the defendant's patents.  *Id.* at 1263.  The defendant also produced the court's own finding that the plaintiff had infringed its patents.  *Id.*

Here, just as in *Dominant*, Plaintiff filed similar tort law claims against Defendant arising out of Defendant's communications with Amazon that Plaintiff was infringing.  524 F.3d at 1255-56.  Unlike in *Dominant*, however, there were not prior findings of infringement at the time the communications were made or this motion was filed to show Defendants' communications with amazon were not objectively baseless.  In this case, both parties dispute the number of complaints Defendants made to Amazon regarding Plaintiff's products and whether those complaints were "successful."  The Court finds a genuine issue of fact exists as to the issue of whether the complaints were, in fact, successful given Plaintiff appears to argue that every time Defendants' complaints resulted in Plaintiff's products being removed, the products were later reinstated.  In the absence of admissible

evidence regarding Amazon's procedures when reviewing allegedly infringing products as well Defendants' actual complaints to Amazon, a genuine issue of fact exists as to the issue of whether federal patent law preempts Plaintiff's state tort law claims.

### 3. *A Genuine Issue of Fact Exists as to Damages for Plaintiff's Tort Claims.*

Defendants argue that all of Plaintiff's state law claims for relief require proof of damages as an element for each tort, and because Plaintiff has no such evidence, "Defendants are entitled to judgment as a matter of law." Def. Mot. at 21:18-22:8 (citing cases). Defendants' argue that they served Plaintiff with a deposition notice pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, which allows a party to serve a deposition notice on a private corporation, which then, must designate one or more "persons who consent to testify on its behalf." FED. R. CIV. P. 30(b)(6). "The persons designated must testify about information known or reasonably available to the organization." *Id.* According to Defendants, Plaintiff identified Mr. Dehmoubed as its Rule 30(b)(6) witness for the topics of Plaintiff's claims and defenses as well as damages that Plaintiff alleges Defendants caused. Def. Mot. at 11:19-23. However, Defendants contend Mr. Dehmoubed failed to testify as to (1) the amount of damages; (2) his methodology for generating the data regarding lost sales; and (3) what portion of lost revenue would have been a profit. *Id.* at 22:9-14, 23:2-5, 24:1-6. Plaintiff responds by advising that it provided evidence of lost sales (1) in its complaint, Pltff. Oppo. at 21:7-8 (citing Complaint at Ex. D, ECF No. 1 at 49), and (2) during discovery, by providing details for each day of lost sales on Amazon due to Defendants' complaints to Amazon, *id.* at 21:9-11 (citing ECF No. 92-3 at 2-3), as well as financial statements for 2017, 2018, and 2019 that detailed its expenses, and thus, lost profits, Pltff. Oppo. at 21:11-13 (citing Exhibits 9 ECF No. 92-4 at 2, and 10, ECF No. 92-5 at 1-2). Defendants respond by arguing that Plaintiff's 2017-2019 financial statements detail only lost profits without showing the sale or purchase price per bag, the number of bags bought or sold, or how much profit could be attributed to each bag. Def. Reply at 12:8-15. As a result, Defendants

argue that Plaintiff cannot establish that it lost any profits when Amazon removed its listings, much less evidence of showing lost profits with reasonable certainty; thus, the Court should grant summary judgment on the tort claims due to Plaintiff's inability to prove a requisite element of each claim: damages.  *Id.* at 12:27-13:2.

As discussed below, all of Plaintiff's tort-based claims require a showing of damages or evidence supporting restitution.  *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1443 (9th Cir. 1990) (applying California law).  Where a plaintiff fails to introduce evidence of damages, summary judgment is appropriate where the underlying claims require proof of damages.  *See, e.g.*, *Weinberg v. Whatcom Cty.*, 241 F.3d 746, 752 (9th Cir. 2001) (holding that the district court did not err by granting the defendant's motion for summary judgment where evidence pertaining to damages was essential to the determination pertaining to the claims on which the motion for summary judgment was based).

Proof of damages requires a plaintiff to "prove both the fact and the amount of damage."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016) (en banc) (per curiam).  However, "[i]t is well-established under California law that while the *fact* of damages must be clearly shown, the *amount* need not be proved with the same degree of certainty, so long as the court makes a reasonable approximation."  *Robi*, 918 F.2d at 1443; *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931) (holding that although damages must be "the certain result of the wrong," they may be "uncertain in respect of their amount."); *see also* 22 Am. Jur. 2d *Damages* § 172 (1965) ("[n]o recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative").  Where a plaintiff alleging injury "proves that his business would have been profitable, he need not prove precisely the amount of the profits he would have made or the amount of harm that the defendant has caused; rather, he need only present such evidence as might reasonably be expected to be available under the circumstances."  *Robi*, 918 F.2d at 1443 (internal quotations and citations omitted).  Further, under California law, the general rule

prohibiting evidence of speculative profits does not apply to cases where the amount of profits is uncertain, but the fact that profits would have resulted absent wrongdoing is not. *See, e.g.*, *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 437 (9th Cir. 1975) (holding the plaintiff's direct and circumstantial evidence on damages, although "relatively thin," highly persuasive in showing it "sustained a substantial loss of profits" due to the defendants' wrongdoing, and thus, it was reasonable to conclude that if defendants had not appropriated the device, the plaintiff would have made all sales of the device in the area). Rather, it applies "to uncertainty or speculation as to whether loss of profits was the result of the wrong and whether such profits would have been derived at all." *Id.*

"Damages that are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." *Lumens Co. v. GoEco LED LLC*, No. SACV1401286CJCDFMX, 2018 WL 1942768, at *6, n.7 (C.D. Cal. Jan. 3, 2018), *aff'd*, 807 F. App'x 612 (9th Cir. 2020) (noting in the parties' cross-motions for summary judgment, the defendant's promises to provide data and admissible evidence at trial did not relieve the defendant of its burden to present admissible evidence to meet its burden on summary judgment). Courts may grant summary judgment where the party bearing the burden of proof "has no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (affirming a district court's grant of summary judgment where the plaintiffs "did not make a showing sufficient to establish the amount, causation, or fact of damages") (citation omitted). Cases have relied on the fact that sales of a substantial number of units changed after another product entered the market. *Tri-Tron*, 525 F.2d at 436-37 ("Although net profits are not shown, opinion evidence was offered and received on the sales and the cost of sales by appellee with a projection of an assumed increase in gross profits over a period of five years."). For example, in *Hunt Foods, Inc. v. Phillips*, 248 F.2d 23, 34 (9th Cir. 1957), the Ninth Circuit held "that under the facts of the instant case, there was operating experience sufficient to permit a reasonable estimate of probable income and expense, and the trial court was justified in awarding

-110-

damages for loss of prospective profits." The *Hunt* evidence of lost profits was based on the operating experience of the business, amount of sales over time, and testimony regarding gross profit, overhead expenses, and relevant income tax return information. *Id.*

Defendants are correct that a party opposing a motion for summary judgment's "promises to provide data and admissible evidence at trial do not relieve [it] . . . from presenting admissible, competent proof of damages to meet its burden on summary judgment." *Lumens*, 2018 WL 1942768 at *6, n.7. Here, however, the Court finds Plaintiff has provided sufficient evidence in its complaint and exhibits opposing summary judgment to create an issue of fact as to damages.

First, Exhibit 8 to Plaintiff's Opposition, ECF No. 92-3 at 2-3, appears to show at least some damages causally connected Defendants' complaints to Amazon. As an example, the sales for portions of February 2018 and April 2018 indicate that after Defendants complained and Amazon removed the products, Plaintiff's sales dropped:

| Date: | Date of Complaints to Amazon: | Date of Reinstatement: | Sales: |
|---|---|---|---|
| **February 2018:** | | | |
| February 10, 2018 | X | | $1,363.05 |
| February 11, 2018 | | | $0.00 |
| February 12, 2018 | | X | $1,083.45 |
| February 13, 2018 | | | $978.60 |
| February 14, 2018 | X | | $0.00 |
| February 15, 2018 | | | $0.00 |
| February 16, 2018 | | X | $978.60 |
| February 17, 2018 | | | $1,398.00 |
| February 18, 2018 | | | $1,398.00 |
| February 19, 2018 | | | $1,258.20 |
| February 20, 2018 | | | $1,852.35 |
| February 21, 2018 | | | $1,013.55 |
| February 22, 2018 | | | $1,398.00 |
| February 23, 2018 | | | $1,398.00 |
| February 24, 2018 | | | $908.70 |
| February 25, 2018 | | | $2,097.00 |
| February 26, 2018 | | | $1,782.45 |
| February 27, 2018 | | | $1,153.35 |

| February 28, 2018 | | | $1,118.40 |
|---|---|---|---|
| **April 2018:** | | | |
| April 1, 2018 | | | $978.60 |
| April 2, 2018 | | | $1,048.50 |
| April 3, 2018 | | | $943.65 |
| April 4, 2018 | | | $1,293.15 |
| April 5, 2018 | XX | | $34.95 |
| April 6, 2018 | | | $768.90 |
| April 7, 2018 | | | $629.10 |
| April 8, 2018 | | | $928.60 |
| April 9, 2018 | | | $629.10 |
| April 10, 2018 | | | $768.90 |
| April 11, 2018 | | | $768.90 |
| April 12, 2018 | | | $629.10 |
| April 13, 2018 | | | $104.85 |
| April 14, 2018 | | | $509.25 |
| April 15, 2018 | | X | $577.15 |
| April 16, 2018 | XX | X | $169.75 |
| April 17, 2018 | | | $577.15 |
| April 18, 2018 | | | $780.83 |
| April 19, 2018 | | X | $679.00 |
| April 20, 2018 | | | $441.35 |
| April 21, 2018 | | | $1,459.85 |
| April 22, 2018 | | | $1,765.40 |
| April 23, 2018 | | | $1,493.80 |
| April 24, 2018 | X | | $441.39 |

*See* ECF No. 92-3 at 2-7.  Plaintiff claims a "total minimum loss due to abuse on Amazon" of $410,815.30.  *Id.*  Second, Exhibit D to the Complaint also shows Plaintiff's losses due to Defendants' complaints:



-112-

Compl. at 49.  This graph creates a clear depiction of, at a minimum, a correlation between Defendants' complaints and a decrease in the sale of Plaintiff's products.  Third, Exhibit 9, ECF No. 92-4 at 2, and Exhibit 10, ECF No. 92-5 at 1-2, show Plaintiff's (1) bag sales, (2) purchases, (3) cost of sales, (4) gross profit, (5) operating income/loss, (6) net income / loss before tax, (7) net income, and (8) gross profits.  "It is . . . clear that in arriving at the amount of such damages in a situation involving loss of profits, net profits are to be considered and not gross anticipated profits."  *Hunt*, 248 F.2d at 33.  Here, Plaintiff has provided net profits, including the information used to calculate net profits.

While Plaintiff will need to provide further calculations and breakdowns at trial, Plaintiff has provided enough information to stave off of summary judgment.  Having concluded a genuine issue of fact exists as to whether (1) Plaintiff's tort claims are barred by the litigation privilege; (2) Plaintiff's claims are preempted by federal patent law; and (3) Plaintiff's damages such that are no grounds to dismiss Plaintiff's tort claims on these bases, the Court analyzes Defendant's final argument for granting summary judgment.

### 4.  *A Genuine Issue of Fact Exists as to Plaintiff's Ability to Prove Misrepresentations, which is Required for its Tort Claims.*

Defendants argue that "Plaintiff cannot prove at least one element of each of its business tort claims for individual reasons for one simple fact: Defendants' complaints to Amazon were not 'misrepresentations' or 'objectively baseless' assertions of patent infringement."  Def. Mot. at 9:10-17.  Plaintiff refutes this assertion, conclusorily arguing it has provided the Court with enough evidence to create a triable issue of fact as to all five of its tort claims.  Pltff. Oppo. at 22-25.  As outlined below, the Court concludes that in opposing Defendants' motion, Plaintiff has shown that a genuine issue of fact exists as to one or more elements of Plaintiff's claims for intentional interference with prospective economic relations and negligent misrepresentations.  However, with respect to the remaining claims for unfair competition under the Lanham Act, unfair competition under California's UCL, and common law unfair competition under California law, Defendants have shown that Plaintiff's evidence fails to create a genuine issue of fact.  Thus, the Court grants judgment in Defendants' favor as to those claims and dismisses them *with prejudice*.

a.   *Intentional Interference with Prospective Economic Relations*

Defendants argue that "[t]here is nothing 'wrongful' about a party reporting infringement to another party in a position to stop it," and as such, Plaintiff cannot establish the third element of this claim, such that no genuine issue of fact exists, warranting the Court granting summary judgment. Def. Mot. at 26:19-21. Plaintiff responds by summarily arguing "Defendants' serial complaints represent a pattern" that when considered as a whole, show "Defendant's [sic] sole purpose was to cause economic harm to Plaintiff and to suppress competition." Pltff. Oppo. at 22:9-23:1. Plaintiff cites only one case addressing the purpose of the independently wrongful requirement but does not cite any cases where a court determined a patentee's statement to a third party that the opposing party infringed on the patentee's rights qualifies as independently wrongful conduct. *See generally id.*

Under California law, a plaintiff alleging a claim for relief for the tort of intentional interference with prospective economic relations or advantage must prove "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [wrongful] acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (applying California law). "[I]nterference with prospective economic advantage requires a plaintiff to allege an act that is wrongful independent of the interference itself." *CRST Van Expedited, Inc. v. Werner Enters., Inc.* 479 F.3d 1099, 1108 (9th Cir. 2007). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Upper Deck Co. v. Panini Am., Inc.*, 469 F. Supp. 3d 963, 983 (S.D. Cal. 2020).

In a case relied upon by Defendants, *Tommy Bahama Grp., Inc. v. Sexton*, the Northern District of California granted the plaintiff's motion for summary judgment on the defendant's counterclaims, including for intentional interference with prospective

-114-

economic advantage. No. C07-06360 EDL, 2009 WL 4673863, at *1, 14 (N.D. Cal. Dec. 3, 2009), *aff'd*, 476 F. App'x 122 (9th Cir. 2012). The court held that the defendant's counterclaim for defamation was based on the plaintiff's alleged report to eBay that the defendant was selling counterfeit goods. *Id.* at 14. However, the court determined that "the undisputed evidence" showed that the plaintiff had told eBay, when making the reports, that it "had a 'good faith belief' that each of the listings was a 'potential trademark infringement.'" *Id.* The court determined that "[s]uch qualified language is not a 'provably false' statement of fact; it is a statement of opinion that is not actionable as defamation, even if ultimately proven false." *Id.* The court used this finding on the defamation counterclaim to likewise conclude that "there is no evidence of any independent wrongful conduct because, as discussed above, Mr. Sexton's defamation claim (the only predicate wrongful act he has alleged) fails as a matter of law." *Id.*

Similarly, in *Salon Supply Store, LLC v. Creative Nail Design, Inc.*, the court denied the plaintiff's motion to dismiss claims for intentional interference where the plaintiff, like Plaintiff here, filed a lawsuit seeking a declaration of non-infringement as well as alleging claims for intentional interference and unfair competition. No. 14-CV-01083-BAS(RBB), 2015 WL 11438492, at *1, *8 (S.D. Cal. June 19, 2015). In that case, the defendant filed claims with eBay to report infringement violations by the plaintiff resulting in the removal of four of the plaintiff's listing from the online marketplace. *Id.* at *3. Although *Salon Supply* proceeded on a different procedural posture (e.g., a motion to dismiss rather than a motion for summary judgment), its analysis proves insightful. The *Salon Supply* court noted that it had already concluded that the plaintiff had sufficiently alleged a violation of California's unfair competition law, and "[t]he requirement of an independently wrongful act may be satisfied by an alleged violation of the UCL." *Id.* at *7. The court discussed two out of state cases cited by the defendant, which held "that 'contacting a third party over legitimate business concerns such as . . . infringement cannot form the basis of a tortious interference claim." *Id.* at *7; *see also Lown Companies, LLC v. Piggy Paint, LLC*, No. 1:11-CV-911, 2012 WL 3277188, at *4 (W.D. Mich. Aug. 9, 2012) (noting that other cases

had held that "where a party's actions are motivated by a legitimate business purpose, its actions do not constitute improper motive or interference."); *Dudnikov v. MGA Entm't*, 410 F. Supp. 2d 1010, 1018-20 (D. Colo. 2005) (granting summary judgment in favor of the defendant on the plaintiff's claim for tortious interference based on the defendant's assertion of intellectual property rights leading to the termination of an online eBay auction because the defendant was well within its rights when it submitted a notice of claimed infringement; thus, the notice "could not, as a matter of law, be improper interference"). However, the *Salon Supply* court noted that "[w]hile California courts have similarly recognized that interference is not wrongful when a party is in pursuit of legitimate commercial interests," California has also held that "pleading that a defendant has engaged in an act that was independently wrongful i.e., unlawful distinguishes competitive behavior from tortious interference and sensibly redresses the balance by providing a remedy for predatory economic behavior and keeping legitimate business competition outside litigative bounds." *Id.* at *7 (internal quotations omitted). Thus, under California law, a plaintiff can defeat a defendant's claim of justification by proving the defendant's conduct is unlawful. *Id.* As a result, in *Salon Supply*, if the plaintiff established the defendant violated the UCL, the claim of competition privilege would be defeated. *Id.* However, the court decided it could not make that determination at the pleading stage, and as such, denied the motion to dismiss the intentional interference claims by concluding the plaintiff had "sufficiently alleged independently wrongful conduct" to survive a motion to dismiss. *Id.*

In the present case, the record indicates there appears to be no genuine issue of material fact—or at least Defendants do not appear to dispute these factors for purposes of this motion—that (1) Plaintiff and Amazon had an economic relationship with the probability of future economic benefit to Plaintiff; (2) Defendant knew of that relationship; (3) Defendant undertook acts designed to disrupt the relation (e.g., making complaints to Amazon); and (4) Defendant actually disrupted the relationship (e.g., as a result of Plaintiff's products being removed from Amazon). Thus, it appears the only issues in dispute are whether (1) Defendants' acts were wrongful beyond the fact of the interference

itself and (2) Plaintiff was damaged.  The Court already concluded that Plaintiff has shown a genuine issue of fact exists as to whether Plaintiff was damaged, leaving only the wrongful act factor.  Here, as in *Salon Supply*, Plaintiff has not proven Defendants' claim of privilege by showing that Defendants' conduct was unlawful.  Instead, because Trolley Bags owned the 828 Patent when it reported Plaintiff's allegedly infringing products, and patents are presumed valid, the Court finds that a genuine issue of fact exists as to whether Defendants' reports to Amazon were made in good faith.  *See, e.g.*, Deposition of Joby Cronkshaw, ECF No. 92 at 6, Transcript at 152:12-15 (responding "Because we believe it does" when Plaintiff's counsel asked Mr. Cronkshaw "Why did Trolley Bags repeatedly complain to Amazon about the Lotus Trolley Bags allegedly infringing its 828 patent?").  Thus, summary judgment on this issue is not warranted.

b. *Negligent Misrepresentation*

Defendants argue they are entitled to summary judgment on this claim for relief because there is no genuine issue of material fact as to the first two elements: Plaintiffs cannot prove Defendants (1) made a misrepresentation (2) without reasonable grounds for believing it to be true.  Def. Mot. at 27:6-20.  Plaintiff responds that "Defendants' alleged good faith belief that the Lotus Bags infringe the '828 Patent was nonexistent" because Trolley Bags' corporate representative testified that he knew that none of the complaints were successful.  Pltff. Oppo. at 23:2-14 (citing Deposition of Joby Cronkshaw, ECF No. 92 at 7, Transcript at 153:3-9 (testifying that Amazon "removed it [the products] for various periods of time," but at every stage, "it has been put back on" when asked whether "each time it was removed, Amazon relisted the Lotus Trolley Bag on Amazon"); *see also id.* at 7, Transcript p. 153:10-16 (answering "No" when asked "Are you aware of any instances where the Lotus Trolley Bags was removed from Amazon due to a complaint from Trolley Bags UK where the Lotus Trolley Bag was permanently removed from Amazon?").  Plaintiff argues this creates a genuine issue of fact sufficient to allow the claim to proceed.

"To allege a claim for negligent misrepresentation, a plaintiff must plead: '(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for

-117-

believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage.'" *Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141, 1151 (S.D. Cal. 2014); *see also Flaxel v. Johnson*, 541 F. Supp. 2d 1127, 1146 (S.D. Cal. 2008). "Moreover, under California law, '[t]he existence of a duty of care is necessary to support a negligent misrepresentation claim.'" *Celebrity Chefs*, 16 F. Supp. 3d at 1151. "The law is quite clear that expressions of opinion are not generally treated as representations of fact, and thus are not grounds for a misrepresentation cause of action." *Mueller v. San Diego Entm't Partners, LLC*, 260 F. Supp. 3d 1283, 1296-97 (S.D. Cal. 2017) (Curiel, J.). "Fraudulent representations, to constitute ground for relief, must be as to existing and material facts; predictions of future events are ordinarily considered nonactionable expressions of opinion." *C.f. Mueller*, 260 F. Supp. 3d at 1296.

In the present case, only the first and second factors remain at issue. However, the Court determines, as it did with the previous claim, that in light of the presumed validity of the patent and testimony indicating that Defendants' representative's testimony that he believed Plaintiff's products infringed, a genuine issue of fact exists as to whether Defendants' reports to Amazon were made without reasonable grounds for believing it to be true. Further, the Court notes that although this order declares the 828 Patent invalid, thereby resulting in Defendants' statements proving to be false, negligent misrepresentation is analyzed at the time the statements were made. *Mueller*, 260 F. Supp. 3d at 1296. At the time Defendants made the statements, there was no adjudication that the 828 Patent was invalid, and thus, a genuine issue of fact exists as to whether Defendants had reasonable grounds for believe their statements were true.

c.   *Unfair Competition (15 U.S.C. § 1125)*

Defendants argue that "Plaintiff cannot show that Defendants used a false or misleading statement of fact in reporting Plaintiff's infringement to Amazon" because they predicate their claims on the fact that Defendants reported the alleged infringement without citing to any specific false or misleading statement. Def. Mot. at 28:12-29:1. Plaintiff

responds "Defendants' false representations [to Amazon] and exaggerations about the scope and validity of the '828 Patent creates the false impression about Defendants' own product as the exclusive source of the product." Pltff. Oppo. at 23:16-18.  Plaintiff further contends that "Defendants' alleged good faith belief that the Lotus Bags" infringed "was nonexistent," and as such, the unfair competition claims under 15 U.S.C. § 1125 must proceed to trial. *Id.* at 24:2-8 (citing *Rodriguez v. Panayiotou*, 314 F.3d 979, 985 (9th Cir. 2002) (noting that the Supreme Court has "made clear that a false assertion of fact could be libelous even though couched in terms of opinion.").

To prevail on a claim for unfair competition under the Lanham Act, 15 U.S.C. § 1125, a plaintiff must prove five elements:

> The elements of a Lanham Act § 43(a): false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  Thus, loosely stated, Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), provides that any party who, "in connection with any goods," uses a false or misleading representation of fact in commerce which misrepresents the nature of another person's goods will be liable.  *Southland*, 108 F.3d at 1139.  "This portion of § 43(a) provides the basis for what are generally known as 'false advertising,' 'trade libel,' and 'product disparagement' claims." *Zenith*, 182 F.3d at 1346-48.  "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod*, 108 F.3d at 1139.

"Under the Lanham Act, a statement may be misleading if it is 'literally true, yet

-119-

deceptive.'"  *Fisher Tooling Co. v. Gillet Outilliage*, No. CV 04-7550 ABC MCX, 2006 WL 5895307, at *6 (C.D. Cal. June 6, 2006) (holding that the plaintiff failed to identify a false or misleading statement where the letters at issue never stated as fact that the plaintiff's product infringed the defendant's patent but rather relayed only a strong opinion that the product infringed; even though that "'strong opinion' was ultimately incorrect, that opinion nevertheless does not qualify as a false statement").  "Opinions, on the other hand, do not qualify as false statements and are, therefore, not actionable." *Fisher*, * 6. *Id.*

"Absent a showing of bad faith, a patent holder is entitled to enforce its patent and even threaten litigation against alleged infringers."  *Fisher*, 2006 WL 5895307 at * 7-9.  "Indeed, a patentee, acting in good faith on its belief as to the nature and scope of its rights, is fully permitted to press those rights even though it may misconceive what those rights are." *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 897 (9th Cir. 1998).  Further, the presumption that a patent holder acts in good faith when asserting rights under a duly granted patent bars a Lanham Act claim as well "unless the complaining party presents affirmative evidence of bad faith on the part of the patent holder." *C.R. Bard. Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1369 (Fed. Cir. 1998).  However, "mere allegations that the patent holder has acted in bad faith will not overcome this presumption." *Fisher*, 2006 WL 5895307 at *7.  As a result, if a patent holder asserts rights in an invalid patent believing in the patent's validity, that patent holder has not acted in bad faith.  *Golan,* 310 F.3d at 1360 (finding there was not bad faith where the patent holder brought an infringement suit relying on an attorney's assurances that patent had not yet expired when, in fact, the patent had already expired).

Defendants argue that Plaintiff premises its "false or misleading statement) on Defendants' acts of reporting Plaintiff's believed infringement to Amazon.  Def. Mot. at 28:12-13.  Defendants argue that such reports, where based on a good faith belief or opinion that the other party is infringing, cannot serve as the basis for an unfair competition claim under the Lanham Act.  *Id.* at 28:16-29:1.  Thus, Defendants contend that because Plaintiff has no evidence of a false or misleading statement of fact, the Court must grant summary

-120-

judgment in favor of Defendants. *Id.*   The Court agrees with Defendants. Defendants correctly note that their designated representative under Rule 30(b)(6), Mr. Dehmoubed, was asked a number of times to state the basis for his claims against Defendants and gave evasive, unresponsive answers. ECF No. 80-8 at 45-46, Dep. Transcript at 173:20-176:7. The Court also agrees with Defendants that Plaintiff has failed to come forward with evidence of a false or misleading fact made in an advertisement about Plaintiff's product sufficient to create liability under the Lanham Act. As such, the Court grants Defendants' motion for summary judgment with respect to the Lanham Act claim. *See Fisher*, 2006 WL 5895307, at *6 (granting summary judgment on a common law unfair competition claim where even though the strong opinion contained in letters sent to third parties asserting that the patent was valid proved incorrect, the opinion still did not qualify as a false statement for purpose of the common law unfair competition claim).

### d.   *Unfair Competition (Cal. Bus. & Prof. Code, § 17200)*

Defendants argue that the Court should grant summary judgment as to Plaintiff's claims under California's unfair competition law because (1) there is an absence of evidence to create a genuine issue of fact as to whether Defendants' complaints to Amazon were unfair or unlawful; (2) Plaintiff lacks standing to pursue its claim under the fraudulent prong because there is no allegation that Plaintiff relied on any statement Defendants made; and (3) "Plaintiff has no evidence of any 'restitution' to which it could claim entitlement." Def. Mot. at 29:3-32:4. Plaintiff responds that its claims under California's UCL law must proceed to trial because "Defendants' acts . . . fall squarely within the unfair prong because Plaintiff is a 'direct competitor' of defendants, and Plaintiff has alleged and shown that Defendants['] acts have 'significantly threatened or harmed competition." Pltff. Oppo. at 24:11-25:2 (citing *Dror v. Kenu, Inc.*, 2019 WL 568420, *14 (N.D. Cal. Nov. 1, 2019)).

California Business and Professions Code, section 17200 *et seq.*, commonly known as the California UCL, prohibits business acts or practices that are (1) fraudulent, (2) unlawful, or (3) unfair. *Davenport v. Litton Loan Servicing, LP*, 725 F. Supp. 2d 862, 878 (N.D. Cal. 2010); *see also Sybersound,* 517 F.3d at 1151. Statutory liability can be

premised on antitrust or trademark violations. *See Sybersound*, 517 F.3d. at 1152 (antitrust); *Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir.1994) (trademark). Each prong of the UCL constitutes a separate and distinct theory of liability. *Kearns v. Ford Motor Co.*, 567 F. 3d 1120, 1127 (9th Cir. 2009). A plaintiff only has standing to challenge a business practice under the UCL if he or she has (1) "suffered injury in fact" and (2) "has lost money or property as a result of" the unfair competition he or she challenges. BUS. & PROF. CODE, § 17204; *Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227 (2006). Further, the remedies for UCL violations are limited to injunctive relief and restitution—a plaintiff may not recover monetary damages. *Chambers v. Whirlpool Corp.*, No. 16-56666, -- F.3d --, 2020 WL 6578223, at *7 (9th Cir. Nov. 10, 2020).

In this case, Plaintiff's opposition only addresses the prong of unfairness, *see generally* Pltff. Mot. at 24:9-27 (arguing that Defendants' conduct falls squarely within the unfair prong), and as such, the Court construes Plaintiff as having waived any argument that Defendants' actions fall under the unlawful or fraudulent prongs, *see Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1491, n. 1 (2019). The "unfair" prong of the UCL applies when the practice or conduct at issue allegedly violates "the policy or spirit of [anti-trust] laws because its effects are comparable to a violation of the law, or that otherwise significantly threatens or harms competition." *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018) (citing *Cel-Tech Commc'ns, Inc., v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999)); *see also Loomis v. Slendertone Distribution, Inc.*, 420 F. Supp. 3d 1046, 1077 (S.D. Cal. 2019). However, "a [business] practice that is neither in violation of the antitrust laws nor deceptive [can] nonetheless [be] unfair" if it is "immoral, unethical, oppressive, or unscrupulous." *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n. 5 (1972); *c.f. Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1123, 1140 (S.D. Cal. 2014) (holding that the plaintiffs did not allege unfair practices within the meaning of the UCL where they failed "to allege acts that more narrowly violate the spirit of the antitrust laws, such as horizontal price fixing, exclusive dealing, or monopolization."). Further, "any finding of unfairness to competitors under section 17200 [must] be *tethered* to some

-122-

1  legislatively declared policy or proof of some actual or threatened impact on competition."
2  *Cel-Tech*, 20 Cal. 4th at 187.

3      "To have standing to assert a Section 17200 claim, the plaintiff must '(1) establish a
4  loss or deprivation of money or property sufficient to qualify as injury in fact,
5  i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused*
6  *by*, the unfair business practice or false advertising that is the gravamen of the claim.'"  *In*
7  *re Turner*, 859 F.3d 1145, 1151 (9th Cir. 2017); *see also Moore v. Mars Petcare US, Inc.*,
8  966 F.3d 1007, 1020 (9th Cir. 2020).  "A plaintiff fails to satisfy this causation requirement
9  if he or she would have suffered 'the same harm whether or not a defendant complied with
10  the law.'"  *Turner*, 859 F.3d at 1151.

11      The "unfair" business practice must be "tethered" to a constitutional provision,
12  statute, or regulation.  *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018); *Cel-Tech*,
13  20 Cal. 4th at 185.  "To determine whether something is sufficiently 'tethered' to a
14  legislative policy for the purposes of the unfair prong, California courts require a close
15  nexus between the challenged act and the legislative policy."  *Hodsdon*, 891 F.3d at 866.
16  Defendants argue that even if Plaintiff proved Defendants' complaints to Amazon were
17  unfair in some more generalized moral sense, the complaints "do not more narrowly violate
18  the letter or spirit of the antitrust laws because Plaintiff has no evidence of price fixing,
19  exclusive dealing, monopolization, or anything of the like."  Def. Mot. at 30:2-13 (citing
20  *Celebrity Chef*, 16 F. Supp. 3d at 1140; *Dror*, 2019 WL 568420 at *14).  Plaintiff fails to
21  provide evidence or argument as to any specific policy that Defendants' conduct violated.
22  In the absence of such evidence, Plaintiff failed to "tether" the conduct at issue, and there
23  is no genuine issue of fact as to this issue.  *Hodsdon*, 891 F.3d at 866; *see also Name.Space*,
24  795 F.3d at 1134 (affirming the district court's dismissal of a UCL claim where the court
25  dismissed on the basis that the plaintiff had failed to state an antitrust violation, trademark
26  claim, or other unlawful act); *Arizona Cartridge Remanufacturers Ass'n, Inc. v. Lexmark*
27  *Int'l, Inc.*, 421 F.3d 981, 988 (9th Cir. 2005) (holding that the plaintiff failed to raise a
28  triable issue of fact that the defendant's advertising statements as to its prebate program

-123-

were false, misled, tended to deceive consumers, or constituted unfair competition).

Finally, as stated, plaintiffs alleging claims for UCL may only recover injunctive relief or restitution, not damages. *Chambers*, 2020 WL 6578223, at *7. "Restitution is the 'return [of] money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person.'" *Loomis*, 420 F. Supp. 3d at 1077. Defendants argue that by only producing evidence of Plaintiff's lost sales based on a 30-day average calculation by Mr. Dehmoubed, Plaintiff has failed to produce evidence of restitution because the lost sales evidence essentially seeks damages rather than "the return of money in which it has an identifiable interest." Def. Mot. at 31:17-23. Where a plaintiff pursuing a UCL claim essentially seeks damages rather than the return of money in which the plaintiff has an identifiable interest, allowing the plaintiff to recover such relief under the UCL would convert the UCL to "an all-purpose substitute for a tort . . . action, something the Legislature never intended." *See, e.g.*, *Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1082 (C.D. Cal. 2003), *on reconsideration in part* (June 5, 2003) (finding the plaintiffs had failed to raise a genuine issue of material fact as to whether they had a vested interest in the money they sought to recover from the defendant warranting the summary judgment on the issue of damages under the UCL).

Here, Plaintiff has failed to present evidence of unfair conduct or an identifiable interest in money possessed by Defendants. As such, Plaintiff failed to raise a genuine issue of fact as to the necessary elements for its UCL claims, and the Court grants Defendants' motion for summary judgment as to Plaintiff's UCL claim.

e. *Common Law Unfair Competition*

Defendants argue that the Court should grant summary judgment on the unfair competition claim because such a claim is premised on the accused party passing off one's goods as those of another, and "Plaintiff has no evidence that Defendants were 'passing off' their goods as the goods of Plaintiff." Def. Mot. at 32:6-22. Plaintiff responds that its common law tort claim for unfair competition must proceed to trial because common law

-124-

unfair competition prohibits unfair or deceptive acts, and Defendants' acts were unfair. Pltff. Oppo. at 25:3-12.

"The common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another." *Sybersound*, 517 F.3d at 1153. Where a plaintiff claiming common law unfair competition fails to show that the defendants "passed off their goods as those of another" or exploited trade names or trade marks, the plaintiff "has not stated a common law unfair competition claim." *Id.* For instance, in *Southland Sod*, the Ninth Circuit agreed that the plaintiffs' allegations did "not amount to 'passing off' or its equivalent," and the plaintiffs' claim for unfair competition was properly dismissed. 108 F.3d at 1146-47.

Like the *Southland* court, the Court agrees that not only does Plaintiff fail to allege Defendants passed off their products as Plaintiff's products, but there is also no evidence in the record that this occurred. As such, given the absence of a genuine issue of fact as to the crux of a common law unfair competition claim, the Court grants summary judgment and dismisses the common law unfair competition claim.

## V.   **CONCLUSION**

For the above reasons, the Court rules on the motions as follows:

1.      Plaintiff's Motion for Summary Judgment is **GRANTED** as follows:

   a.      The Court concludes that the 828 Patent is invalid.

   b.      Even if the 828 Patent was valid, Plaintiff did not infringe on the 828 Patent because the 828 Patent design and Plaintiff's 912 Patent design (as well as the product itself) are dissimilar in light of prior art.

   c.      Plaintiff has not infringed on Defendant's common law trademark.

   d.      Plaintiff did not specify to which specific counterclaims its motion was directed, as is required by Rule 56(a) of the Federal Rules of Civil Procedure. Nonetheless, the Court determines that Plaintiff is the prevailing party with respect to (1) Plaintiff's First Claim for Relief for declaratory judgment of non-infringement of the 828 Patent and Defendants' related First Counterclaim for infringement of the 828 Patent as well as (2)

Plaintiff's Second Claim for Relief seeking a declaratory judgment of non-infringement of the Trademark and Defendants' related Second Counterclaim, for common law trademark infringement.[24]

        e.      Defendants' third counterclaim for declaratory judgment of invalidity of the 912 Patent, fourth counterclaim for interference with prospective contractual relations, fifth counterclaim for negligent misrepresentation, sixth counterclaim for unfair competition pursuant to 15 U.S.C. § 1125, and seventh counterclaim for unfair competition pursuant to the common law and California's UCL remain as those counterclaims for relief were not addressed by Plaintiff's Motion.

        2.      Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** as follows:

        a.      A genuine issue of fact exists as to whether Plaintiff's tort-based claims for relief are protected by California's litigation privilege.

        b.      Plaintiff's tort-based claims for relief are not protected by the *Noerr-Pennington* Doctrine.

        c.      A genuine issue of fact exists as to whether Defendants' complaints to Amazon were made in bad faith, and thus, whether Plaintiff's claims are preempted by federal patent law.

        d.      Defendants' have not proven the absence of a genuine issue of fact as to damages for Plaintiff's claims.

        e.      A genuine issue of fact exists as to one or more elements of Plaintiff's claims for intentional interference with prospective economic relations and negligent misrepresentations.  However, the Court finds that Defendants have shown that Plaintiff's evidence fails to create a genuine issue of fact with respect to Plaintiff's claims for common

---

[24] The only acts of common law unfair competition alleged by Defendants are trademark infringement, *see, e.g.*, First Amend. Ans. at 14, ¶ 36 (pleading that Plaintiff's acts constitute common law trademark infringement and unfair competition), and as such, if the claims for trademark infringement fail, so too must the claims for unfair competition.

law unfair competition under the Lanham Act, unfair competition under California's UCL, and common law unfair competition under California law.  As such, the Court grants summary judgment in favor of Defendants as to those three claims for relief and dismisses the claims *with prejudice*.

3.     Upon resolution of the cross-motions for summary judgment, Plaintiff's third claim for relief for interference with prospective of contractual economic relations against all Defendants and fourth claim for relief for negligent misrepresentation against all Defendants remain while the remaining claims from Defendants' counterclaims are the third claim for relief for declaratory judgment of invalidity of the 912 Patent; fourth claim for relief for interference with prospective contractual relations; fifth claim for relief for negligent misrepresentation; sixth claim for relief for unfair competition, 15 U.S.C. § 1125; and seventh claim for relief for unfair competition under the common law and Cal. Bus. & Prof. Code § 17200.

**IT IS SO ORDERED.**

DATED:     March 12, 2021

_____
**HON. ROGER T. BENITEZ**
United States District Judge

-127-